**Marc P. Berger**
**Sanjay Wadhwa**
**George N. Stepaniuk**
**Todd Brody**
**David C. Austin**
**Chevon Walker**
**Attorneys for Plaintiff**
**U.S. SECURITIES AND EXCHANGE COMMISSION**
New York Regional Office
200 Vesey Street, Suite 400
New York, NY 10281-1022
(212) 336-0080 (Brody)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,          **Plaintiff,**  -against-  STEVEN FISHOFF, DESHAN GOVENDER, WINSON TANG, FEATHERWOOD CAPITAL, INC., and JSF INVESTMENT CAPITAL INC.,          **Defendants.** | Civil No.  Jury Trial Demanded |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") alleges the following against defendants Steven Fishoff ("Fishoff"), Deshan Govender ("Govender"), Winson Tang ("Tang"), Featherwood Capital, Inc. ("Featherwood"), and JSF Investment Capital Inc. ("JSF") (collectively, "Defendants"):

## SUMMARY OF ALLEGATIONS

1. This case involves unlawful trading in one issuer's stock as part of a serial insider trading scheme perpetrated by a group of stock traders led by Fishoff. The overall scheme involved numerous stocks and generated over $5.5 million in total trading profits for Fishoff's group over the course of several years. Of those total profits, $1.5 million was generated by the illegal insider trading that is the subject of this action.

2. In December 2013 and January 2014, Fishoff used material non-public information obtained from a corporate executive at a large, publicly-traded pharmaceutical company, Sangamo BioSciences Inc. ("Sangamo"), to trade Sangamo securities and to tip others who traded Sangamo securities. As detailed below, Fishoff and other members of his group unlawfully traded in advance of a January 9, 2014 announcement of a lucrative licensing agreement between Sangamo and Biogen Idec Inc. ("Biogen"), another large pharmaceutical company. They learned the information from Govender, who held himself out as a portfolio manager for a trading entity controlled by Fishoff. Govender, in turn, had received the information from Tang, a high-level Sangamo executive and longtime friend of Govender.

3. Specifically, in December 2013, Tang tipped Govender about the confidential negotiations between Sangamo and Biogen, in violation of a duty of confidentiality that Tang owed to Sangamo. Govender then tipped Fishoff and two other members of Fishoff's group, Ronald Chernin ("Chernin") and Steven Costantin ("Costantin"). In turn, Fishoff tipped two other members of his group, Paul Petrello ("Petrello") and Joseph Spera ("Spera").

4. Using trading accounts held by entities they controlled, including defendants Featherwood and JSF, Fishoff and the others jointly made over $1.5 million by purchasing Sangamo stock and call options before the announcement, following which the market price of

Sangamo stock rose by over 38 percent. Fishoff, through a wholly-controlled entity, then wired over $222,000 to compensate Govender for his tips relating to Sangamo.

5. By virtue of the conduct alleged herein, each of the Defendants, directly or indirectly, singly or in concert, violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]. Unless the Defendants are permanently restrained and enjoined, they will again engage in the acts, practices, transactions, and courses of business set forth in this complaint and in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

6. The Commission brings this action pursuant to the authority conferred upon it by Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)], and seeks to restrain and permanently enjoin the Defendants from engaging in the acts, practices, transactions, and courses of business alleged herein. In addition, the Commission seeks a final judgment (a) ordering the Defendants to disgorge their ill-gotten gains, together with prejudgment interest thereon, including an order holding each of the Defendants jointly and severally liable for disgorgement of the ill-gotten gains obtained through the unlawful trading of Sangamo securities by Fishoff, Petrello, Chernin, Spera and the entities through which they conducted that trading; (b) ordering the Defendants to pay civil monetary penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1]; and (c) prohibiting Tang from acting as an officer or director of any issuer that has a class of securities registered pursuant to Exchange Act Section 12 [15 U.S.C. § 78l], or that is required to file reports pursuant to Exchange Act Section 15(d) [15 U.S.C. § 78o(d)].

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391 and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. A substantial part of the events constituting or giving rise to the alleged violations occurred in the Southern District of New York, including the receipt and dissemination of material non-public information on the basis of which the violative trading occurred; moreover, one of the three individual defendants, Govender, resides in the Southern District of New York, and resided and worked there during the relevant period.

9. In connection with the conduct alleged in this complaint, the Defendants, directly or indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange.

## THE DEFENDANTS

10. **Fishoff**, age 60, is president and sole owner of Featherwood, named after the street on which he resides in Westlake Village, California. Fishoff also has a residence in Palm Springs, California. Fishoff owns or controls a large number of other entities, including Featherwood, JSF and Cedar Lane Enterprises, Inc. ("Cedar Lane"), through which he engages, or directs others to engage, in securities and other financial transactions. In connection with the conduct described herein with respect to insider trading in stocks other than Sangamo, Fishoff recently pled guilty to criminal charges filed against him by the United States Attorney's Office for the District of New Jersey ("USAO-DNJ"). *United States v. Steven Fishoff*, 15-cr-586 (DNJ)(MAS). The Commission's civil action against Fishoff and his related entities, including Featherwood, with respect to such trading is currently pending before the United States District

4

Court for the District of New Jersey, captioned *SEC v. Steven Fishoff, et al.*, 15-cv-3725 (DNJ)(MAS-DEA) ("*SEC v. Fishoff I*").

11.     **Govender**, age 47, purported to be a health care investment consultant and portfolio manager for Cedar Lane from approximately October 2012 until at least 2015. Govender resides in New York, New York. Govender conducts business, including activities relevant hereto, through BKG Strategic Advisory, LLC ("BKG"), a New York limited liability company he organized in March 2012 and controls, and whose business address is Govender's home address.

12.     **Tang**, age 60, served as a Vice President of Clinical Research at Sangamo from January 2010 until June 2015. At Sangamo, Tang worked on the clinical development of gene and T-cell therapies for the treatment of HIV/AIDS and other diseases. Tang resides in San Francisco, California.

13.     **Featherwood** is a California corporation controlled by Fishoff and whose business address is Fishoff's home address. Featherwood is a defendant in *SEC v. Fishoff I*.

14.     **JSF** is a California corporation controlled by Fishoff and whose business address is Fishoff's home address.

## RELEVANT INDIVIDUALS AND ENTITIES

15.     **Sangamo** is a Delaware corporation headquartered in Richmond, California. At all relevant times, its common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NASDAQ under the symbol SGMO.

16.     **Biogen** is a Delaware corporation headquartered in Cambridge, Massachusetts. At all relevant times, its common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NASDAQ under the symbol BIIB.

17. **Petrello** is president and sole owner of Brielle Properties, Inc. ("Brielle") and other entities he used to trade securities. During the relevant period, he resided in Brielle, New Jersey, and Boca Raton, Florida, where he currently resides. During the relevant period, Petrello and Fishoff were close friends who took family vacations and celebrated holidays together. In connection with the conduct described herein with respect to insider trading in stocks other than Sangamo, Petrello pled guilty to criminal charges filed against him by the USAO-DNJ. *United States v. Petrello*, 16-cr-69 (DNJ)(MAS). Petrello subsequently consented to the entry of a partial final consent judgment against him and his related entities, including Brielle, in *SEC v. Fishoff I*, in which Petrello and those entities were charged by the Commission with insider trading in Sangamo and numerous other stocks

18. **Brielle** is a Florida corporation with a business address in Boca Raton, Florida. During the relevant period, Petrello controlled Brielle. Petrello is the authorized trader on the Brielle account.

19. **Chernin** is a disbarred California attorney resides in Oak Park, California, a few miles from Fishoff's home. During the relevant period, he was a close friend and business associate of Fishoff. Chernin is listed in corporate documents as president of Cedar Lane and as an officer of other entities that he and Fishoff used to trade securities and for other purposes. In connection with the conduct described herein with respect to insider trading in stocks other than Sangamo, Chernin pled guilty to criminal charges filed against him by the USAO-DNJ. *United States v. Chernin,* 16-cr-157 (DNJ)(MAS). Chernin subsequently consented to the entry of a partial final consent judgment against him and his related entities in *SEC v. Fishoff I*, in which Chernin and those entities were charged by the Commission with insider trading in Sangamo and numerous other stocks.

20.     **Costantin** resides in Farmingdale, New Jersey and is Fishoff's brother-in-law. Costantin's sister is married to Fishoff.  Costantin is also a friend and business associate of Chernin.  Costantin is listed in corporate documents as an officer of Cedar Lane and at least one other entity that he and Fishoff used to trade securities and for other purposes.  In connection with the conduct described herein with respect to insider trading in stocks other than Sangamo, Costantin pled guilty to criminal charges filed against him by the USAO-DNJ. *United States v. Costantin*, 16-cr-158 (DNJ)(MAS).  Costantin subsequently consented to the entry of a partial final consent judgment against him and his related entities, including Cedar Lane, in *SEC v. Fishoff I*, in which Costantin and those entities were charged by the Commission with insider trading in Sangamo and numerous other stocks.

21.     **Cedar Lane** is a New York corporation that was formed in February 2012, and whose business address is Chernin's home address.  Corporate documents list Chernin as president and Costantin as vice president and secretary of Cedar Lane and also list them as its co-owners, although Fishoff controlled Cedar Lane.  Cedar Lane is a defendant in *SEC v. Fishoff I*.

22.     **Spera** is the sole owner of Joleine, Inc. ("Joleine") a New Jersey corporation he controls and used as a trading vehicle during the relevant period.  Spera resides in Boca Raton, Florida.  Spera and Petrello are childhood friends.  In connection with the conduct described herein with respect to insider trading in stocks other than Sangamo, Spera pled guilty to criminal charges filed against him by the USAO-DNJ.  *United States v. Spera*, 17-cr-526 (DNJ)(MAS). The Commission also charged Spera and Joleine with insider trading in Sangamo and numerous other stocks in a civil action filed in the United States District Court for the District of New Jersey, captioned *SEC v. Joseph Spera, et al.*, 17-cv-12875 (DNJ)(MAS-DEA).  Spera has consented to the entry of a partial final consent judgment against him and Joleine in that action.

23.     **Joleine** is a New Jersey corporation controlled by Spera and whose business address is Spera's home address.

## THE DEFENDANTS' INSIDER TRADING SCHEME

### Background to Fishoff's Scheme and Govender's Role

24.     As detailed in the Commission's complaint in *SEC v. Fishoff I*, Fishoff's scheme initially focused on the systematic misappropriation of material non-public information from investment banks confidentially marketing secondary stock offerings by publicly traded issuers. Fishoff, Petrello, Chernin, Costantin and Spera together made over $4 million by obtaining advance knowledge of such offerings from bankers and then selling short the issuers' stock before the offerings were publicly announced.

25.     The short-selling component of Fishoff's scheme followed the same general pattern in each instance. Using Featherwood as his principal trading vehicle, and also other entities identified above, Fishoff sold short the issuers' stock in advance of offerings in which Fishoff or one of the others involved in his scheme was brought "over the wall" by the investment bank marketing the offering -- *i.e.*, provided with confidential information about the offering solely on the condition that they not trade the issuer's securities or disclose the confidential information to anyone else before the offering was publicly announced. As contemplated by their scheme, Fishoff, Chernin and Costantin knowingly breached the "wall crossing" agreements, and effectively stole the information from the banks and the issuers, by selling the stocks short before the offerings were announced and/or tipping others about the offerings in violation of the conditions to which they had agreed. In virtually every instance, Fishoff then tipped Petrello, and Petrello then shorted those stocks, and either Fishoff or Petrello also then tipped Spera, who then also shorted those stocks.

26. In some instances, Fishoff, Chernin, and Costantin obtained the confidential offering information from Govender, who was brought over the wall on certain pharmaceutical stock offerings starting in or about October 2012, when Govender was recruited into Fishoff's group. Fishoff recruited Govender because Govender held himself out as having expertise in pharmaceutical stocks and, more importantly, as having contacts in the pharmaceutical industry. Fishoff retained Govender for the purpose of obtaining market sensitive confidential information through such contacts for use in trading, including inside information unlawfully obtained from issuers. Fishoff understood that he needed to compensate Govender for any profitable trading that resulted from Govender obtaining such confidential information.

**Insider Trading in Advance of the Sangamo-Biogen Announcement**

27. Fishoff, Petrello, Chernin, and Spera unlawfully, and using the same deceptive trading structures and tiered lines of communication, traded Sangamo securities on the basis of material non-public information that Govender obtained from Tang and passed on to the others. This information related to a potential business combination between Sangamo and Biogen, two large pharmaceutical companies.

**Tang's Relationship with Govender**

28. Tang and Govender first met in or about the early 2000s when Tang was the head of health care investments for a private equity firm. He and Govender had been close friends and business associates for approximately ten or more years at the time of the events at issue. The two maintained a close personal friendship and professional relationship throughout the relevant period. For example, Tang received payments from Govender during the course of their relationship for assisting Govender with scientific analysis. On a separate occasion, Tang provided a recommendation letter for Govender when the latter applied for a fellowship in 2010.

Prior to and during 2014, Tang and Govender also collaborated on a joint business venture, seeking to license technologies from a cancer research center in order to fund and develop new cancer treatments. During the relevant period, the two spoke frequently by cell phone and exchanged personal emails.

29. During the relevant period, Govender held himself out as a portfolio manager for Cedar Lane, and he operated under the direction of Fishoff, Chernin, and Costantin since at least October 2012. Tang was aware that Govender's business-related activities included seeking non-public information about companies and passing such information on to persons who traded on the basis of such information. Tang was also aware that Govender was paid by those to whom Govender provided information.

30. Tang provided Govender with confidential information about Sangamo on multiple occasions, including on at least one occasion prior to tipping Govender about the Sangamo-Biogen transaction. In September 2013, Tang conveyed material non-public information to Govender about a planned secondary stock offering by Sangamo, which led to short sales by Cedar Lane and Brielle in advance of the announcement of the offering.

### Tang Had a Duty Not to Disclose Sangamo's Material Non-Public Information

31. At all relevant times, Tang was the Vice President of Clinical Research at Sangamo. As a corporate officer and employee of Sangamo, Tang owed a duty to Sangamo's shareholders to safeguard material non-public information that belonged to the company. Sangamo's insider trading policy and other corporate policies governing confidentiality, which Tang agreed in writing to follow, prohibited a person with inside information from directly or indirectly communicating that information to another person

without authorization. This included confidential information about the negotiations with Biogen.

### Tang Learned Material Non-Public Information About the Sangamo-Biogen Negotiations and Set Off a Tipping Chain

32. From approximately January 2013 through January 8, 2014, Sangamo and Biogen conducted ongoing confidential negotiations regarding a possible collaboration and licensing agreement with respect to the development of therapeutic treatments for certain illnesses. The licensing agreement was announced before the market opened on January 9, 2014. Following the announcement, Sangamo's stock price increased by over 38 percent, from a closing price of $13.65 per share on January 8 to a closing price of $18.88 on January 9.

33. Tang was aware of Sangamo's negotiations with Biogen by at least December 5, 2013, when he attended a senior management meeting during which the transaction was discussed. This information was material and non-public. As the following events demonstrate, Tang tipped Govender about the transaction.

34. Starting on December 7, 2013 – two days after Tang learned of the negotiations – Govender and Tang exchanged numerous calls, and Govender also exchanged numerous calls with Chernin, Costantin, and Fishoff. On December 16 (a Monday) at 12:51 p.m., Tang's cell phone called Govender's cell phone. At 1:38 p.m., Govender held a conference call with Chernin and Costantin for nearly seven minutes. Immediately following that call, at 1:45 p.m., Costantin placed an 8-second call to Fishoff. One minute later, at 1:46 p.m., Chernin began to purchase Sangamo stock, executing a buy order through an electronic trading platform for 800 shares that settled into the Cedar Lane account. At 1:52 p.m., just minutes after receiving the 1:45 p.m. call from Costantin, Fishoff also began to purchase shares of Sangamo stock, executing a buy order through an electronic trading platform of 1,000 shares that settled into the

11

Featherwood account. At 2:05 p.m., Fishoff received an 11-second call from Petrello. At 2:06 p.m., Fishoff returned Petrello's call and that call lasted for four minutes. At 2:09 p.m., Petrello also began to purchase Sangamo stock, executing a buy order through an electronic trading platform of 2,500 shares that settled into the Brielle account. The next call Fishoff made after the call with Petrello was to Spera, at 2:13 p.m., which lasted for almost two minutes. Within a minute of that call ending, Spera executed a purchase of 10,000 Sangamo shares through his online trading account for Joleine. Between December 16 and 20, Spera executed the purchase of 50,000 shares of Sangamo for his online Joleine account.

35. Tang continued to pass confidential information about the status of the Sangamo-Biogen negotiations on to Govender between December 16, 2013 and the announcement on January 9, 2014. Govender, in turn, then continued to pass that information on to Chernin, Costantin and Fishoff during this period, updating them on the status of the transaction and reassuring them that they would substantially profit from their Sangamo positions when the transaction was announced. Chernin, Fishoff, Petrello, and Spera continued to purchase Sangamo stock through December 23, and Fishoff and Chernin also purchased Sangamo call options in Featherwood and Cedar Lane accounts on December 17 and 20. Govender remained in constant phone contact with Chernin, Costantin, and Fishoff during this period, and also had further phone contact with Tang. Fishoff, in turn, continued to communicate regularly with Chernin, Costantin, Petrello, and Spera.

36. For example, on December 19, 2013, Govender placed a one-minute call to Tang, and on December 20 (a Friday) at 6:47 p.m., Tang called Govender for a call that lasted more than 15 minutes. On December 23 (the following Monday) at 3:49 p.m., Govender called Chernin. As soon as that call ended, at 3:51 p.m., Chernin called Fishoff. At 3:53 p.m., Fishoff

executed a buy order for 20,000 shares of Sangamo stock, half of which settled into the Featherwood account and half of which settled into his JSF account.

37. On the evening of December 23, 2013, Govender placed several calls to Tang. Early the next morning, at 9:38 a.m. on December 24, Govender placed a call to Chernin but did not reach him. However, at 9:39 a.m., Chernin returned Govender's call and the call lasted for approximately one-and-one-half minutes. Those calls were immediately followed by a call from Chernin to Fishoff, and then calls between Fishoff and Petrello. On that same day (December 24), the Featherwood, Cedar Lane, and Brielle accounts began to sell off portions of their Sangamo positions, because Fishoff and Petrello, given the size of the positions, became anxious about the timing of the announcement and a temporary downturn in the stock price.

38. However, starting on the morning of December 26, 2013, Govender again exchanged calls with Chernin, Costantin, and Fishoff, and Fishoff received a call from Petrello. Based on information provided by Tang, Govender reassured Fishoff, Chernin and Costantin that the Sangamo transaction remained on track and that they would profit handsomely from their long positions in Sangamo when the deal was announced. After these calls, the Featherwood and Brielle accounts resumed making purchases of Sangamo stock. The Cedar Lane account continued to sell Sangamo shares into January 2014, but purchased additional call options and shares on January 7 and 8, respectively. The purchase of call options – less expensive than shares of stock – allowed Fishoff to free up cash while he awaited the Sangamo announcement. Govender continued to communicate with Chernin, Costantin, and Fishoff during this period, and also spoke with Tang by phone for approximately seven-and-a-half minutes on January 2. After the Sangamo-Biogen transaction was announced on the morning of January 9, 2014, Govender received two calls from Tang, one of which lasted for approximately 15 minutes, and

also exchanged numerous calls with Chernin, Costantin, and Fishoff. Govender continued to exchange calls with Tang, Chernin, Costantin, and Fishoff over the next few days.

39. Between December 16, 2013 and January 8, 2014, the following Sangamo securities trades and unlawful trading profits were made by the relevant parties:

| Account | Purchases | Sales | Unlawful Profits |
|---|---|---|---|
| Featherwood | <ul><li>76,500 shares at an average price of $13.55 per share</li><li>400 call option contracts at a price of $2.93 per contract</li><li>152 call option contracts at a price of $2.30 per contract</li></ul> | 23,500 shares at an average price of $14.01 per share | $555,487 |
| JSF | 10,000 shares at an average price of $14.35 per share | | $38,711 |
| Cedar Lane | <ul><li>109,000 shares at an average price of $13.26 per share</li><li>250 call option contracts at a price of $2.00 per contract</li><li>250 call option contracts at a price of $3.80 per contract</li></ul> | 75,000 shares at an average price of $13.72 per share | $398,130 |
| Brielle | 45,500 shares at an average price of $13.32 per share | 2,000 shares at an average price of $14.05 per share | $189,759 |
| Paul Petrello | 5,000 shares at an average price of $12.50 per share | | $31,900 |
| Joleine | 50,000 shares at an average price of $13.12 per share | | $287,805 |

40. Collectively, these individuals and entities made a total of approximately $1.5 million in profits trading Sangamo securities.

41. Approximately one month later, on February 11, 2014, Spera wired $139,658, comprising approximately half of his Sangamo trading profits, to Fishoff.

42. The next day, on February 12, Govender received, through BKG, a wire transfer from Cedar Lane in the amount of $222,788, as compensation for tipping Fishoff, Chernin and Costantin about the Sangamo-Biogen negotiations. That amount was far larger than any prior payment to Govender from Cedar Lane or from any other entity controlled by or associated with Fishoff.

43. Later in 2014, Govender informed Tang that Govender had made a substantial amount of money from the information that he received from Tang.

44. At all relevant times herein, Tang knew that Govender was in the business of obtaining and selling material non-public information. As such, when Tang provided material non-public information to Govender about the Sangamo-Biogen negotiations, Tang knew, should have known, or recklessly disregarded that Govender would convey the information to others for the purpose of trading securities. Tang provided material non-public information to Govender about the Sangamo-Biogen negotiations with the expectation of conferring a benefit on Govender and because of their close friendship.

45. Govender was aware that Tang was a Sangamo insider and thus had access to material non-public information about the company. Govender knew, should have known, or was reckless in not knowing that the information about the Sangamo-Biogen negotiations that he received from Tang was material and non-public.

46. When Govender provided this information to Chernin, Constantin and Fishoff, Govender knew, should have known, or was reckless in not knowing that the information had been conveyed to him in breach of a fiduciary duty or similar obligation arising from a relationship of trust and confidence in exchange for a personal benefit. Govender also knew, should have known, or was reckless in not knowing that Chernin, Constantin and Fishoff would use the information Govender provided to trade securities and/or convey the information to others for the purpose of trading securities.

47. Fishoff knew, should have known, or was reckless in not knowing that the information about the Sangamo-Biogen negotiations that he received from Govender (either directly or through Chernin and/or Constantin) was material and non-public. When Fishoff traded Sangamo securities, he knew, should have known, or was reckless in not knowing that the material non-public information that he received from Govender (either directly or through Chernin and/or Constantin) about the Sangamo-Biogen negotiations had been conveyed (i) in breach of a fiduciary duty, or obligation arising from a relationship of trust and confidence, owed to the original source of the information; and (ii) in exchange for a personal benefit to the person (i.e., Tang) who owed such duty or obligation to the original source of the information (i.e., Sangamo). When Fishoff conveyed material non-public information about the Sangamo-Biogen negotiations to Petrello and Spera, Fishoff knew, should have known, or was reckless in not knowing that Petrello and Spera would use the information to trade securities.

## CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5

### (All Defendants)

48. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 47.

49. The Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale, of securities by the use of the means of instruments of transportation or communication in interstate commerce, or of the mails or the facilities of a national securities exchange, knowingly or recklessly have: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

50. By reason of the foregoing, the Defendants, directly or indirectly, singly or in concert, have violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests a Final Judgment:

### I.

Permanently restraining and enjoining the Defendants from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

### II.

Ordering the Defendants, jointly and severally, to disgorge all of the unlawful trading

profits and all other ill-gotten gains resulting from the violations alleged in this complaint, and ordering each of them to each pay prejudgment interest thereon;

**III.**

Ordering the Defendants to pay civil monetary penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1];

**IV.**

Prohibiting Tang under Section 2l(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)] from acting as an officer or a director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]; and

**V.**

Granting such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands that this case be tried to a jury.

Dated: New York, New York  
August 23, 2018

Respectfully submitted,

*/s/ Marc P. Berger*
Marc P. Berger
Sanjay Wadhwa
George N. Stepaniuk
Todd Brody
David C. Austin
Chevon Walker
Counsel for Plaintiff
U.S. Securities and Exchange Commission
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0080 (Brody)