Honorable Judge Andrew Carter
United States District Court
Southern District of New York

Case No: 1:18-CV-07685

December 2, 2019.

Defendant Deshan Govender response to SEC's Attorneys motion for monetary relief and motion for Court to set fine.

Respectfully submitted,

*(signature)*

Deshan S. Govender (DG)
7 Turnberry Lane
Albany, NY 12211
Via email: dgovender03@yahoo.com

Table of contents:

Document #1:  Table of contents pages 1-2.  Statement Response to SEC Motion for Fine: Pages 3 - 12.

Document #2:  All Exhibits detailing and support for my response:  pages 1-97
- Exhibit #1 pages 1-6:  Chronological analysis of SGMO fundamentals using primary research to formulate investment thesis:  Long and Short depending on analysis.
- Exhibit #2 pages 7-40: Emails in support of Exhibit #1 (deep due diligence) detailing Negative view on SGMO
- Exhibit #3 pages 41-52: DG Fidelity personal account trading SGMO in Jan 2013, Feb 2013 for $61k loss.
- Exhibit # 4: pages 53-67: SEC and USAO drop dozens of insider cases alleging tipper and tipee and relationship to profiteer.  Navidea employee fine, personally traded on information.  Phil Mickelson named as defendant but no fine no penalty.
- Exhibit #5: page 68:  PACER, NJ cv-07685 Administratively Terminated by Judge Shipp in NJ.  DG not named in case.
- Exhibit #6:  pages 69-70.  DG phone records for December 16, 2013 as cited in complaint on phone call form W. Tang to DG.
- Exhibit #7: pages 71:  emails between W. Tang and DG and academic institutions regarding licensing of technologies and topic of various phone calls in December 2013.
- Exhibit #8: pages 72-82: Sept 2013 to Jan 2014 trading statements.  Many biotech names were traded and profitable including SGMO.

- Exhibit #9: 83-93:  Other recent SEC civil settlements.  Settlements here in much larger fraud cases dwarf the amount that SEC is asking DG to pay.  3 different examples cited here equate to 1% civil fine paid in relation to fraud amount or investor loss.
- Exhibit #10: pages 94-96:  Job offer goes away on 8/23/19 upon full disclosure to Employer regarding SEC complaint.
- Exhibit #11:  I Help Uganda Grow (iHUG) sponsor letter for children education in various schools in Uganda.

DG Statement in response to SEC Motion:

The SEC complaint dated August 23, 2018 and filed in SDNY (Case No: 1:18-CV-07685) states on page 2, paragraph 1) Fishoff led an insider scheme whereby they used information for their gain. At no point does the complaint alleged that I was part of this insider scheme nor offer any supporting documents in the motion to set a fine. The SEC complaint and motion brief relies on the phone log sequence in December 2013 for the Sangamo (SGMO) trade(s) in December 2013 and January 2014 to tie me to the improper SGMO trading. The SEC case here for asking for a fine close to $1M rests on phone records and inference. The SEC also tried to affiliate me with Fishoff's schemes. This is not the case. I had no part of nor idea that Fishoff was part of a trading ring using information about upcoming secondary offerings to trade ahead of the financings and to which he and his associates have subsequently plead guilty. I was not named in any of the NJ case that Fishoff and colleagues plead to criminal behavior. I was not named in any of these proceedings because I was not part of their scheme and was only a part time consultant. Part of the non-contractual consulting was that they allowed me have a title as portfolio manager for the purpose of furthering my career as an analyst and get positive exposure for the platform in which I believed to be legitimate at the time. I only met Fishoff on 2 occasions and barely knew him or his associates. I did not have any written or signed contract whatsoever with Fishoff or any of his affiliates – the SEC has not provided any documentation besides my temporary resume stating that I consulted at Cedat Lane (one of Fishoff's trading entities). My contribution was analysis as an ad hoc consultant. *The SEC complaint tries ineffectively to tie me to some of Fishoff's other improper and illegal operations.* This is entirely not accurate and misleading.

I was a highly specialized analyst conducting deep dive fundamental analysis on public and private company's technologies and assessment of success [Exhibit #1 pages 1-6: Chronological analysis of SGMO fundamentals using primary research to formulate investment thesis, over 100 hundred hours of diligence on my part: Bear and Bull thesis. Demonstrates that I was an expert in SGMO, engaged with CEO and management, read scientific articles and medical journals to assimilate an investment thesis]. Fishoff may have used information without my knowledge that was conveyed to me by investment bankers and at every step of the way in

conversation and emails. I always followed proper protocol and notify Fishoff et.al that we are restricted from trading and "over the wall" given potential upcoming transaction. Fishoff et.al. used some information conveyed by bankers to his benefit. I was never privy nor know of his scheme to front-run and trade confidential secondaries. I consulted with FIshoff as well as was interviewing with other biotechnology focused investment funds in which I sent my research [Exhibit #2 pages 7-40: Emails in support of Exhibit #1 detailing Negative view on SGMO]. The consulting role with Fishoff was meant to be was a Segway as I found an opportunity and interviewed at larger and more stable investment firms. Unlike all the case examples in the SEC motion, I had no decision-making authority while consulting for Fishoff. I did not exercise any trading, nor did I have any real-time access to what Fishoff was trading at any time.   The SEC in their detailed motion cite many cases of individuals who paid hefty civil fines. Almost all of them are citing cases where the defendant directly profited by making the trading decisions. This SGMO case was very, very different. I was paid as a consultant for my expert advice in which I built over many hundreds of hours of diligence and work and made a recommendation that either the paying advisee took or not. Again, I had no decision-making authority to trade as an expert consultant offering an opinion. I generated many dozens (close to 100) of investment ideas to drive performance through diligence. The SEC has found one name in SGMO to single out given my relationship with Winson Tang. I resigned from consulting with Fishoff et.al in December 2014 when I was contacted by the USAO about assisting in their investigation on the secondary offerings, which I had no knowledge. I had nothing to offer, so I did not assist in any way. The SEC claims my consulting went "well into 2015" (they offer no documentation), and this again is misleading as I resigned in 2014 when I learnt about their illegal trading.

I had followed the Sangamo evolving story at my previous job at Kingsbrook Partners, where we bought and sold SGMO shares upon my deep dive fundamental analysis. I was a visible analyst on Wall St. and build my career on hard work. I have been on live Bloomberg TV and been asked to comment on Biotechnology in numerous well circulated publications. I also traded SGMO in my personal account at substantial losses in 2013 [Exhibit #3 pages 41-52: DG Fidelity personal account trading SGMO in Jan 2013, Feb 2013 for $61k loss]. Thus, if I were relying

100% on insider information on SGMO to turn a profit for myself and or others, then it would be contradictory to the SEC complaint on profiteering on tips and motion for fine in terms of not including all inputs. I lost large amounts of my personal money trading SGMO. The lesson learnt from the SGMO trading loss based on diligence was to follow more closely to management and their guidance on future results. The SEC complaint and motion for a fine is incomplete and biased and makes the impression that I did no work on SGMO and was merely "tipped" by an insider who I had known superficially over the years and had never considered a friend. I developed a relationship with Winson Tang for the purposes of licensing and developing interesting and innovative technologies from academic institutions to get it to patients in need. This topic will be addressed later in my response with supporting documents.

The complaint states that SDNY is the proper venue, page 4 paragraph 8. Please recall that the SEC filed the Fishoff case in the District of New Jersey in 2014 where I was not named as a defendant. However, in regard to the SGMO trade, the original Fishoff complaint in NJ wrote of an "Associate A". The original complaint also only ties "Associate A" to only the SGMO trade and not the other trading in which Fishoff and his associates was named as a defendant. Unfortunately, everyone concluded that I had to be "Associate A" given my listed age and residence in Manhattan in the description and that I was affiliated with Cedar Lane Enterprises as a consultant. Thus, the disclosure decimated my hard earned reputation in an instant. As a result, I lost many job opportunities and never recovered to this day. Judge Shipp in NJ administratively terminated the case on July 19, 2018 [Exhibit #5: page 68: PACER, NJ cv-07685 Administratively Terminated by Judge Shipp in NJ. DG not named in case]. After almost 5 years and not getting anywhere in NJ on their complaint, the SEC re-filed their complaint against me and others about a month after Judge Shipp's termination of the case. I went unemployed for several years until I found something in industry. I was employed in industry in 2015 and then again from April 2017 to February 2017. Other than those times, I have been unemployed, mostly due to the SEC disclosure in 2014.

I would like to add that the SEC never offered for me to come discuss the case with them when they contacted me in July 2018. They only wanted to speak to an attorney. I did not receive a

Wells notice nor was it discussed.   My attorney at the time, David Spears (Spears & Imes) advised me not to do anything or take any action and that the SEC did not have anything to proceed with on the SGMO trade given recent Appeals court rulings in favor of defendants regarding insider trading cases involving a "tipper" [Exhibit # 4: pages 53-67: SEC and USAO drop dozens of insider cases alleging tipper and tipee and relationship to profiteer.  Article on Nvidea employee fine - personally traded and profited.  Phil Mickelson named as profiteer and defendant but no fine no penalty].  I parted ways with David Spears soon after the SDNY filing on 8/23/18.  I am told Mr. Spears now represents the Trump administration.

Almost all of these dozens of cases cited in Exhibit #4 involved alleged insider and tipper cases that were dropped and never reopened.  My case, even though very small in size compared to the cases in Exhibit #4 was filed almost 5 years to name me as a defendant in SDNY.  To m knowledge, the sEC nover again pursued the dropped cased given the appeal court's decision regarding what constitutes an insider trade.  The case was terminated in NJ 4 years after the initial allegation and then the SEC deftly maneuvered to file in SDNY without any attempt to meet with me to answer any questions or provide me the opportunity to offer any documentation and evidence to the contrary.  September 2018 would mark 5 years coming due given that Cedar Lane started trading SGMO and the end of August/ beginning of Sept 2013 [Exhibit #8: pages 72-82:  Sept 2013 to Jan 2014 trading statements.  Note: Many biotech names were traded, conversed, emailed and profitable (or non-profitable) including SGMO].  Fishoff et.al made and lost money on SGMO.

Thus, after barely getting my footing after the 2014 NJ criminal complaint vs Fishoff et.al where I was mentioned as "associate A" and finding employment in industry, the SEC then re-files in SDNY.  I am emphasizing that naming me as a defendant closed all doors for gainful employment in my field.  In addition, the SEC noted in their complaint on page 4, item 7 &8 states that the reason for filing venue in SDNY was that I was a resident in Manhattan in 2013 and 2014.  No mention of Judge Shipp's termination in July 2018 as a catalyst for them to file in SDNY.  The civil case against Fishoff once in NJ (w/o DG named) then terminated in NJ, then refiled to SDNY to include and use me for jurisdiction purposes, now back in NJ and slated with NJ Judge for a status update for December 5, 2019.  In essence, the SEC used me to enter SDNY

given no action in NJ as well as to further get fines which they could not collect from Fishoff in his criminal NJ case. This is the SEC's job, and they have every right to use the courts to serve their goals.

On page 11, paragraph 34 of the complaint, the SEC attorneys outline their only documentation of linking me to Winson Tang via phone calls and then inferring that start of SGMO trades by Fishoff et.al. Paragraph 34 states that on December 16, 2013, I received a call on my cell phone from Tang at 12:51pm. As a matter for clarification for the call and time stamp for this alleged call was not mentioned in the complaint and is very misleading [Exhibit #6: pages 69-70. DG phone records for December 16, 2013 as cited in complaint on phone call from W. Tang to DG: no phone call exists according to these phone records]. Since the call time stamp was not mentioned in the complaint and my partial judgment, I am submitting my phone record now as documentation that it is either an error from the SEC or a fabrication. The SEC civil complaint states that I received a call from TANG on December 16, 2013 so it must be a fact and we must treat as such for this motion; however, my phone records show something quite different; no call form TANG on 12/16/13 and certainly no call at 12:51pm. The brief mentions the time stamp and date, the complaint does not mention the time stamp. I have no record of this call. The SEC continues to follow my calls and my calls to the traders. The fact is that Tang and I were looking and investigating various technologies that were at academic institutions that were available for licensing. Please see [Exhibit #7: page 71: snapshot of emails between W. Tang and DG and academic institutions regarding licensing of technologies and topic of various phone calls in December 2013.

My phone calls with Tang pertained soley to other technologies and not regarding his work relating to SGMO. Again, I am not admitting nor denying any of the complaint and my judgment, only to provide the court with documentation for their consideration versus the very misleading statement from the SEC.

On page 15 and paragraph #42., the complaint states that I received a wire of $222,788. This is confirmed. However, please see [Exhibit #8: pages 72-82: Sept 2013 to Jan 2014 trading statements. Many biotech names were traded and profitable including SGMO].

They were many other biotechnology trades that were profitable and some were not. In addition, my conversations with Fishoff et.al also had to do with these other trades and not isolated to SGMO. Thus, some portion and not all of the $222k wire was for SGMO according to the trading statements. In addition, I never known or had any contact what so ever with Spera who has plead guilty and had paid Fishoff on SGMO profits. The SEC field in NJ to go after Fishoff and his associates on numerous other trades in which I had nothing to do with. Fishoff et.al plead guilty. They filed a civil complaint in NJ re the SGMO trade in which I was never named. The case was administratively terminated. The $222k wire is also misleading. The SEC goes out if its way to describe Fishoff's other trading and profits in my complaint. I had nothing to do with any of it, but the mention of these actions on the part of Fishoff serve to unfairly affiliate me with his actions.

NOTE: Fishoff et.al have plead guilty in their criminal cases in NJ. Fishoff's monetary fine was $50k.

I do not have access to LEXIS and the database the SEC uses to cite case law. I have looked up as best as I can on the SEC website and the cases are much different than my civil complaint. Almost all of the cases cited involve active traders and profiting. I was an ad hoc consultant. Furthermore and for a comparison and supporting cases to support my response, I have provided the court here of 3 SEC civil penalties (2 in biotech and 1 in automotive) [Exhibit #9: 83-93: Other recent SEC civil settlements. Settlements cited here in much larger fraud cases than this SGMO trade dwarf the amount that SEC is asking me to pay. 3 different examples cited here equate to 1% civil fine paid in relation to fraud amount or investor loss.]
Also in Exhibit #9 are a Wall Street Journal and NY times article on SEC's bias in pressing fines against smaller defendants and not going after larger defendants/firms. Furthermore, please see SEC settlements in Exhibit #9 for Elizabeth Holmes of Theranos who frauded investors over $1B and settled with the SEC for $500k cash payment (less than 1% of fraud) with a no admission/denial settlement. Recently, executives in MiMedix frauded investors by a fraud scheme to inflate revenues which when disclosed lost $1B in market value of the stock. The

fine was $1.5M and paid for by insurance of the company (1.5% of lost value due to fraud and again 1.5% fine paid in relation to amount of profit/fraud, Exhibit #9). Also, CEO of Nissan motors was said to steal $100M from Nissan and his SEC civil fine was $1M (1% equivalent fine paid in relation to total of fraud and gain). Please see exhibit #9 for Holmes, MiMedix and Ghosn settlements. Ms. Holmes, having settled with the SEC for $500k after fruading investors of $1B, is now glorified as a "white" knight who took risk on technology and continues to be viewed in a privileged and some say glorified manner and much differently than I have upon the SEC public disclosure.

Upon the SEC's request to set a fine in relation to my household's finances, we submitted over 500 pages of tax returns, financial statements, bank statements, mortgage documentation, vehicle obligations, charity and records affirming our net debt financial situation and conclusion. We submitted all the required information the SEC had requested starting in 2013. We did not hear any disagreement from the SEC in our financial situation nor did the SEC offer terms of a fine to settle that is commensurate with our ability to pay any fine. The SEC took 4 months to review my financial status and documents and came back with zero rebuttal on the conclusions of net debt. Again, I remain unemployed in my field of work and other fields due the SEC complaint. I have had numerous interviews and when I disclose the SEC complaint, I now get no follow up and eventual silence. My lost income since 2014 due to the SEC complaint from lost job opportunities is well over $1M. In terms of already paying any due fine as a deterrent for future, please see a CEO/consulting opportunity offered in August 2018 [Exhibit #10: pages 94-96: Job offer goes away on 8/23/19 upon full disclosure to Employer regarding SEC complaint]. This is a severe deterrent for any future behavior. It is also a summation and sampling of a hefty 'fine' already paid due to lost opportunity to earn income and provide for my Family. Lost income and inability to find gainful employment has been the most sever fine anyone can place on any civil resolution. Thanks to search engines like Google, this civil complaint disclosure will stay with me for decades. I was a very visible and highly regarded analyst covering biotechnology. The SEC complaint put an end to that. No price can be put on an hard earned reputation.

On page 5 of the motion brief submitted to the Court on October 31, 2019, The SEC states that there was another occasion of SGMO insider trading in September 2013. This was not mentioned in the complaint dated August 23, 2018 and the SEC is taking the liberty to include something so that they can convince the court that all this was all insider and no work or skills were employed to garner an investment thesis. Furthermore, on page 10 the SEC's motion brief states that I have submitted to the court that I have "numerous lucrative employment opportunities" that exist once this case is finalized. This is pure fabrication on the part of the SEC and again and in my view overstepping and falsifying a statement to try and garner the court's favor for a fine. I have in no way submitted to the court that there are opportunities waiting. This is simply not true and in fact, the opposite is true and that opportunities no longer exist. I am taken a back every time I read the SEC brief and complaint that they would try and maneuver away from the truth to try and get more and more out of this 2014 complaint.

I signed the partial consent judgement, neither an admission nor denial. I signed it to move on and not spend precious time and resources on litigating the merits of the complaint. I had little choice – no job, income to fight the SEC. I decided to move on given that the public disclosure shut the door on many opportunities and that finding a job in my field makes it almost impossible given the allegations in the complaint. The sooner I resolved the matter (rightfully or wrongfully), the better I would be to find new employment and stabilize my Family which includes 2 very young children (ages 5 and 3). I am very involved in community service for our underprivileged youth. I am a proud member of Alpha Phi Alpha and we sponsor the education of a child in Uganda (see exhibit #12). I was born in Zambia where my parents were exiled and fled Apartheid South Africa. I continue to support Family and underprivileged in South Africa and have sponsored deserving individuals travel and employment/intern experiences in the USA.

In summary, I want to emphasize that I was an ad hoc consultant with no contract and was compensated to offer expert advice on biotechnology. I did no trading nor had any visibility to

Fishoff's trading or schemes. I was never named in any complaint related to Fishoff and not until Judge Shipp terminated the case involving the SGMO trade in July 2018. The SEC filed in SDNY in August 2018, about a month after Judge Shipp's termination. I have signed a partial consent judgment not denying or admitting the SEC's statements in the complaint. I do not have the large resources to employ a qualified attorney to engage with the SEC as Ms. Holmes of Theranos, MiMedix management and Nissan CEO. I have provided the court detailed documents and emails of my analysis as well as phone records only to give the court more inputs for any assessment and not to go in conflict with my signed partial judgment. I also have submitted emails in between Tang and myself in relation to phone conversations regarding licensing technologies in the complaint's referenced time period. More importantly and direct to this response to the SEC motion seeking a fine, I have submitted every document requested by the SEC for a financial waiver. No response to the financial information was provided or opinions on the conclusions reached of net debt. In 2 recent biotech cases where the fraud was over $1B, the SEC civil fine amounted to $500k for Elizabeth Holmes (less than 1% of fraud, gain) and for MiMedix management, the fine was $1.5M between them for over a $1B loss to investors – 1.5% of fraud amount/loss to investors. I respectfully ask the Court to consider that the SEC request for a $1M fine is out of bounds and not consistent with its own practices. The SEC fine request does not take into account ALL the lost opportunities and long-lasting damage to my Family and job opportunities which should be considered as lost income or equivalent to have already paid a fine for the last 5.5 years and since the NJ complaint. Furthermore, I wish the court to consider that the SEC waited years to file this case in SDNY and never offered me a Wells notice opportunity to discuss the matter with them directly prior to public disclosure. I would like the court to consider that the SEC caused permanent and irreparable harm to my reputation in the original 2014 complaint versus Fishoff et.al by naming me as "Associate A". After 5 years and on my way to a recovery in my career, the SEC then re-files a terminated case in NJ by Judge Shipp in SDNY with no Wells notice. I would like to note that the first SGMO trades occurred in beginning of September 2013 and the SEC filing in SDNY came in 10 days prior to 5 the 5-year mark. I kindly and respectfully ask the court to set a fine of zero or as close

to zero as possible given all the above and especially the lack of work and all the lost opportunities that will never come back.

I am also asking the court to consider, if helpful an appearance for me to express in person to the court other factors that have adversely and permanently impacted me, my Family and those who depend on me earning a living. I humbly submit to the court that I have learnt from my bad behavior in the SGMO instance described in my partial judgment. I thank the Court and the SEC for its consideration in this matter and once finalized to continue to seek employment and repair the damage done. I will continue to aspire and contribute in some meaningful way a long term positive impact on our society and next generation.

*Document #2: Exhibit Documents. Pages 1-97.*

*> 06/07/08 > covered stock*

*Interview pun toffin & asked for targets*

## DG History of Trading Recommendations on SGMO

### 1. Late breaker at Ash 12/11 into JPM 1/13 and Shire announcement 2/12

   a. Ash conference held 12/9-12/11 */ 2011*

      i. Kathleen High of U Penn presented abstract on SGMO hemophilia product

      ii. Minor impact on SGMO stock price *> went up a little; days data*

      iii. DG spoke with SGMO CEO (Lamphere) and IR (Wolf), who were very upbeat and positive and spoke about "dry value", "unpartnered programs", and "stay tuned"

*Shire OPT option*

*SGM > Equity*

*sold in February 2014*

*Why if event in January*

   b. JPM conference held 1/8-12/12 */ 2012*

      i. SGMO highlighted program that was subject of late breaker at Ash

      ii. From 12/30 to 1/12 JPM presentation date, stock went from 2.84 to 3.34 (17.6%)

*> in data @ Ash*

   c. Announcement on 2/1/12 of Shire JV with SGMO on the program announced as late breaker at Ash and highlighted at JPM conference

      i. Reaction of SGMO stock price

         • 1/31/12  3.45
         • 2/1/12  4.19
         • 2/22/12  5.67 (up 64% from 1/31)

*③ Cedar Loaner sold is tru*

*Trojan Horse ①*

*to access annual email on (check annual complaints)*

*"only able to access of secondary grants to Ivoder"*

*② Other emails on Tarp on reversal/science*

**2. Ash 12/12 into JPM 1/13 – no announcement regarding new program but SGMO stock run-up – DG becomes negative on SGMO for months**

    a. Ash conference held 12/12

        i. No late breaker

        ii. Just update on existing programs

    b. JPM conference held 1/7-10/13

        i. No high impact data or news

        ii. Reaction of SGMO stock price

            • 1/4   6.65
            • 1/10  6.90
            • 1/17  9.03
            • 1/24  9.79 (up 47% from 1/4)

        iii. DG predicted run-up around JPM conference in advance based on his observations of effects of prior JPM conferences and other conferences

            • Emails between DG and Bhezad

    c. DG struck by run-up on no news and comes to view SGMO as overvalued

        i. 1/28/13 buys 200 Mar 16 $9 puts for $17,165 in personal account at Fidelity

            • Account statement printout

        ii. 2/7/13 buys 170 Mar 16 $9 puts for $21,221 in personal Fidelity account

            • Account statement printout

iii.  DG insists to numerous individuals he thinks SGMO is a huge shorting opportunity

- 2/7/13 DG email to Fishoff
- 2/20/13 DG email to Besman at JPM
- 2/20/13 DG email to Szopinski at Bloomberg
- 2/28/13 DG email to Hoffman at Lazard
- 3/6/13 DG email to Benison at Little Gem
- 3/7/13 DG email to Behzad
- 3/11/13 DG email to Singh (scientist, investor, and former CEO)
- 4/1/13 DG email to Behzad
- 5/6/13 DG email to Behzad
- 5/13/13 DG email to Fishoff
- 5/14/13 DG email to Behzad
- 5/14 DG email to Ohlen at ECOR 1

iv.  Results DG has been expecting to be negative are announced and SGMO stock does not react

v.  End of period of negative recommendations re SGMO

- 5/20/13 announcement of $42.5 million funding from California Institute
- From this time until 9/4/13, nothing in writing from DG re SGMO

*[Handwritten annotations in margins, partially illegible]*

3. **2013 conferences and announcement of late breaker at Ash in 12/13 into JPM conference in 1/14 and Biogen announcement 1/9/14 – DG becomes very bullish on SGMO**

   a. JMP conference 7/7-10/13 

      i. Met with CEO (Lamphere) and IR (Wolf) for one hour

      ii. Very upbeat about upcoming ICAAC conference

      iii. Again, talk about unpartnered programs and stay tuned

      iv. Will have major update at Ash conference

   b. Wedbush conference 8/13-13/13

      i. Heard SGMO presentation, very upbeat

   c. ICAAC conference 9/10-12/13 (SGMO late breaker announced 8/13/13)

      i. 9/4/13 DG email of Antonopoulos at Hudson Bay

      ii. 9/4/13 email to Fishoff, Costantino, Chernin – buy 100,000 shares (stock is at 10.52)

      iii. On 9/12/13 SGMO stock is at $10.50, and next day, after SGMO presentation, stock is at $11.28

   d. 11/19/13 DG meeting with CEO (Lamphere) and IR (Wolf) at 21 Club

      i. DG was at a dinner conference for RPRX

      ii. Ran into CEO and IR, who were at a Lazard dinner conference for SGMO

      iii. Talked for 20 minutes

- CEO and IR were very upbeat and talking same way they talked before the Shire announcement in 2/12

- We have great stuff coming up at Ash

e. Piper Jaffray conference 11/3-4/13

    i. DG attends SGMO presentation – very upbeat

f. Ash conference 12/6-9/13

    i. SGMO has one of small number of late breakers and it is very impressive (it's the program that Biogen entered into JV on)

g. JPM conference is scheduled for 1/13-16/13

    i. 1/8/13 DG email to Fishoff, Costantin, Chernin about SGMO presentation at upcoming JPM conference

h. From 9/12 forward DG was extremely bullish on SGMO and by time of Ash conference it was his number 1 pick and he was passionate about it

    i. He continually pressed Cedar Lane to buy it, including stock and options, in anticipation of run-up in value based on late breakers and conferences

    ii. He did not know if they did buy it or not, as was the case with all of his non-secondary offering recommendations – he only learned of trades when he got his monthly P&L at end of each month

i. 1/9/13 Biogen JV with SGMO announced on program that was subject of late breaker at Ash)

    i. DG still bullish after 1/9 announcement based on likely short covering

       - DG emails to Fishoff, Costantin, and Chernin

1. DG got some of the profits from the short sales relating to secondaries

    a. He got nothing from those

    b. They did those on the Featherwood platform and he never saw what was happening on Featherwood

    c. Profits from those short sales do not show up on his monthly P&L statements

2. Unusual for Cedar Lane to buy substantial amount of a company's stock, and that was not CL's usual trading strategy

    a. Review chart of CL trades over $100,000

3. Significance of 5/13/13 DG email to Fishoff and Chernin and Fishoff reply of "NO THANK YOU"

    a. Review email

4. Significance of 9/8/13 Reed Smith email

    a. Review email
    b. No short sales of SGMO that DG is aware of
    c. It appears that CL covers shorts of 2,000 shares and 11,000 shares, but it is not clear where those short sales occurred

5. Significance of 9/17 DG emails about "Where do we stand on SGMO?"

    a. Review emails

6. Background comment that SGMO trading around that time was not innocent

7. Significance of DG calls with Cedar Lane guys in 12/13 and 1/14

    a. Review schedules

8. Significance of Cedar Lane trading in 12/13 and 1/14

6

# CEDAR LANE TRADES BASED ON DG'S ANALYSIS AND RECOMMENDATIONS
## July 1, 2013-April 30, 2014

*+ many names & trades equivalent to SGMO in terms of $ value.*

| PAGE # | TRADE DATE(S) | SYMBOL | AMOUNT BOUGHT ✓ |
|--------|---------------|--------|-----------------|
| 3 | 7/19/2013 | SNV | $ 126,796.00 |
| 6 | 7/25/2013 | AEZS | $ 500,001.00 |
| 7 | 7/25/2013 | HOLX | $ 224,765.00 |
| 8 | 8/14/2013 | MDCO | $ 378,125.00 |
| 9 | 8/16, 20/2013 | ANAC | $ 183,907.95 |
| 10 | 8/14/2013 | EVHC | $ 230,000.00 |
| 11 | 8/16/2013 | SPHS | $ 200,000.00 |
| 12-13 | 8/19-11/21/2013 | PFE | $ 5,346,067.50 |
| 15 | 9/16/2013-3/6/2014 | SGMO | $ 1,703,471.00 |
| 18 | 9/9/2013 | SSH | $ 1,312,500.00 |
| 22 | 9/26/2013 | HTZ | $ 1,086,917.50 |
| 23 | 9/26/2013 | MRK | $ 380,465.06 |
| 24 | 9/30/2013 | BMY | $ 465,080.00 |
| 26 | 10/4, 10/2013 | NBS | $ 840,104.00 |
| 27 | 10/4/2013 | LCI | $ 180,000.00 |
| 30 | 10/10/2013-1/31/2014 | CYTR | $ 1,031,560.00 |
| 31 | 10/11-10/22/2013 | NPSP | $ 625,656.64 |
| 33 | 10/16/2013 | REGN | $ 604,080.00 |
| 35 | 10/17-10/23/2013 | AMRN | $ 237,577.00 |
| 36 | 10/17/2013 | TKMR | $ 200,000.00 |
| 37 | 10/17/2013 | SRPT | $ 468,252.00 |
| 38 | 10/23/2013 | CGIX | $ 490,410.00 |
| 40 | 10/24/2013 | NVDQ | $ 416,550.00 |
| 41 | 10/25/2013 | SRNE | $ 725,000.00 |
| 44 | 10/31/2013 | PCYC | $ 353,910.90 |
| 46 | 11/6/2013 | KPTI | $ 134,517.08 |
| 50 | 11/7-11/11/2013 | PATH | $ 93,930.43 |
| 52-53 | 11/18/2013-3/28/2014 | CHTP* | $ 1,276,338.50 |
| 59 | 12/12/2013 | ADMP | $ 446,250.00 |
| 61 | 12/12/2013-4/30/2014 | SYN | $ 560,121.30 |
| 67 | 1/15, 16/2014 | RNN | $ 307,100.00 |
| 68 | 1/24/2014 | KIPS | $ 105,000.00 |
| 69 | 1/24/2014 | TNXP | $ 1,050,000.00 |
| 72 | 1/29, 31/2014 | CLDXOA | $ 122,400.00 |
| 73 | 1/29, 30/2014 | CLDXOB | $ 225,000.00 |

Total names traded in this period: 108
Total trades over $100,000: 35 (32%)

---

* Cedar Lane also bought call options at a cost of $105,386.19.

31035.1/0381-00001

| From: | Behzad Aghazadeh <behzad@venbio.com> |
|---|---|
| Sent: | Monday, May 6, 2013 8:49 AM |
| To: | Deshan Govender <dhesh.healthcare@gmail.com> |
| Subject: | Fwd: SGMO: ASGCT presentations highlighted by preliminary HIV Phase 2 data; BUY (Lazard Capital Markets) |

FYI - lets catch up

Sent from my iPhone

Begin forwarded message:

**From:** <Ryan.Martins@lazardcap.com>
**Date:** May 6, 2013, 8:42:07 AM EDT
**To:** Behzad Aghazadeh <behzad@venbio.com>
**Subject: Re: SGMO: ASGCT presentations highlighted by preliminary HIV Phase 2 data; BUY (Lazard Capital Markets)**

Upside case - $10-$11 which presumes positive data in the CCR5 delta 32 patients with a majority of patients demonstrating viral load decreases during the 16 wk treatment interruption and a majority being able to stay off HAART post the treatment interruption. Given that there is ~50% retail ownership, I would caution that it would not be surprising for the stock to move on data showing even 1/7 patients have been able to stay off HAART longer term,

Downside case - $6-$7 which presumes not much impact on viral loads in both trials and none to a minority patients being able to stay off HAART after the treatment interruption.

I have $4 out of my $16 PT coming from HIV (based only on 25% probability of success in the CCR5 delta 32 patients).

Ryan Martins
Biotechnology Analyst
Equity Research
**LAZARD CAPITAL MARKETS**
4 Embarcadero Center, Suite 2550
San Francisco, CA 94111
T 415-281-3446
F 415-281-3401
C 510-390-3407

ryan.martins@lazardcap.com

| From: | Behzad Aghazadeh <behzad@venbio.com> |
|---|---|
| To: | Ryan Martins/TRD/Lazard@Lazard NYC |
| Date: | 05/06/2013 05:31 AM |
| Subject: | Re: SGMO: ASGCT presentations highlighted by preliminary HIV Phase 2 data; BUY (Lazard Capital Markets) |

Ryan,

What's the up/down going into ASGCT for Sgmo? And what is in your valuation in the name for

CONTROL00013363

| | |
|---|---|
| **From:** | D. S. Govender <dhesh.healthcare@gmail.com> |
| **Sent:** | Monday, May 6, 2013 9:35 AM |
| **To:** | Behzad Aghazadeh <behzad@venbio.com> |
| **Subject:** | Re: SGMO: ASGCT presentations highlighted by preliminary HIV Phase 2 data; BUY (Lazard Capital Markets) |

I have discussed this w Ryan. He has drunk the kool aid.  Stock goes to $4, HIV failure.

D.S. Govender

On May 6, 2013, at 5:48 AM, Behzad Aghazadeh <behzad@venbio.com> wrote:

> FYI - lets catch up
>
> Sent from my iPhone
>
> Begin forwarded message:
>
>> **From:** <Ryan.Martins@lazardcap.com>
>> **Date:** May 6, 2013, 8:42:07 AM EDT
>> **To:** Behzad Aghazadeh <behzad@venbio.com>
>> **Subject: Re: SGMO: ASGCT presentations highlighted by preliminary HIV Phase 2 data; BUY (Lazard Capital Markets)**
>>
>> Upside case - $10-$11 which presumes positive data in the CCR5 delta 32 patients with a majority of patients demonstrating viral load decreases during the 16 wk treatment interruption and a majority being able to stay off HAART post the treatment interruption. Given that there is ~50% retail ownership, I would caution that it would not be surprising for the stock to move on data showing even 1/7 patients have been able to stay off HAART longer term,
>>
>> Downside case - $6-$7 which presumes not much impact on viral loads in both trials and none to a minority patients being able to stay off HAART after the treatment interruption.
>>
>> I have $4 out of my $16 PT coming from HIV (based only on 25% probability of success in the CCR5 delta 32 patients).
>>
>> Ryan Martins
>> Biotechnology Analyst
>> Equity Research
>> **LAZARD CAPITAL MARKETS**
>> 4 Embarcadero Center, Suite 2550
>> San Francisco, CA 94111
>> T 415-281-3446
>> F 415-281-3401
>> C 510-390-3407
>>
>> ryan.martins@lazardcap.com

| | |
|---|---|
| From: | Behzad Aghazadeh <behzad@venbio.com> |
| To: | Ryan Martins/TRD/Lazard@Lazard NYC |
| Date: | 05/06/2013 05:31 AM |
| Subject: | Re: SGMO: ASGCT presentations highlighted by preliminary HIV Phase 2 data; BUY (Lazard Capital Markets) |

CONTROL00001278

Ryan,

What's the up/down going into ASGCT for Sgmo? And what is in your valuation in the name for HIV v everything else?

Thanks,
Behzad


Sent from my iPhone

On May 6, 2013, at 6:40 AM, "Ryan Martins" <Ryan.Martins@LazardCap.com> wrote:

<mime-attachment.png> **May 6, 2013**


Company Note  Biotechnology


## Sangamo BioSciences  (Click here for Full PDF)

**ASGCT presentations highlighted by preliminary HIV Phase 2 data; BUY**

(SGMO, BUY, $8.61, PT: $16.00)

Ryan Martins, 415-281-3446, ryan.martins@lazardcap.com
Jonathan Chang, PhD 415-281-3415, jonathan.chang@lazardcap.com

**Highlights:** SGMO will be presenting 12 abstracts at the American Society of Gene & Cell Therapies (ASGCT) 2013 Annual Meeting (May 15-18). Preliminary data from the SB-728-T HIV Phase 2 trials that investors are most focused on will be presented as part of a scientific symposium on May 15 at 10AM ET. Updated data will also be presented on the in vivo protein replacement platform (IVPRP) and electroporation-based delivery of ZFNs into hematopoietic stem cells (HSCs). Details on all 12 abstracts including takeaways for each are provided on Page 3.

- **Preliminary data from Phase 2 HIV trials.** SGMO's CMO Dr. Dale Ando is expected to provide an update on the ongoing Phase 2 trials during his talk titled "Clinical Studies of the Infusion of ZFN CCR5 Modified Autologous CD4 T cells (SB-728T) in HIV Subjects" on May 15 at 10AM ET. We expect an update on the CCR5Δ32 heterozygote aviremic HIV patients (N=20) and aviremic HIV patients lymphodepleted with increasing cytoxan doses (N=3 per cohort) prior to SB-728 treatment. While SGMO has not indicated how many patients in each study will have data presented at ASGCT, we will primarily be looking for impact of SB-728 treatment on viral load along with immune reconstitution data. Viral load impact will be assessed during the 16 week treatment interruption (during which HAART will be discontinued) and after the interruption when patients with an undetectable viral load can remain off HAART until HIV RNA levels are detectable or their CD4 T cell count falls below 350 or 500 cells/mm3 respectively in the two studies.

- **Other presentations highlight the breadth of programs and ongoing research/preclinical work.** Abstract 488 provides an update on the IVPRP that had promising Factor IX data at ASH. 183 utilizes electroporation for ZFN mRNA delivery into HSCs on a clinical scale to disrupt the CCR5 gene. SGMO has guided to an IND filing for this program in 2014. Electroporation is also the planned delivery modality for SGMO's hemoglobinopathy programs. We do not expect material updates to HIV abstracts 46 and 58 from data presented at CROI. 504 and 107 describe the use of ZFNs for treatment of multiple myeloma/acute leukemia and targeted allele correction in cystic fibrosis induced pluripotent stem cells. 486, 487, 492, and 568 relate to methods for delivery and specific integration of ZFNs and donor DNA.

**Investment Thesis**

Sangamo's zinc finger proteins enable precise targeting of DNA and may be the key to unlocking the potential of gene therapy. We see tremendous value in the monogenic disease programs, specifically the in vivo protein replacement platform for Hemophilia and LSDs. The Berlin patient and CCR5 heterozygous patient Phase 1 experience in HIV suggest the potential for positive data in the Phase 2 heterozygous patient trial.

**Valuation**

We arrive at our $16 PT by applying a sales/royalty multiple to probability adjusted peak sales projections of the individual pipeline programs, Sigma/Dow partnerships, and cash.

**Risks**

Competitive, commercial, clinical, and regulatory.

Full PDF

**IMPORTANT DISCLOSURES**

This report has been prepared by Lazard Capital Markets LLC ('LCM') in New York. It may not be reproduced, redistributed or copied in whole or in part for any purpose. This report has been approved by, and is being distributed in the US or to US persons, by LCM, which accepts responsibility for its contents in the US.

Transactions undertaken in the US in any security mentioned herein must be effected through LCM or another US-registered broker-dealer, in conformity with SEC Rule 15a-6.

Neither this report nor any copy or part thereof may be distributed in any other jurisdictions where its distribution may be restricted by law and persons into whose possession this report comes should inform themselves about, and observe, any such restrictions. Distribution of this report in any such other jurisdictions may constitute a violation of US securities laws, or the law of any such other jurisdictions.

This report does not constitute an offer or solicitation to buy or sell any securities referred to herein. It should not be so construed, nor should it or any part of it form the basis of, or be relied on in connection with, any contract or commitment whatsoever. The information in this report, or on which this report is based, has been obtained from sources which LCM believes to be reliable and accurate. However, it has not been independently verified and no representation or warranty, express or implied, is made as to the accuracy or completeness of any information obtained from third parties. The information or opinions are provided as at the date of this report and are subject to change without notice. The information and opinions provided in this report take no account of the investors' individual circumstances and should not be taken as specific advice on the merits of any investment decision. Investors should consider this report as only a single factor in making any investment decisions. Further information is available upon request. LCM does not accept any liability whatsoever for any direct or consequential loss howsoever arising, directly or indirectly, from any use of this report or its contents.

Disclosures for the covered securities mentioned in this note can be found in the full report or by visiting our disclosure website at Disclosure Site

**ANALYST CERTIFICATION**

All of the recommendations and views about the securities and companies in this report accurately reflect the personal views of the research analyst named on the cover of this report. No part of this research analyst's compensation was, is, or will be directly or indirectly related to the specific recommendations or views expressed by the research analyst in this research report.

Lazard Capital Markets LLC
30 Rockefeller Plaza, New York, NY 10020

CONTROL00001278

Member NYSE and FINRA

Please contact your Lazard Capital Markets Sales Representative at 800-223-4080 with questions or comments.

Click here to access additional research on Lazard Capital Market's Equity Research website.

Click here to subscribe if you do not have a user ID.

If you would like to be removed from the distribution list, forward this email to LCMResearch@lazardcap.com and place "unsubscribe" in the subject field.

<mime-attachment.gif>

| | |
|---|---|
| **From:** | Behzad Aghazadeh <behzad@venbio.com> |
| **Sent:** | Monday, May 6, 2013 9:36 AM |
| **To:** | D. S. Govender <dhesh.healthcare@gmail.com> |
| **Subject:** | RE: SGMO: ASGCT presentations highlighted by preliminary HIV Phase 2 data; BUY (Lazard Capital Markets) |

When are we getting together ... I want to rebuild portfolio

**From:** D. S. Govender [mailto:dhesh.healthcare@gmail.com]
**Sent:** Monday, May 06, 2013 9:35 AM
**To:** Behzad Aghazadeh
**Subject:** Re: SGMO: ASGCT presentations highlighted by preliminary HIV Phase 2 data; BUY (Lazard Capital Markets)

I have discussed this w Ryan. He has drunk the kool aid.  Stock goes to $4, HIV failure.

D.S. Govender

On May 6, 2013, at 5:48 AM, Behzad Aghazadeh <behzad@venbio.com> wrote:

> FYI - lets catch up
>
> Sent from my iPhone
>
> Begin forwarded message:
>
>> **From:** <Ryan.Martins@lazardcap.com>
>> **Date:** May 6, 2013, 8:42:07 AM EDT
>> **To:** Behzad Aghazadeh <behzad@venbio.com>
>> **Subject: Re: SGMO: ASGCT presentations highlighted by preliminary HIV Phase 2 data; BUY (Lazard Capital Markets)**
>>
>> Upside case - $10-$11 which presumes positive data in the CCR5 delta 32 patients with a majority of patients demonstrating viral load decreases during the 16 wk treatment interruption and a majority being able to stay off HAART post the treatment interruption. Given that there is ~50% retail ownership, I would caution that it would not be surprising for the stock to move on data showing even 1/7 patients have been able to stay off HAART longer term,
>>
>> Downside case - $6-$7 which presumes not much impact on viral loads in both trials and none to a minority patients being able to stay off HAART after the treatment interruption.
>>
>> I have $4 out of my $16 PT coming from HIV (based only on 25% probability of success in the CCR5 delta 32 patients).
>>
>> Ryan Martins
>> Biotechnology Analyst
>> Equity Research
>> LAZARD CAPITAL MARKETS
>> 4 Embarcadero Center, Suite 2550
>> San Francisco, CA 94111
>> T 415-281-3446
>> F 415-281-3401
>> C 510-390-3407
>>
>> ryan.martins@lazardcap.com

From:     Behzad Aghazadeh <behzad@venbio.com>
To:       Ryan Martins/TRD/Lazard@Lazard NYC
Date:     05/06/2013 05:31 AM
Subject:  Re: SGMO: ASGCT presentations highlighted by preliminary HIV Phase 2 data; BUY (Lazard Capital Markets)

---

Ryan,

What's the up/down going into ASGCT for Sgmo? And what is in your valuation in the name for HIV v everything else?

Thanks,
Behzad

Sent from my iPhone

On May 6, 2013, at 6:40 AM, "Ryan Martins" <Ryan.Martins@LazardCap.com> wrote:

<mime-attachment.png> **May 6, 2013**

Company Note  Biotechnology

# Sangamo BioSciences (Click here for Full PDF)

**ASGCT presentations highlighted by preliminary HIV Phase 2 data; BUY**

(SGMO, BUY, $8.61, PT: $16.00)

Ryan Martins, 415-281-3446, ryan.martins@lazardcap.com
Jonathan Chang, PhD 415-281-3415, jonathan.chang@lazardcap.com

**Highlights:** SGMO will be presenting 12 abstracts at the American Society of Gene & Cell Therapies (ASGCT) 2013 Annual Meeting (May 15-18). Preliminary data from the SB-728-T HIV Phase 2 trials that investors are most focused on will be presented as part of a scientific symposium on May 15 at 10AM ET. Updated data will also be presented on the in vivo protein replacement platform (IVPRP) and electroporation-based delivery of ZFNs into hematopoietic stem cells (HSCs). Details on all 12 abstracts including takeaways for each are provided on Page 3.

- **Preliminary data from Phase 2 HIV trials.** SGMO's CMO Dr. Dale Ando is expected to provide an update on the ongoing Phase 2 trials during his talk titled "Clinical Studies of the Infusion of ZFN CCR5 Modified Autologous CD4 T cells (SB-728T) in HIV Subjects" on May 15 at 10AM ET. We expect an update on the CCR5Δ32 heterozygote aviremic HIV patients (N=20) and aviremic HIV patients lymphodepleted with increasing cytoxan doses (N=3 per cohort) prior to SB-728 treatment. While SGMO has not indicated how many patients in each study will have data presented at ASGCT, we will primarily be looking for impact of SB-728 treatment on viral load along with immune reconstitution data. Viral load impact will be assessed during the 16 week treatment interruption (during which HAART will be discontinued) and after the interruption when patients with an undetectable viral load can remain off HAART until HIV RNA levels are detectable or their CD4 T cell count falls below 350 or 500 cells/mm3 respectively in the two studies.
- **Other presentations highlight the breadth of programs and ongoing research/preclinical work.** Abstract 488 provides an update on the IVPRP that had promising Factor IX data at ASH. 183 utilizes electroporation for ZFN mRNA delivery

CONTROL00013364

into HSCs on a clinical scale to disrupt the CCR5 gene. SGMO has guided to an IND filing for this program in 2014. Electroporation is also the planned delivery modality for SGMO's hemoglobinopathy programs. We do not expect material updates to HIV abstracts 46 and 58 from data presented at CROI. 504 and 107 describe the use of ZFNs for treatment of multiple myeloma/acute leukemia and targeted allele correction in cystic fibrosis induced pluripotent stem cells. 486, 487, 492, and 568 relate to methods for delivery and specific integration of ZFNs and donor DNA.

## Investment Thesis

Sangamo's zinc finger proteins enable precise targeting of DNA and may be the key to unlocking the potential of gene therapy. We see tremendous value in the monogenic disease programs, specifically the in vivo protein replacement platform for Hemophilia and LSDs. The Berlin patient and CCR5 heterozygous patient Phase 1 experience in HIV suggest the potential for positive data in the Phase 2 heterozygous patient trial.

## Valuation

We arrive at our $16 PT by applying a sales/royalty multiple to probability adjusted peak sales projections of the individual pipeline programs, Sigma/Dow partnerships, and cash.

## Risks

Competitive, commercial, clinical, and regulatory.

Full PDF

## IMPORTANT DISCLOSURES

This report has been prepared by Lazard Capital Markets LLC ('LCM') in New York. It may not be reproduced, redistributed or copied in whole or in part for any purpose. This report has been approved by, and is being distributed in the US or to US persons, by LCM, which accepts responsibility for its contents in the US.

Transactions undertaken in the US in any security mentioned herein must be effected through LCM or another US-registered broker-dealer, in conformity with SEC Rule 15a-6.

Neither this report nor any copy or part thereof may be distributed in any other jurisdictions where its distribution may be restricted by law and persons into whose possession this report comes should inform themselves about, and observe, any such restrictions. Distribution of this report in any such other jurisdictions may constitute a violation of US securities laws, or the law of any such other jurisdictions.

This report does not constitute an offer or solicitation to buy or sell any securities referred to herein. It should not be so construed, nor should it or any part of it form the basis of, or be relied on in connection with, any contract or commitment whatsoever. The information in this report, or on which this report is based, has been obtained from sources that LCM believes to be reliable and accurate. However, it has not been independently verified and no representation or warranty, express or implied, is made as to the accuracy or completeness of any information obtained from third parties. The information or opinions are provided as at the date of this report and are subject to change without notice. The information and opinions provided in this report take no account of the investors' individual circumstances and should not be taken as specific advice on the merits of any investment decision. Investors should consider this report as only a single factor in making any investment decisions. Further information is available upon request. LCM does not accept any liability whatsoever for any direct or consequential loss howsoever arising, directly or indirectly, from any use of this report or its contents.

Disclosures for the covered securities mentioned in this note can be found in the full report or by visiting our disclosure website at Disclosure Site

## ANALYST CERTIFICATION

All of the recommendations and views about the securities and companies in this report

accurately reflect the personal views of the research analyst named on the cover of this report. No part of this research analyst's compensation was, is, or will be directly or indirectly related to the specific recommendations or views expressed by the research analyst in this research report.

Lazard Capital Markets LLC
30 Rockefeller Plaza, New York, NY 10020
Member NYSE and FINRA

Please contact your Lazard Capital Markets Sales Representative at 800-223-4080 with questions or comments.

Click here to access additional research on Lazard Capital Market's Equity Research website.

Click here to subscribe if you do not have a user ID.

If you would like to be removed from the distribution list, forward this email to LCMResearch@lazardcap.com and place "unsubscribe" in the subject field.

<mime-attachment.gif>

| | |
|---|---|
| **From:** | D. S. Govender <dhesh.healthcare@gmail.com> |
| **Sent:** | Monday, May 6, 2013 9:40 AM |
| **To:** | Behzad Aghazadeh <behzad@venbio.com> |
| **Subject:** | Re: SGMO: ASGCT presentations highlighted by preliminary HIV Phase 2 data; BUY (Lazard Capital Markets) |

After ARVO. What did you need on Thrombogenics? I will try get a read from some KOLs. Ophthotech is slated to have a pos update in combo w lucentis. I am short REGN

D.S. Govender

On May 6, 2013, at 6:36 AM, Behzad Aghazadeh <behzad@venbio.com> wrote:

> When are we getting together ... I want to rebuild portfolio
>
>
>
> **From:** D. S. Govender [mailto:dhesh.healthcare@gmail.com]
> **Sent:** Monday, May 06, 2013 9:35 AM
> **To:** Behzad Aghazadeh
> **Subject:** Re: SGMO: ASGCT presentations highlighted by preliminary HIV Phase 2 data; BUY (Lazard Capital Markets)
>
> I have discussed this w Ryan. He has drunk the kool aid. Stock goes to $4, HIV failure.
>
> D.S. Govender
>
> On May 6, 2013, at 5:48 AM, Behzad Aghazadeh <behzad@venbio.com> wrote:
>
>> FYI - lets catch up
>>
>> Sent from my iPhone
>>
>> Begin forwarded message:
>>
>>> **From:** <Ryan.Martins@lazardcap.com>
>>> **Date:** May 6, 2013, 8:42:07 AM EDT
>>> **To:** Behzad Aghazadeh <behzad@venbio.com>
>>> **Subject: Re: SGMO: ASGCT presentations highlighted by preliminary HIV Phase 2 data; BUY (Lazard Capital Markets)**
>>>
>>> Upside case - $10-$11 which presumes positive data in the CCR5 delta 32 patients with a majority of patients demonstrating viral load decreases during the 16 wk treatment interruption and a majority being able to stay off HAART post the treatment interruption. Given that there is ~50% retail ownership, I would caution that it would not be surprising for the stock to move on data showing even 1/7 patients have been able to stay off HAART longer term,
>>>
>>> Downside case - $6-$7 which presumes not much impact on viral loads in both trials and none to a minority patients being able to stay off HAART after the treatment interruption.
>>>
>>> I have $4 out of my $16 PT coming from HIV (based only on 25% probability of success in the CCR5 delta 32 patients).

CONTROL00001279

Ryan Martins
Biotechnology Analyst
Equity Research
**LAZARD CAPITAL MARKETS**
4 Embarcadero Center, Suite 2550
San Francisco, CA 94111
T 415-281-3446
F 415-281-3401
C 510-390-3407

ryan.martins@lazardcap.com

From:     Behzad Aghazadeh <behzad@venbio.com>
To:       Ryan Martins/TRD/Lazard@Lazard NYC
Date:     05/06/2013 05:31 AM
Subject:  Re: SGMO: ASGCT presentations highlighted by preliminary HIV Phase 2 data; BUY (Lazard
Capital Markets)

Ryan,

What's the up/down going into ASGCT for Sgmo? And what is in your
valuation in the name for HIV v everything else?

Thanks,
Behzad

Sent from my iPhone

On May 6, 2013, at 6:40 AM, "Ryan Martins"
<Ryan.Martins@LazardCap.com> wrote:

<mime-attachment.png> **May 6, 2013**

Company Note  Biotechnology

# Sangamo BioSciences (Click here for Full PDF)

### ASGCT presentations highlighted by preliminary HIV Phase 2 data; BUY

(SGMO, BUY, $8.61, PT: $16.00)

Ryan Martins, 415-281-3446, ryan.martins@lazardcap.com
Jonathan Chang,  PhD 415-281-3415, jonathan.chang@lazardcap.com

**Highlights:** SGMO will be presenting 12 abstracts at the American Society of
Gene & Cell Therapies (ASGCT) 2013 Annual Meeting (May 15-18).
Preliminary data from the SB-728-T HIV Phase 2 trials that investors are most
focused on will be presented as part of a scientific symposium on May 15 at
10AM ET. Updated data will also be presented on the in vivo protein
replacement platform (IVPRP) and electroporation-based delivery of ZFNs
into hematopoietic stem cells (HSCs). Details on all 12 abstracts including
takeaways for each are provided on Page 3.

- **Preliminary data from Phase 2 HIV trials.** SGMO's CMO Dr. Dale
  Ando is expected to provide an update on the ongoing Phase 2 trials
  during his talk titled "Clinical Studies of the Infusion of ZFN CCR5

CONTROL00001279

Modified Autologous CD4 T cells (SB-728T) in HIV Subjects" on May 15 at 10AM ET. We expect an update on the CCR5Δ32 heterozygote aviremic HIV patients (N=20) and aviremic HIV patients lymphodepleted with increasing cytoxan doses (N=3 per cohort) prior to SB-728 treatment. While SGMO has not indicated how many patients in each study will have data presented at ASGCT, we will primarily be looking for impact of SB-728 treatment on viral load along with immune reconstitution data. Viral load impact will be assessed during the 16 week treatment interruption (during which HAART will be discontinued) and after the interruption when patients with an undetectable viral load can remain off HAART until HIV RNA levels are detectable or their CD4 T cell count falls below 350 or 500 cells/mm3 respectively in the two studies.

- **Other presentations highlight the breadth of programs and ongoing research/preclinical work.** Abstract 488 provides an update on the IVPRP that had promising Factor IX data at ASH. 183 utilizes electroporation for ZFN mRNA delivery into HSCs on a clinical scale to disrupt the CCR5 gene. SGMO has guided to an IND filing for this program in 2014. Electroporation is also the planned delivery modality for SGMO's hemoglobinopathy programs. We do not expect material updates to HIV abstracts 46 and 58 from data presented at CROI. 504 and 107 describe the use of ZFNs for treatment of multiple myeloma/acute leukemia and targeted allele correction in cystic fibrosis induced pluripotent stem cells. 486, 487, 492, and 568 relate to methods for delivery and specific integration of ZFNs and donor DNA.

## Investment Thesis

Sangamo's zinc finger proteins enable precise targeting of DNA and may be the key to unlocking the potential of gene therapy. We see tremendous value in the monogenic disease programs, specifically the in vivo protein replacement platform for Hemophilia and LSDs. The Berlin patient and CCR5 heterozygous patient Phase 1 experience in HIV suggest the potential for positive data in the Phase 2 heterozygous patient trial.

## Valuation

We arrive at our $16 PT by applying a sales/royalty multiple to probability adjusted peak sales projections of the individual pipeline programs, Sigma/Dow partnerships, and cash.

## Risks

Competitive, commercial, clinical, and regulatory.

Full PDF

## IMPORTANT DISCLOSURES

This report has been prepared by Lazard Capital Markets LLC ('LCM') in New York. It may not be reproduced, redistributed or copied in whole or in part for any purpose. This report has been approved by, and is being distributed in the US or to US persons, by LCM, which accepts responsibility for its contents in the US.

Transactions undertaken in the US in any security mentioned herein must be effected through LCM or another US-registered broker-dealer, in conformity with SEC Rule 15a-6.

Neither this report nor any copy or part thereof may be distributed in any other jurisdictions where its distribution may be restricted by law and persons into whose possession this report comes should inform themselves about, and observe, any such restrictions. Distribution of this report in any such other

jurisdictions may constitute a violation of US securities laws, or the law of any such other jurisdictions.

This report does not constitute an offer or solicitation to buy or sell any securities referred to herein. It should not be so construed, nor should it or any part of it form the basis of, or be relied on in connection with, any contract or commitment whatsoever. The information in this report, or on which this report is based, has been obtained from sources that LCM believes to be reliable and accurate. However, it has not been independently verified and no representation or warranty, express or implied, is made as to the accuracy or completeness of any information obtained from third parties. The information or opinions are provided as at the date of this report and are subject to change without notice. The information and opinions provided in this report take no account of the investors' individual circumstances and should not be taken as specific advice on the merits of any investment decision. Investors should consider this report as only a single factor in making any investment decisions. Further information is available upon request. LCM does not accept any liability whatsoever for any direct or consequential loss howsoever arising, directly or indirectly, from any use of this report or its contents.

Disclosures for the covered securities mentioned in this note can be found in the full report or by visiting our disclosure website at Disclosure Site

**ANALYST CERTIFICATION**

All of the recommendations and views about the securities and companies in this report accurately reflect the personal views of the research analyst named on the cover of this report. No part of this research analyst's compensation was, is, or will be directly or indirectly related to the specific recommendations or views expressed by the research analyst in this research report.

Lazard Capital Markets LLC
30 Rockefeller Plaza, New York, NY 10020
Member NYSE and FINRA

Please contact your Lazard Capital Markets Sales Representative at 800-223-4080 with questions or comments.

Click here to access additional research on Lazard Capital Market's Equity Research website.

Click here to subscribe if you do not have a user ID.

If you would like to be removed from the distribution list, forward this email to LCMResearch@lazardcap.com and place "unsubscribe" in the subject field.

<mime-attachment.gif>

**From:**        Dhesh Govender <dhesh.healthcare@gmail.com>
**Sent:**        Monday, May 13, 2013 10:25 AM
**To:**          Ron Chernin <rhchernin@hotmail.com>; Steve Fishoff <JFishoff@aol.com>
**Subject:**     SGMO, stock is expected to run into Wed am HlV data. I am forecasting NEGATIVE.
                 $5 PT.

CONTROL00001284

**From:** Dhesh Govender <dhesh.healthcare@gmail.com>
**Sent:** Monday, May 13, 2013 2:27 PM
**To:** Ron Chernin <rhchernin@hotmail.com>; Steve Fishoff <JFishoff@aol.com>
**Subject:** SGMO trade

Steven,

May 18 $7 puts are trading at $0.30 ask.
Stock at $9 today.

Stock goes to $5 on Wed, Thurs post data.
6x return.

Forecasting underwhelming data on Wed. am.
can we put $100k to work here?

CONTROL00001285

**From:**      JFishoff@aol.com
**Sent:**      Monday, May 13, 2013 3:03 PM
**To:**        dinesh.healthcare@gmail.com
**Subject:**   Re: SGMO trade

NO THANK YOU

In a message dated 05/13/13 11:26:47 A.M. Pacific Daylight Time, dhesh.healthcare@gmail.com writes:

> Steven,
>
> May 18 $7 puts are trading at $0.30 ask.
> Stock at $9 today.
>
> Stock goes to $5 on Wed, Thurs post data.
> 6x return.
>
> Forecasting underwhelming data on Wed. am.
> can we put $100k to work here?

| | |
|---|---|
| **From:** | Dhesh Govender <dhesh.healthcare@gmail.com> |
| **Sent:** | Monday, May 13, 2013 3:15 PM |
| **To:** | Steve Fishoff <JFishoff@aol.com> |
| **Subject:** | Re: SGMO trade |

Understand.
I am working on some deal oriented trades w. Ron.  I am sure he filled you in as well as I am setting up some mtgs for him at Bof A in Vegas.


On Mon, May 13, 2013 at 3:02 PM, <JFishoff@aol.com> wrote:
  NO THANK YOU

  In a message dated 05/13/13 11:26:47 A.M. Pacific Daylight Time, dhesh.healthcare@gmail.com writes:

  > Steven,
  >
  > May 18 $7 puts are trading at $0.30 ask.
  > Stock at $9 today.
  >
  > Stock goes to $5 on Wed, Thurs post data.
  > 6x return.
  >
  > Forecasting underwhelming data on Wed. am.
  > can we put $100k to work here?

CC

| | |
|---|---|
| **From:** | JFishoff@aol.com |
| **Sent:** | Monday, May 13, 2013 3:26 PM |
| **To:** | dhesh.healthcare@gmail.com |
| **Subject:** | Re: SGMO trade |

TY

In a message dated 05/13/13 12:14:37 P.M. Pacific Daylight Time, dhesh.healthcare@gmail.com writes:

> Understand.
> I am working on some deal oriented trades w. Ron.  I am sure he filled you in as well as I am setting up some mtgs for him at Bof A in Vegas.
>
>
> On Mon, May 13, 2013 at 3:02 PM, <JFishoff@aol.com> wrote:
>> NO THANK YOU
>
>> In a message dated 05/13/13 11:26:47 A.M. Pacific Daylight Time, dhesh.healthcare@gmail.com writes:
>>
>>> Steven,
>>>
>>> May 18 $7 puts are trading at $0.30 ask.
>>> Stock at $9 today.
>>>
>>> Stock goes to $5 on Wed, Thurs post data.
>>> 6x return.
>>>
>>> Forecasting underwhelming data on Wed. am.
>>> can we put $100k to work here?

| | |
|---|---|
| **From:** | Dhesh Govender <dhesh.healthcare@gmail.com> |
| **Sent:** | Tuesday, May 14, 2013 10:11 PM |
| **To:** | Oleg Nodelman <oleg@ecor1cap.com> |
| **Subject:** | SGMO breaks tom on underwhelming data, $5 |

CONTROL00001293

| From: | Behzad Aghazadeh <behzad@venbio.com> |
|-------|-------------------------------------|
| Sent: | Tuesday, May 14, 2013 10:57 AM |
| To: | Deshan Govender (dhesh.healthcare@gmail.com) |
| Subject: | FW: Piper/SGMO: ASGCT Outlook Positive for Sangamo's HIV Program |
| Attach: | 153629.pdf |

FYI

-----Original Message-----
From: Charles C. Duncan, PhD [mailto:charles.c.duncan@pjc.com]
Sent: Tuesday, May 14, 2013 10:55 AM
To: Behzad Aghazadeh
Subject: Piper/SGMO: ASGCT Outlook Positive for Sangamo's HIV Program

Piper/SGMO: ASGCT Outlook Positive for Sangamo's HIV Program

Sangamo BioSciences, Inc. [SGMO]
Price: 8.98
Rating: Overweight

Charles C. Duncan, PhD,  Sr. Research Analyst
212 284-5025 charles.c.duncan@pjc.com

Roy Buchanan, Ph.D.,  Research Analyst
212 284-9458 roy.d.buchanan@pjc.com

We will be in attendance at the American Society of Gene and Cell
Therapy (ASGCT), May 15-18 in Salt Lake City. Sangamo has 12 abstracts
slated for presentation at the meeting (Exhibit 1), and this will
include data from the company's programs in HIV/AIDS (SB-728-T), other
hematological indications, and in monogenic diseases. We believe
investors are primarily focused on the preliminary Phase II data from
the HIV program, however we anticipate that, although likely positive,
the data will be limited in scope and look more to a full data set by
YE13 to get a better gauge on progress with '728. That said, we are
hosting a physician-expert call this Thursday to discuss the data and
the outlook for the program. We are reiterating our Overweight rating
and $14 price target on Sangamo.

  * The HIV data may fill out some early views of the '728 program.
Sangamo's Chief Scientific Officer will present the preliminary
data from two Phase II studies of '728. One study involves an
expansion cohort of up to 20 patients on anti-retroviral therapy
(HAART) who have a mutation in one of their CCR5 genes which
confers resistance to HIV. The other is a study of patients on
anti-retroviral therapy who will have had their lymphocyte levels
reduced (lymphopenic conditioning) in order to create a supportive
environment for introduction of the modified T-cells ('728). Both
studies continue to enroll patients and were recently initiated
(January 2012), and given essentially sequential enrollment, we
anticipate only a handful (maybe 3-5, 10 at most) to be
represented on Wednesday.

* What do we anticipate? For the study of CCR5-heterozygotes, we anticipate clear stabilization and early evidence of viral load reductions following a treatment interruption. Note we expect there to be an initial increase in viral load following the treatment interruption, however the major question will be longer-term stabilization, in our view. We will also be looking for an increase in CD4+ T-cell counts. For the lymphopenic conditioning study, we expect safety data and evidence of cellular engraftment from a first cohort of patients.

* How to play the data. Regardless of the price reaction following data on Wednesday, we would likely be buyers in advance of more full data by year end. We anticipate that the full data should support the technological innovation of '728 and set the stage for a partnership to lead to Phase III. We also believe there will be scientific takeaways that can be gleaned from these studies which may prove useful for technological de-risking of the Sangamo pipeline generally.

Guides for the journey. Piper Jaffray & Co. Since 1895. Member SIPC and NYSE. Learn more at piperjaffray.com. Piper Jaffray corporate headquarters is located at 800 Nicollet Mall, Minneapolis, MN 55402

Piper Jaffray outgoing and incoming e-mail is electronically archived and recorded and is subject to review, monitoring and/or disclosure to someone other than the recipient. This e-mail may be considered an advertisement or solicitation for purposes of regulation of commercial electronic mail messages. If you do not wish to receive commercial e-mail communications from Piper Jaffray, go to: http://www.piperjaffray.com/do_not_email to review the details and submit your request to be added to the Piper Jaffray "Do Not E-mail" list.

For additional disclosure information see http://www.piperjaffray.com/disclosures

-----
No virus found in this message.
Checked by AVG - www.avg.com
Version: 2013.0.2904 / Virus Database: 3162/6319 - Release Date: 05/12/13

Disclosure

The information in this transmittal may be legally privileged, confidential, and/or otherwise protected by law from disclosure, and is intended only for the recipient(s) listed above. If you received this transmittal in error, you are hereby notified that any distribution or copying of this transmittal is prohibited; please notify the sender and then delete this message and any attachment from your system. Emails sent to or from this address may be monitored, reviewed and archived. This email is not meant as a general guide to investing, and makes no express or implied investment recommendation.

CONTROL00013450

| From: | D. S. Govender <dhesh.healthcare@gmail.com> |
|---|---|
| Sent: | Tuesday, May 14, 2013 11:35 AM |
| To: | Behzad Aghazadeh <behzad@venbio.com> |
| Subject: | Re: Piper/SGMC: ASGCT Outlook Positive for Sangamo's HIV Program |

Spin has begun. Won't matter, it's a dead program.

D.S. Govender

On May 14, 2013, at 10:56 AM, Behzad Aghazadeh <behzad@venbio.com> wrote:

> FYI
>
> -----Original Message-----
> From: Charles C. Duncan, PhD [mailto:charles.c.duncan@pjc.com]
> Sent: Tuesday, May 14, 2013 10:55 AM
> To: Behzad Aghazadeh
> Subject: Piper/SGMO: ASGCT Outlook Positive for Sangamo's HIV Program
>
>
>
> Piper/SGMO: ASGCT Outlook Positive for Sangamo's HIV Program
>
> Sangamo BioSciences, Inc. [SGMO]
> Price: 8.98
> Rating: Overweight
>
>
> Charles C. Duncan, PhD,  Sr. Research Analyst
> 212 284-5025 charles.c.duncan@pjc.com
>
> Roy  Buchanan, Ph.D.,  Research Analyst
> 212 284-9458 roy.d.buchanan@pjc.com
>
>
>
>   We will be in attendance at the American Society of Gene and Cell
>   Therapy (ASGCT), May 15-18 in Salt Lake City. Sangamo has 12 abstracts
>   slated for presentation at the meeting (Exhibit 1), and this will
>   include data from the company's programs in HIV/AIDS (SB-728-T), other
>   hematological indications, and in monogenic diseases. We believe
>   investors are primarily focused on the preliminary Phase II data from
>   the HIV program, however we anticipate that, although likely positive,
>   the data will be limited in scope and look more to a full data set by
>   YE13 to get a better gauge on progress with '728. That said, we are
>   hosting a physician-expert call this Thursday to discuss the data and
>   the outlook for the program. We are reiterating our Overweight rating
>   and $14 price target on Sangamo.
>
>
>
>   * The HIV data may fill out some early views of the '728 program.
>   Sangamo's Chief Scientific Officer will present the preliminary
>   data from two Phase II studies of '728. One study involves an
>   expansion cohort of up to 20 patients on anti-retroviral therapy
>   (HAART) who have a mutation in one of their CCR5 genes which
>   confers resistance to HIV. The other is a study of patients on
>   anti-retroviral therapy who will have had their lymphocyte levels
>   reduced (lymphopenic conditioning) in order to create a supportive
>   environment for introduction of the modified T-cells ('728). Both

CONTROL00001289

> studies continue to enroll patients and were recently initiated
> (January 2012), and given essentially sequential enrollment, we
> anticipate only a handful (maybe 3-5, 10 at most) to be
> represented on Wednesday.
>
>
>    * What do we anticipate? For the study of CCR5-heterozygotes, we
> anticipate clear stabilization and early evidence of viral load
> reductions following a treatment interruption. Note we expect
> there to be an initial increase in viral load following the
> treatment interruption, however the major question will be
> longer-term stabilization, in our view. We will also be looking
> for an increase in CD4+ T-cell counts. For the lymphopenic
> conditioning study, we expect safety data and evidence of cellular
> engraftment from a first cohort of patients.
>
>
>    * How to play the data. Regardless of the price reaction following
> data on Wednesday, we would likely be buyers in advance of more
> full data by year end. We anticipate that the full data should
> support the technological innovation of '728 and set the stage for
> a partnership to lead to Phase III. We also believe there will be
> scientific takeaways that can be gleaned from these studies which
> may prove useful for technological de-risking of the Sangamo
> pipeline generally.
>
>
> Guides for the journey. Piper Jaffray & Co. Since 1895. Member SIPC and NYSE. Learn more at piperjaffray.com. Piper Jaffray
corporate headquarters is located at 800 Nicollet Mall, Minneapolis, MN 55402
>
> Piper Jaffray outgoing and incoming e-mail is electronically archived and recorded and is subject to review, monitoring and/or
disclosure to someone other than the recipient. This e-mail may be considered an advertisement or solicitation for purposes of
regulation of commercial electronic mail messages. If you do not wish to receive commercial e-mail communications from Piper
Jaffray, go to: http://www.piperjaffray.com/do_not_email to review the details and submit your request to be added to the Piper
Jaffray "Do Not E-mail" list.
>
> For additional disclosure information see http://www.piperjaffray.com/disclosures
>
> -----
> No virus found in this message.
> Checked by AVG - www.avg.com
> Version: 2013.0.2904 / Virus Database: 3162/6319 - Release Date: 05/12/13
>
>
>
> Disclosure
>
> The information in this transmittal may be legally privileged, confidential, and/or otherwise protected by law from disclosure, and is
intended only for the recipient(s) listed above. If you received this transmittal in error, you are hereby notified that any distribution or
copying of this transmittal is prohibited; please notify the sender and then delete this message and any attachment from your system.
Emails sent to or from this address may be monitored, reviewed and archived. This email is not meant as a general guide to investing,
and makes no express or implied investment recommendation.
> <153629.pdf>

CONTROL00001289

| From: | Behzad Aghazadeh <behzad@venbio.com> |
| Sent: | Tuesday, May 14, 2013 11:46 AM |
| To: | D. S. Govender <dhesh.healthcare@gmail.com> |
| Subject: | RE: Piper/SGMO: ASGCT Outlook Positive for Sangamo's HIV Program |

I hope you are right bud!

-----Original Message-----
From: D. S. Govender [mailto:dhesh.healthcare@gmail.com]
Sent: Tuesday, May 14, 2013 11:35 AM
To: Behzad Aghazadeh
Subject: Re: Piper/SGMO: ASGCT Outlook Positive for Sangamo's HIV Program

Spin has begun. Won't matter, it's a dead program.

D.S. Govender

On May 14, 2013, at 10:56 AM, Behzad Aghazadeh <behzad@venbio.com> wrote:

> FYI
>
> -----Original Message-----
> From: Charles C. Duncan, PhD [mailto:charles.c.duncan@pjc.com]
> Sent: Tuesday, May 14, 2013 10:55 AM
> To: Behzad Aghazadeh
> Subject: Piper/SGMO: ASGCT Outlook Positive for Sangamo's HIV Program
>
>
>
> Piper/SGMO: ASGCT Outlook Positive for Sangamo's HIV Program
>
> Sangamo BioSciences, Inc. [SGMO]
> Price: 8.98
> Rating: Overweight
>
>
> Charles C. Duncan, PhD,  Sr. Research Analyst
> 212 284-5025 charles.c.duncan@pjc.com
>
> Roy  Buchanan, Ph.D.,  Research Analyst
> 212 284-9458 roy.d.buchanan@pjc.com
>
>
>
> We will be in attendance at the American Society of Gene and Cell
> Therapy (ASGCT), May 15-18 in Salt Lake City. Sangamo has 12 abstracts
> slated for presentation at the meeting (Exhibit 1), and this will
> include data from the company's programs in HIV/AIDS (SB-728-T), other
> hematological indications, and in monogenic diseases. We believe
> investors are primarily focused on the preliminary Phase II data from
> the HIV program, however we anticipate that, although likely positive,
> the data will be limited in scope and look more to a full data set by
> YE13 to get a better gauge on progress with '728. That said, we are
> hosting a physician-expert call this Thursday to discuss the data and
> the outlook for the program. We are reiterating our Overweight rating
> and $14 price target on Sangamo.
>
>
>
>
> * The HIV data may fill out some early views of the '728 program.

CONTROL00013452

> Sangamo's Chief Scientific Officer will present the preliminary
> data from two Phase II studies of '728. One study involves an
> expansion cohort of up to 20 patients on anti-retroviral therapy
> (HAART) who have a mutation in one of their CCR5 genes which
> confers resistance to HIV. The other is a study of patients on
> anti-retroviral therapy who will have had their lymphocyte levels
> reduced (lymphopenic conditioning) in order to create a supportive
> environment for introduction of the modified T-cells ('728). Both
> studies continue to enroll patients and were recently initiated
> (January 2012), and given essentially sequential enrollment, we
> anticipate only a handful (maybe 3-5, 10 at most) to be
> represented on Wednesday.
>
>
> * What do we anticipate? For the study of CCR5-heterozygotes, we
> anticipate clear stabilization and early evidence of viral load
> reductions following a treatment interruption. Note we expect
> there to be an initial increase in viral load following the
> treatment interruption, however the major question will be
> longer-term stabilization, in our view. We will also be looking
> for an increase in CD4+ T-cell counts. For the lymphopenic
> conditioning study, we expect safety data and evidence of cellular
> engraftment from a first cohort of patients.
>
>
> * How to play the data. Regardless of the price reaction following
> data on Wednesday, we would likely be buyers in advance of more
> full data by year end. We anticipate that the full data should
> support the technological innovation of '728 and set the stage for
> a partnership to lead to Phase III. We also believe there will be
> scientific takeaways that can be gleaned from these studies which
> may prove useful for technological de-risking of the Sangamo
> pipeline generally.
>
>
> Guides for the journey. Piper Jaffray & Co. Since 1895. Member SIPC and NYSE. Learn more at piperjaffray.com. Piper Jaffray
corporate headquarters is located at 800 Nicollet Mall, Minneapolis, MN 55402
>
> Piper Jaffray outgoing and incoming e-mail is electronically archived and recorded and is subject to review, monitoring and/or
disclosure to someone other than the recipient. This e-mail may be considered an advertisement or solicitation for purposes of
regulation of commercial electronic mail messages. If you do not wish to receive commercial e-mail communications from Piper
Jaffray, go to: http://www.piperjaffray.com/do_not_email to review the details and submit your request to be added to the Piper
Jaffray "Do Not E-mail" list.
>
> For additional disclosure information see http://www.piperjaffray.com/disclosures
>
> -----
> No virus found in this message.
> Checked by AVG - www.avg.com
> Version: 2013.0.2904 / Virus Database: 3162/6319 - Release Date: 05/12/13
>
>
>
> Disclosure
>
> The information in this transmittal may be legally privileged, confidential, and/or otherwise protected by law from disclosure, and is
intended only for the recipient(s) listed above. If you received this transmittal in error, you are hereby notified that any distribution or
copying of this transmittal is prohibited; please notify the sender and then delete this message and any attachment from your system.
Emails sent to or from this address may be monitored, reviewed and archived. This email is not meant as a general guide to investing,
and makes no express or implied investment recommendation.
> <153629.pdf>


-----
No virus found in this message.
Checked by AVG - www.avg.com

Version: 2013.0.2904 / Virus Database: 3162/6319 - Release Date: 05/12/13

Disclosure

The information in this transmittal may be legally privileged, confidential, and/or otherwise protected by law from disclosure, and is intended only for the recipient(s) listed above. If you received this transmittal in error, you are hereby notified that any distribution or copying of this transmittal is prohibited; please notify the sender and then delete this message and any attachment from your system. Emails sent to or from this address may be monitored, reviewed and archived. This email is not meant as a general guide to investing, and makes no express or implied investment recommendation.

CONTROL00013452

| | |
|---|---|
| **From:** | D. S. Govender <dhesh.healthcare@gmail.com> |
| **Sent:** | Tuesday, May 14, 2013 1:28 PM |
| **To:** | Behzad Aghazadeh <behzad@venbio.com> |
| **Subject:** | Re: Piper/SGMO: ASGCT Outlook Positive for Sangamo's HIV Program |

I will be. Would be nice to get paid on this.

Also, BMY long. You shld take big position.

D.S. Govender

On May 14, 2013, at 11:45 AM, Behzad Aghazadeh <behzad@venbio.com> wrote:

> I hope you are right bud!
>
> -----Original Message-----
> From: D. S. Govender [mailto:dhesh.healthcare@gmail.com]
> Sent: Tuesday, May 14, 2013 11:35 AM
> To: Behzad Aghazadeh
> Subject: Re: Piper/SGMO: ASGCT Outlook Positive for Sangamo's HIV Program
>
> Spin has begun. Won't matter, it's a dead program.
>
> D.S. Govender
>
> On May 14, 2013, at 10:56 AM, Behzad Aghazadeh <behzad@venbio.com> wrote:
>
>> FYI
>>
>> -----Original Message-----
>> From: Charles C. Duncan, PhD [mailto:charles.c.duncan@pjc.com]
>> Sent: Tuesday, May 14, 2013 10:55 AM
>> To: Behzad Aghazadeh
>> Subject: Piper/SGMO: ASGCT Outlook Positive for Sangamo's HIV Program
>>
>>
>>
>> Piper/SGMO: ASGCT Outlook Positive for Sangamo's HIV Program
>>
>> Sangamo BioSciences, Inc. [SGMO]
>> Price: 8.98
>> Rating: Overweight
>>
>>
>> Charles C. Duncan, PhD,  Sr. Research Analyst
>> 212 284-5025 charles.c.duncan@pjc.com
>>
>> Roy  Buchanan, Ph.D.,  Research Analyst
>> 212 284-9458 roy.d.buchanan@pjc.com
>>
>>
>>
>> We will be in attendance at the American Society of Gene and Cell
>> Therapy (ASGCT), May 15-18 in Salt Lake City. Sangamo has 12 abstracts
>> slated for presentation at the meeting (Exhibit 1), and this will
>> include data from the company's programs in HIV/AIDS (SB-728-T), other
>> hematological indications, and in monogenic diseases. We believe
>> investors are primarily focused on the preliminary Phase II data from
>> the HIV program, however we anticipate that, although likely positive,
>> the data will be limited in scope and look more to a full data set by
>> YE13 to get a better gauge on progress with '728. That said, we are

CONTROL00001290

>> hosting a physician-expert call this Thursday to discuss the data and
>> the outlook for the program. We are reiterating our Overweight rating
>> and $14 price target on Sangamo.
>>
>>
>>
>>
>>    * The HIV data may fill out some early views of the '728 program.
>>    Sangamo's Chief Scientific Officer will present the preliminary
>>    data from two Phase II studies of '728. One study involves an
>>    expansion cohort of up to 20 patients on anti-retroviral therapy
>>    (HAART) who have a mutation in one of their CCR5 genes which
>>    confers resistance to HIV. The other is a study of patients on
>>    anti-retroviral therapy who will have had their lymphocyte levels
>>    reduced (lymphopenic conditioning) in order to create a supportive
>>    environment for introduction of the modified T-cells ('728). Both
>>    studies continue to enroll patients and were recently initiated
>>    (January 2012), and given essentially sequential enrollment, we
>>    anticipate only a handful (maybe 3-5, 10 at most) to be
>>    represented on Wednesday.
>>
>>
>>    * What do we anticipate? For the study of CCR5-heterozygotes, we
>>    anticipate clear stabilization and early evidence of viral load
>>    reductions following a treatment interruption. Note we expect
>>    there to be an initial increase in viral load following the
>>    treatment interruption, however the major question will be
>>    longer-term stabilization, in our view. We will also be looking
>>    for an increase in CD4+ T-cell counts. For the lymphopenic
>>    conditioning study, we expect safety data and evidence of cellular
>>    engraftment from a first cohort of patients.
>>
>>
>>    * How to play the data. Regardless of the price reaction following
>>    data on Wednesday, we would likely be buyers in advance of more
>>    full data by year end. We anticipate that the full data should
>>    support the technological innovation of '728 and set the stage for
>>    a partnership to lead to Phase III. We also believe there will be
>>    scientific takeaways that can be gleaned from these studies which
>>    may prove useful for technological de-risking of the Sangamo
>>    pipeline generally.
>>
>>
>> Guides for the journey. Piper Jaffray & Co. Since 1895. Member SIPC and NYSE. Learn more at piperjaffray.com. Piper Jaffray
corporate headquarters is located at 800 Nicollet Mall, Minneapolis, MN 55402
>>
>> Piper Jaffray outgoing and incoming e-mail is electronically archived and recorded and is subject to review, monitoring and/or
disclosure to someone other than the recipient. This e-mail may be considered an advertisement or solicitation for purposes of
regulation of commercial electronic mail messages. If you do not wish to receive commercial e-mail communications from Piper
Jaffray, go to: http://www.piperjaffray.com/do_not_email to review the details and submit your request to be added to the Piper
Jaffray "Do Not E-mail" list.
>>
>> For additional disclosure information see http://www.piperjaffray.com/disclosures
>>
>> -----
>> No virus found in this message.
>> Checked by AVG - www.avg.com
>> Version: 2013.0.2904 / Virus Database: 3162/6319 - Release Date: 05/12/13
>>
>>
>>
>> Disclosure
>>
>> The information in this transmittal may be legally privileged, confidential, and/or otherwise protected by law from disclosure, and
is intended only for the recipient(s) listed above. If you received this transmittal in error, you are hereby notified that any distribution

CONTROL00001290

or copying of this transmittal is prohibited; please notify the sender and then delete this message and any attachment from your system. Emails sent to or from this address may be monitored, reviewed and archived. This email is not meant as a general guide to investing, and makes no express or implied investment recommendation.
>> <153629.pdf>
>
> -----
> No virus found in this message.
> Checked by AVG - www.avg.com
> Version: 2013.0.2904 / Virus Database: 3162/6319 - Release Date: 05/12/13
>
>
>
> Disclosure
>
> The information in this transmittal may be legally privileged, confidential, and/or otherwise protected by law from disclosure, and is intended only for the recipient(s) listed above. If you received this transmittal in error, you are hereby notified that any distribution or copying of this transmittal is prohibited; please notify the sender and then delete this message and any attachment from your system. Emails sent to or from this address may be monitored, reviewed and archived. This email is not meant as a general guide to investing, and makes no express or implied investment recommendation.

| From: | Oleg Nodelman <oleg@ecor1cap.com> |
| --- | --- |
| Sent: | Tuesday, May 14, 2013 10:53 PM |
| To: | Dhesh Govender <dhesh.healthcare@gmail.com> |
| Subject: | Re: SGMO breaks tom on underwhelming data, $5 |

Will be watching for it.


Oleg Nodelman
EcoR1 Capital, LLC
oleg@EcoR1cap.com
p. 415-448-6534
c. 415-722-1038

On May 14, 2013, at 19:11, Dhesh Govender <dhesh.healthcare@gmail.com> wrote:

CONTROL00013456

**From:** Dhesh Govender <dhesh.healthcare@gmail.com>
**Sent:** Wednesday, May 15, 2013 5:56 PM
**To:** Steve Fishoff <JFishoff@aol.com>; Ron Chernin <rhchernin@hotmail.com>
**Subject:** fyi; SGMO action_05_15_13, data came out around 10:15am EST.



CONTROL00001302

| | |
|---|---|
| **From:** | Dhesh Govender <dhesh.healthcare@gmail.com> |
| **Sent:** | Wednesday, September 4, 2013 9:16 AM |
| **To:** | George Antonopoulos <gantonopoulos@hudsonbaycapital.com> |
| **Subject:** | SGMO trade |

G -

SMGO will have data next week at ICAAC.
stock will run up into the conference, late breaker on their HIV program.
Trade is into the data. Sell on the news next week.  Expect Pos data, high conviction given trial design and data thus far.  Fact that it is a late breaker is a big bull signal.

stock I know very very well and we traded it multiple times while at Kingsbrook.
Call if any questions.

Lets catch up on newco this week.  Have some thoughts.
-dg

CONTROL00003049

**From:**     Dhesh Govender <dhesh.healthcare@gmail.com>
**Sent:**     Tuesday, September 17, 2013 10:16 AM
**To:**       Ron Chernin <rhchernin@hotmail.com>
**Subject:**  where do we stand on SGMO? thnx

CONTROL00003159



Envelope 903246462

DHESHA S GOVENDER
1510 LEXINGTON AVE APT 9H
NEW YORK NY 10029-7161

# Investment Report

February 1, 2013 - February 28, 2013

| | |
|---|---|
| Online | Fidelity.com |
| FAST(sm)-Automated Telephone | 800-544-5555 |
| Customer Service | 800-544-6666 |

## Your Portfolio Summary

### Changes in Portfolio Value

| Mar 2012 - Feb 2013 | |
|---|---|
| Beginning value as of Feb 1 | $39,150.27 |
| Transaction costs, loads and fees | -141.86 |
| Change in investment value | -28,829.93 |
| **Ending value as of Feb 28** | **$10,178.48** |
| Total trades for portfolio period | 3 |

### Value by Account

| | Account Number | Net Value February 1, 2013 | Net Value February 28, 2013 |
|---|---|---|---|
| **General Investment** | | | |
| Fidelity Account℠ - Individual - TOD | X25-611581 | $0.67 | $0.67 |
| **Personal Retirement** | | | |
| Fidelity Rollover IRA | 140-554820 | 39,149.60 | 10,177.81 |
| **Total Portfolio Value** | | **$39,150.27** | **$10,178.48** |

### Income Summary

| | This period | Year to Date |
|---|---|---|
| Tax-deferred | $0.07 | $0.68 |

# Your Portfolio Details



## Fidelity Account ℠  X25-611581        DHESHA S GOVENDER - INDIVIDUAL TOD

**Account Summary**

| | |
|---|---|
| Beginning value as of Feb 1 | $0.67 |
| Change in investment value | 0.00 |
| Ending value as of Feb 28 | **$0.67** |

Account trades from Mar 2012 - Feb 2013 .......... 0

### Holdings  (Symbol) as of February 28, 2013

**Core Account 100% of holdings**

| | Quantity February 28, 2013 | Price per Unit February 28, 2013 | Total Value February 1, 2013 | Total Value February 28, 2013 |
|---|---|---|---|---|
| CASH | 0.670 | $1.000 | $0.67 | $0.67 |

*For balances below $10,000.00, the current interest rate is 00.01%.*

### Core Account   - Cash

| Description | Amount | Balance | Description | Amount | Balance |
|---|---|---|---|---|---|
| **Beginning** | | $0.67 | **Ending** | | **$0.67** |

## Fidelity Rollover IRA  140-554820        DHESHA S GOVENDER - ROLLOVER IRA - FIDELITY MANAGEMENT TRUST CO - CUSTODIAN

**Account Summary**

| | | **Income Summary** | | |
|---|---|---|---|---|
| Beginning value as of Feb 1 | $39,149.60 | | Tax-deferred | This Period | Year to Date |
| Transaction costs, loads and fees | -141.86 | | | $0.07 | $0.68 |
| Change in investment value | -28,829.93 | | | | |
| Ending value as of Feb 28 | **$10,177.81** | | | | |

Account trades from Mar 2012 - Feb 2013 .......... 3



Investment Report

February 1, 2013 - February 28, 2013

## Fidelity Rollover IRA 140-554820

DHESHA S GOVENDER - ROLLOVER IRA - FIDELITY MANAGEMENT TRUST CO - CUSTODIAN

### Holdings (Symbol) as of February 28, 2013

| | Performance February 28, 2013 | Quantity February 28, 2013 | Price per Unit February 28, 2013 | Cost | Total Value February 28, 2013 | Total Value February 1, 2013 |
|---|---|---|---|---|---|---|
| **Options 91% of holdings** | | | | | | |
| PUT (SGMO) SANGAMO BIOSCIENCES MAR 16 13 $9 (100 SHS) (SGMO13O316P9) | | 370.000 | $0.250 | $38,387.35 | $9,250.00 | |
| **Subtotal of Options** | | | | **38,387.35** | **9,250.00** | |
| **Core Account 9% of holdings** | | | | | | |
| FIDELITY CASH RESERVES (FDRXX) | 7-day Yield: 0.01% | 927.810 | 1.000 | not applicable | 927.81 | 927.81 |
| **Subtotal of Core Account** | | | | | **927.81** | **927.81** |
| **Total** | | | | | **$ 38,387.35** | **$10,177.81** |

Position held in cash account.
Total Cost does not include the cost basis on core, money market or other positions where cost basis is unknown or not applicable.

## Transaction Details (for holdings with activity this period)

### Core Account - Fidelity Cash Reserves

| Description | Amount | Balance | Description | Amount | Balance |
|---|---|---|---|---|---|
| **Beginning** | | | | | |
| Investment Activity | | | Core account income | 0.07 | |
| Securities bought | -$21,221.86 | $22,149.60 | Subtotal of Investment Activity | - $21,221.79 | |
| | | | **Ending** | | **$927.81** |

### Investment Activity

| Settlement Date | Security | Description | Quantity | Price per Unit | Cost | Transaction Amount |
|---|---|---|---|---|---|---|
| 2/08 | PUT (SGMO) SANGAMO BIOSCIENCES MAR 16 13 $9 (100 SHS) OPENING TRANSACTION | You bought Transaction cost: -$141.86 | 170.000 | $1.24000 | $16,000.00 | -$21,221.86 |
| 2/15 | CALL (CLSN) CELSION CORP COM NEW FEB 16 13 $9 (100 SHS) | Expired | -200.000 | | $41,075.48 | 0.00 |



# Investment Report

February 1, 2013 - February 28, 2013

## Fidelity Rollover IRA  140-554820   DHESHA S GOVENDER - ROLLOVER IRA - FIDELITY MANAGEMENT TRUST CO - CUSTODIAN

## Transaction Details

### Investment Activity

| Settlement Date | Security | Description | Quantity | Price per Unit | Cost | Transaction Amount |
|---|---|---|---|---|---|---|
| 2/28 | FIDELITY CASH RESERVES | Transaction Loss $41,075.48 Dividend received | | | | 0.07 |

*Cost basis and gain/loss information is provided as a service to our customers and is based on standards for filing US Federal Tax Returns as determined by Fidelity. This information is not intended to address tax law or reporting requirements applicable in your country of tax residence.*

### Daily Additions and Subtractions  Fidelity Cash Reserves @ $1 per share (the following is provided to you in accordance with industry regulations)

| Date | Amount | Balance | Date | Amount | Balance | Date | Amount | Balance |
|---|---|---|---|---|---|---|---|---|
| 2/08 | -$21,221.86 | $927.74 | 2/28 | 0.07 | 927.81 | | | |

## ▼ Additional Information About Your Investment Report

*Effective 3/1/2013, the Italian government has instituted a Financial Transaction Tax on both American Depository Receipts (ADRs) and foreign ordinary (ORDs). This tax applies only to executed buy orders and is in addition to the commission and principal amount of your transaction. The tax for ADRs and for ORDs is 0.12%. Please contact our International team with any questions at 800-544-2976.*



## Information About Your Fidelity Statement

For TDD Service for the Hearing-Impaired, call 800-544-0118, 9 am - 9 pm ET, 7 days a week. For Lost or Stolen Cards For 24 hour worldwide customer service, call 800-529-2164 for American Express or 800-323-5353 for VISA with Fidelity Maté checks payable to Fidelity Investments and include your account number. For retirement and health savings accounts (HSA), designate in the memo field whether your contribution is for the current or prior year. Mail to: Fidelity Investments, P.O. Box 770001, Cincinnati, OH 45277-0003.

**Income Summary** Shows income by tax status for the statement and year-to-date periods. Except for interest income, dividends, or distributed by tax-exempt securities, Fidelity reports dividends and capital gains held in taxable accounts as taxable income. A portion of income reported as tax-exempt income may be subject to alternative minimum tax rules and/or state and local taxes. In Traditional IRAs, Rollover IRAs, SEP-IRAs, SIMPLE IRAs and Keoghs, earnings are reported as tax-deferred income. In Roth IRAs and HSAs, earnings are reported as tax-exempt income, as they may not be taxable when you take a distribution. Tax-exempt income is reported to the IRS on Form 1099-B. However, cost basis, realized gain and loss, and holding period information may not reflect adjustments required for your tax reporting. Fidelity and NFS specifically disclaim any liability arising out of a customer's use of, or any tax position taken in reliance upon, such information. Unless otherwise specified, NFS determines cost basis at the time of sale based on the first-in, first-out (FIFO) method. Transaction profit or loss is calculated by comparing purchase cost basis using the FIFO method if shares were purchased at different times or prices.

**Cost Basis, Gain/Loss, and Holding Period Information** Cost basis is the original amount paid to purchase a security, including the amount of reinvested dividends and capital gains. Generally, we adjust cost basis for wash sales, return of capital (including ETFs) and other distributions. NFS is required to report certain cost basis and holding period information to the IRS on Form 1099-B. However, cost basis, realized gain and loss, and holding period information may not reflect all adjustments required for your tax reporting. **Cost** Fidelity provides purchase cost information for securities held in retirement and HSA accounts. Such information may be adjusted for certain transactions and distributions. Unless otherwise specified, NFS determines cost basis at the time of sale based on the first-in, first-out (FIFO) method. Consult your tax advisor for further information.

## Additional Information About Your Brokerage Account, If Applicable

Customers are entitled to free credit balances in your brokerage account, subject to any open commitments in your cash accounts. Free credit balances are not segregated and may be used in NFS's business in accordance with federal securities law. There is no free credit balance in your retirement or HSA account.

**Assets Separate from Your Brokerage Account** Only securities in the margin portion of your brokerage account contribute to margin and maintenance requirements. Assets held by FBS as agent for your account (including but not limited to assets held directly with the fund (Fidelity Mutual Fund Accounts)) are not covered by the Securities Investor Protection Corporation (SIPC) and do not count toward your margin and maintenance requirements. Assets held by Portfolio Advisory Services (PAS) and carried by NFS and are covered by SIPC but do not constitute a brokerage account are held in a separate account. These securities are marked-to-market for margin purposes, and any increase or decrease from the previous week's value is transferred weekly to your margin account. Fidelity represents your short account balance as of the last weekly mark-to-market, not as of the statement end date.

**Information** concerning certain transaction confirmation previously delivered to you may be available upon request. Short positions in American-style options are liable for assignment anytime. The writer of a European-style option is subject to exercise assignment procedures only during the exercise period. For more information on Assignment, please refer to your margin account agreement.

**Equity Dividend Reinvestment** Shares credited to your account resulted from transactions by FBS acting as agent for your account, and NFS as agent for the Depository Trust Company (DTC).

**Price Information/Total Market Value** The Total Market Value has been calculated out to 9 decimal places; however, the individual unit price is displayed in 5 decimal places. The Total Market Value represents prices obtained from various sources, we believe to be reliable regarding the price level of securities, but which the price for such security is generally not available from pricing vendors use a variety of techniques to estimate value. These estimates, particularly for fixed income securities, may be based on certain minimum principal amounts (e.g. $1 million) and may not reflect all of the factors that affect the value at which the security could be sold. If a price is not available from a pricing source, the Market Value of a security may be displayed as not available and may not be reflected in the account's total value, nor included in the amounts of your portfolio's appraisal. The value, and a current valuation for CDs is generally illiquid. You should always request a current valuation for your securities prior to making a financial decision or placing an order. In executing orders on the Floor of the NYSE, the Floor broker may permit.

**Wash Sales** A wash sale occurs when the loss from the transaction is disallowed for federal income tax purposes but may be used to adjust the cost basis of purchased shares. Fidelity adjusts the cost basis of purchased shares when a wash sale occurs within an account as the result of an identical security purchase. Fidelity does not report disallowed losses or adjust cost basis related to wash sales triggered by sales and purchases of the same security within different accounts or by sales and purchases of "substantially identical securities within the same or different accounts. We deliver statements within the year or different accounts.

## Information About Mutual Funds and Their Performance

An investment in a money market fund is not insured or guaranteed by the Federal Deposit Insurance Corporation (FDIC) or any other government agency. Although the fund seeks to preserve the value of your investment at $1.00 per share, it is possible to lose money by investing in the fund. Before investing, consider the funds' investment objectives, risks, charges and expenses. Contact Fidelity for a prospectus containing this information. Read it carefully. Performance data shown represents past performance and is no guarantee of future results. Investment return and principal value will fluctuate, so you may have a gain or loss when shares are sold. Current performance may be higher or lower than that quoted. Visit Fidelity.com for most recent month-end performance.

For mutual fund and other products, the additional compensation as well as other remuneration received by FBS or NFS will be furnished to you upon written request. At the time you purchase shares of a no-load fund, those shares will be assigned either a transaction fee (TF) or no transaction fee (NTF) status. When you subsequently sell those shares, any applicable fees will be assessed based on the status assigned to the shares at the time of purchase.

Fidelity Brokerage Services LLC (FBS) and National Financial Services LLC (NFS) and you. Inquiries, concerns or questions regarding your brokerage account or the activity therein should be directed to Fidelity Brokerage Services LLC (FBS) by calling 800-544-6666, and NFS, who carries your brokerage accounts, by calling 800-544-6666. Any oral communications regarding inaccuracies or discrepancies should be re-confirmed in writing to protect your rights, including rights under the Securities Investor Protection Act (SIPA). Please advise us of material changes in your investment objectives or financial situation related to your brokerage account(s).

Securities in accounts carried by NFS, a Fidelity Investments company, are protected in accordance with the Securities Investor Protection Corporation (SIPC) up to $500,000 (including $250,000 for claims for cash). For details, including limitations and exclusions, please contact us by calling 1-800-544-6666, or visit www.sipc.org or call 1-202-371-8300. NFS has arranged for additional insurance protection for cash and covered securities to supplement its SIPC coverage. Neither coverage protects against a decline in the market value of securities.

Fidelity Distributions Corporation (FDC) is the distributor for Fidelity Funds with marketing and shareholder services provided by Fidelity Investments Institutional Operations Company, Inc. or Fidelity Personal Trust Company, FSB (FPTC), a federal savings bank, or Fidelity Management Trust Company (FMTC). FBS, NFS, and FDC are direct or indirect subsidiaries of FMR LLC. Upon written request, Fidelity will mail an NFS financial statement, which is also available for inspection at its office. Fidelity Portfolio Advisory Service® and Fidelity® Strategic Disciplines are services of Strategic Advisers, Inc., a registered investment adviser and a Fidelity Investments company. Brokerage services provided by Fidelity Brokerage Services LLC, Member NYSE, SIPC. Fidelity Personal Trust Company, FSB (FPTC), a federal savings bank, or Fidelity Management Trust Company (FMTC). Non-deposit investment products and trust services offered through FPT and FMTC and their affiliates are not insured or guaranteed by the FDIC or any other government agency, are not obligations of, nor endorsed or guaranteed by, any bank or other depositing institution, nor are they federally insured by the FDIC or any other government agency, and are subject to investment risks, including possible loss of principal. Fidelity Insurance Agency, Inc. and FMR LLC. Insurance products are distributed by FBS (FBS), Fidelity Insurance Agency, Inc., and through FPFT LLC, a broker dealer registered in all 50 states, and FMR LLC subsidiaries. In NY, insurance products and services offered through FPT and FMTC and their affiliates are distributed by the bank or other depositing institution, nor are they federally insured by the FDIC or any other government agency, and are subject to investment risks, including possible loss of principal. Mutual fund shares, other securities held in your account, and insurance products are neither deposits of insured by the bank, or any affiliated or non-affiliated bank, nor are they obligations of, or guaranteed by, a bank or other depositing institution, nor are they federally insured by the FDIC, the Federal Reserve Board or any other agency. Written inquiries may be mailed to: Fidelity Investments, Client Services, P.O. Box 770001, Cincinnati, OH 45277-0045. To confirm that an authorized, direct deposit has been made to your Fidelity Account or the Fidelity Mutual Fund Account, call Fidelity at 1-800-544-5555.



**Investment Report**

January 1, 2013 - January 31, 2013

Online                          Fidelity.com
FAST(sm)-Automated Telephone    800-544-5555
Customer Service                800-544-6666

Envelope 902217119

DHESHA S GOVENDER
1510 LEXINGTON AVE APT 9H
NEW YORK NY 10029-7161

## Your Portfolio Summary

### Changes in Portfolio Value

| | |
|---|---|
| Beginning value as of Jan 1 | $80,390.63 |
| Transaction costs, loads and fees | -330.97 |
| Change in investment value | -40,909.39 |
| **Ending value as of Jan 31** | **$39,150.27** |
| | |
| Total trades for portfolio period | 2 |
| Feb 2012 - Jan 2013 | |

### Value by Account

| | Account Number | Net Value January 1, 2013 | Net Value January 31, 2013 |
|---|---|---|---|
| **General Investment** | | | |
| Fidelity Account℠ - Individual - TOD | X25-611581 | $0.67 | $0.67 |
| **Personal Retirement** | | | |
| Fidelity Rollover IRA | 140-554820 | 80,389.96 | 39,149.60 |
| **Total Portfolio Value** | | **$80,390.63** | **$39,150.27** |

### Income Summary

| | This period | Year to Date |
|---|---|---|
| Tax-deferred | $0.61 | $0.61 |



**Investment Report**

January 1, 2013 - January 31, 2013

# Your Portfolio Details

## Fidelity Account sm   X25-611581    DHESHA S GOVENDER - INDIVIDUAL TOD

### Account Summary

| | |
|---|---|
| Beginning value as of Jan 1 | $0.67 |
| Change in investment value | 0.00 |
| **Ending value as of Jan 31** | **$0.67** |

Account trades from Feb 2012 - Jan 2013 ............ 0

### Holdings   (Symbol) as of January 31, 2013

**Core Account 100% of holdings**

CASH

*For balances below $10,000.00, the current interest rate is 00.01%.*

### Core Account   - Cash

| Description Beginning | Amount | | Quantity January 31, 2013 | Price per Unit January 31, 2013 | Total Value January 1, 2013 | Total Value January 31, 2013 |
|---|---|---|---|---|---|---|
| CASH | | | 0.670 | $1.000 | $0.67 | $0.67 |

## Fidelity Rollover IRA   140-554820    DHESHA S GOVENDER - ROLLOVER IRA - FIDELITY MANAGEMENT TRUST CO - CUSTODIAN

### Account Summary

| | |
|---|---|
| Beginning value as of Jan 1 | $80,389.96 |
| Transaction costs, loads and fees | -330.97 |
| Change in investment value | -40,909.39 |
| **Ending value as of Jan 31** | **$39,149.60** |

Account trades from Feb 2012 - Jan 2013 ............ 2

### Income Summary   Tax-deferred

| Description Ending | | Balance | This Period | Year to Date | Amount | Balance |
|---|---|---|---|---|---|---|
| CASH | | $0.67 | $0.61 | $0.61 | | $0.67 |



# Investment Report

January 1, 2013 - January 31, 2013

## Fidelity Rollover IRA   140-554820

DHESHA S GOVENDER - ROLLOVER IRA - FIDELITY MANAGEMENT TRUST CO - CUSTODIAN

| Holdings   (Symbol) as of January 31, 2013 | Performance January 31, 2013 | Quantity January 31, 2013 | Price per Unit January 31, 2013 | Cost | Total Value January 31, 2013 | Total Value January 1, 2013 |
|---|---|---|---|---|---|---|
| **Options 43% of holdings** | | | | | | |
| CALL (CLSN) CELSION CORP COM NEW FEB 16 13 $9 (100 SHS) (CLSN13021 6C9) | | 200.000 | $0.050 | $41,075.48 | $1,000.00 | $1,000.00 |
| PUT (SGMO) SANGAMO BIOSCIENCES MAR 16 13 $9 (100 SHS) (SGMO13031 6P9) | | 200.000 | 0.800 | 17,165.49 | 16,000.00 | 16,000.00 |
| **Subtotal of Options** | | | | 58,240.97 | 17,000.00 | 17,000.00 |
| **Core Account 57% of holdings** | | | | | | |
| FIDELITY CASH RESERVES (FDRXX ) | 7-day Yield: 0.01% | 22,149.600 | 1.000 | not applicable | $80,389.96 | 22,149.60 |
| **Subtotal of Core Account** | | | | | | 22,149.60 |
| **Total** | | | | | **$ 58,240.97** | **$39,149.60** |

*All positions held in cash account unless indicated otherwise.*
*Total Cost does not include the cost basis on core, money market or other positions where cost basis is unknown or not applicable.*

## Transaction Details   (for holdings with activity this period)

### Core Account   - Fidelity Cash Reserves

| Description | Amount | Balance | Description | Amount | Balance |
|---|---|---|---|---|---|
| **Beginning** | | $80,389.96 | Core account income | 0.61 | |
| **Investment Activity** | | | **Subtotal of Investment Activity** | - $58,240.36 | |
| Securities bought | -$58,240.97 | | **Ending** | | $22,149.60 |

### Investment Activity

| Settlement Date | Security | Description | Quantity | Price per Unit | Transaction Amount |
|---|---|---|---|---|---|
| 1/25 | CALL (CLSN) CELSION CORP COM NEW FEB 16 13 $9 (100 SHS) OPENING TRANSACTION | You bought Transaction cost: -$5.51 | 7.000 | $2.00000 | -$1,405.51 |

Investment Report

January 1, 2013 - January 31, 2013

# Fidelity Rollover IRA   140-554820

DHESHA S GOVENDER - ROLLOVER IRA - FIDELITY MANAGEMENT TRUST CO - CUSTODIAN

## Transaction Details

### Investment Activity

| Settlement Date | Security | Description | Quantity | Price per Unit | Transaction Amount |
|---|---|---|---|---|---|
| 1/25 | CALL (CLSN)<br>CELSION CORP COM NEW<br>FEB 16 13 $9 (100 SHS)<br>OPENING TRANSACTION | You bought<br>Transaction cost: -$16.61 | 11.000 | 2.00000 | -2,216.61 |
| 1/25 | CALL (CLSN)<br>CELSION CORP COM NEW<br>FEB 16 13 $9 (100 SHS)<br>OPENING TRANSACTION | You bought<br>Transaction cost: -$143.36 | 182.000 | 2.05000 | -37,453.36 |
| 1/29 | PUT (SGMO)<br>SANGAMO BIOSCIENCES<br>MAR 16 13 $9 (100 SHS)<br>OPENING TRANSACTION | You bought<br>Transaction cost: -$165.49 | 200.000 | 0.85000 | -17,165.49 |
| 1/31 | FIDELITY CASH<br>RESERVES | Dividend received | | | 0.61 |

## Daily Additions and Subtractions   Fidelity Cash Reserves   @ $1 per share (the following is provided to you in accordance with industry regulations)

| Date | Amount | Balance | Date | Amount | Balance | Date | Amount | Balance |
|---|---|---|---|---|---|---|---|---|
| 1/25 | -$41,075.48 | $39,314.48 | 1/29 | -17,165.49 | 22,148.99 | 1/31 | 0.61 | 22,149.60 |

## Additional Information About Your Investment Report

▼

*OPTIONS REGULATORY FEE (ORF)*

*The Chicago Board Options Exchange (CBOE), Philadelphia Stock Exchange (PHLX), International Stock Exchange (ISE), Boston Stock Exchange (BOX), NASDAQ Options Market (NOM), the C2 Options Exchange, and the MIAX Options Exchange have implemented an Options Regulatory Fee (ORF) that is applied to all options transactions across all exchanges. According to the options exchanges, this fee supports their ongoing oversight and regulatory activities pertaining to trading activities.*

*The ORF applies to both buy and sell option transactions. The cumulative fee as of January 2, 2013 is $.0377 per contract.*



**Investment Report**

January 1, 2013 - January 31, 2013

## Additional Information About Your Investment Report

The aggregate ORF from all exchanges is included in the "Activity Assessment Fee" on the trade confirms. The ORF will be periodically re-evaluated by each regulatory body, and is subject to change. All fees collected by National Financial Services will be passed on to the appropriate regulatory body to meet this requirement.



## Information About Your Fidelity Statement

For TDD Service for the Hearing-Impaired, call 800-544-0118, 9 am - 9 pm ET, 7 days a week. Lost or Stolen Cards For 24 hour worldwide customer service, call 800-529-2164 for American Express or 800-323-5353 for VISA & Gold Check Card.

**Additional Information About Your Account** To contact Fidelity Make checks payable to Fidelity Investments and include your account number. For retirement and health savings accounts (HSA), designated as Fidelity Investments, as custodian. Your contribution is for the current or prior year. Mail to: Fidelity Investments, P.O Box 770001, Cincinnati, OH 45277-0003.

**Income Summary** Shows income by tax status for the statement and year-to-date periods. Except for interest income, Income Summary may not reflect all activity in your account. Fidelity reports dividends and capital gains held in taxable accounts as taxable income. A portion of income reported may be tax-exempt income may be tax-exempt. In Roth IRAs and HSAs, earnings are tax-exempt income may be taxable. In Traditional IRAs, Rollover IRAs, SEP-IRAs, SIMPLE IRAs and Keoghs, earnings are tax-deferred income. In Roth IRAs, earnings are reported as tax-exempt income as they may not reflect adjustments required for your tax reporting purposes, plus any identical securities. Fidelity reports dividends and capital gains.

**Change** in account value shows how your account value has changed since the prior statement period, including the change of reinvested dividends and capital gains. Generally, we adjust sales charges, or fees, disclaim any liability arising out of a customer's use of, or any tax position taken in reliance on, such information. NFS determines your holdings due to price changes, plus any identical securities. Fidelity and NFS specifically disclaim any liability arising out of a customer's use of, or any tax position taken in reliance on, such information. Unless otherwise specified, NFS determines your cost basis. On transactions in which NFS is the broker-dealer. This default methods of valuation.

**Cost Basis, Gain/Loss, and Holding Period Information** Cost basis is the original amount paid to purchase a security, including the amount of reinvested dividends and capital gains. Generally, we adjust sales charges, or fees, when applicable. We also use average cost basis for mutual fund shares and holding period events such as returns of capital (including, for NFS is required to report certain cost basis and holding period information to the IRS on Form 1099-B. However, cost basis, realized gain and loss, and holding period information may not reflect all adjustments required for your tax reporting purposes.

Fidelity and NFS specifically disclaim any liability arising out of a customer's use of, or any tax position taken in reliance on, such information. NFS determines your cost basis. On transactions in which NFS is the broker-dealer. This default methods of valuation. Unless otherwise specified, NFS determines your cost basis. Cost Basis Fidelity does not purchase cost information for securities held in retirement and HSA accounts, NFS specifically disclaim any liability arising out of a customer's use of, or any tax position taken in reliance on, such information may be adjusted for certain transactions and are sold within a retirement or HSA account. We determine cost basis and holding period reinvestments. For further information calculated by subtracting purchase cost from sales proceeds using the FIFO method if shares were purchased at different times or prices.

## Additional Information About Your Brokerage Account, If Applicable

**Customer Free Credit Balance** Your cash balances in your brokerage account, subject to business in accordance with federal securities law. There is no free credit balance in a retirement or HSA account.

**Assets Separate from Your Brokerage Account** Only securities in the margin and cash accounts are held in your account and covered by SIPC, and distributed by FBS and Fidelity Insurance Agency, Inc. and covered by the Securities Investor Protection Corporation (SIPC) and do not count toward your margin and maintenance requirements. Assets held by Portfolio Advisory Services (PAS) are carried by NFS and are covered by SIPC but do not collateralize your margin loan. These securities are transferred weekly to your margin account. Fidelity increases or decrease from the previous week's value is covered by SIPC, and any increase or decrease in the value of the last weekly Stated by Fidelity Advisory Service, Inc. These securities are Marked-to-market through Fidelity's margin account. These securities are Fidelity Account or through Fidelity Advisory Service, Inc. These securities are not covered by SIPC, and are held in a separate account.

**Information About Your Option Transactions** Each option confirmation previously delivered to you options are included among customer short positions pursuant to a random allocation procedure, a description is available upon request. Short positions in American-style options are liable for assignment anytime. The writer of a European-style option is obligated to settle prior to the exercise period. For more information about these, please contact your investment professional.

**Price Information/Total Market Value** The Total Market Value has been calculated out to 3 decimal places; however, the individual unit price is displayed in 3 decimal places. The Total Market Value represents prices obtained from various sources and may differ from its actual market prices. The Market Value of a security, including quotes, but market quotes are not available for fixed income securities. Prices received from pricing vendors use a variety of techniques to estimate value. These estimates, particularly for fixed income securities, may be based on certain minimum principal amounts (e.g. $1 million) and may not reflect all of the transactions. Data reflect value at a security. This is generally not available from a pricing source. The Market Value of a security including those priced at par value, may differ from its purchase price and may not closely reflect the value at which the security is generally not available from a pricing source. The Market Value of a security, including those priced at par value, may differ from its purchase price and may not closely reflect the value at which the security, may be sold on certain market factors. The secondary market for CDs on your fixed income security prior to maturity may result in a loss. The secondary market for CDs is generally illiquid. You should always request a current valuation for your securities prior to placing an order. In executing orders on the Floor of the NYSE, the Floor broker may permit.

---

**Wash Sales** If a wash sale occurs, the loss from the transaction is disallowed for federal income tax purposes and may be added to the cost basis of the newly-purchased security. Fidelity adjusts the cost basis of newly-purchased shares when a wash sale occurs within an account as the result of an identical security purchase. Fidelity does not report disallowed losses or adjust cost basis related to wash sales involving identical securities purchased in the same security within other accounts or for substantially identical securities. Please review your statement and report any inaccuracies or discrepancies. Inquiries, concerns or questions regarding your brokerage account or the activity therein should be directed to Fidelity by calling Services LLC (FBS) by calling 800-544-6666, and NFS by calling 800-544-6666. Any oral communications regarding such inaccuracies or discrepancies should be reconfirmed in writing to protect your rights, including the Securities Investor Protection Act (SIPA). Please advise us of material changes in your investment objectives of financial situation related to your brokerage account(s).

**Information About Mutual Funds and Their Performance** An investment in a money market fund is not insured or guaranteed by the Federal Deposit Insurance Corporation (FDIC) or any other government agency. Although the fund seeks to preserve the value of your investment at $1.00 per share, it is possible to lose money by investing in the fund. Before investing, consider the funds' investment objectives, risks, charges, and expenses. Contact Fidelity for a prospectus containing this information. Read it carefully. Performance data shown represents past performance and is no guarantee of future results. Investment return and principal value will fluctuate, so you may have a gain or loss when you sell your shares. Current performance may be higher or lower than that quoted. Visit Fidelity.com or call for most recent month-end performance.

Results are annualized for performance periods greater than one year. In addition to sales loads and 12b-1 fees described in the prospectus, FBS or NFS receives other compensation in connection with the purchase and/or the on-going maintenance of positions in certain mutual fund and other investment products in your account, its investment advisor or one of its affiliates. Additional information about the source(s) and amount(s) of compensation as well as other remuneration received by NFS will be furnished to you upon written request. At the time you purchase shares of a mutual fund, those shares will be assigned either a transaction fee (TF) or no transaction fee (NTF) status, which is assigned to the shares at the time of purchase and applicable fees will be assessed based on the status assigned to the shares at the time of purchase.

**Information About Your Brokerage Account** If Fidelity accepts an order at a price away from where the security is trading to seek price improvement and if such permission would not be inconsistent with the broker's best execution obligations, your order could be executed at a later time, and at a price better or worse than the quoted market at the time you placed your order. Unless Fidelity receives other instructions, orders for securities will be placed for your Fidelity Personalized Portfolios account at such set price necessary to effect the order. Fidelity does not guarantee a particular price or time of execution for orders placed away from the market price. This type of order is held by FBS or NFS and Fidelity does not represent your interest or your participation in the program, as of a date no greater than 13 months from the date of this statement. Therefore, the estimated values shown herein may not necessarily reflect actual market values or be realized upon liquidation. If an estimated value is not provided, valuation information is unavailable.

**Securities Held in Your Account** Securities in accounts carried by NFS, our clearing firm ("SIPC") up to $500,000 (including $250,000 for claims for cash) in accordance with its rules. For details, including the SIPC brochure, please see www.sipc.org or call 1-202-371-8300. NFS has arranged for additional protection for cash and covered securities to supplement its SIPC coverage. Neither coverage protects against a decline in the market value of securities.

**Fidelity Distributions Corporation** FBS, Brokerage services are provided by FBS, which clears all transactions through its affiliate, NFS. NFS carries all brokerage accounts. FBS and NFS are members of the NYSE and SIPC. FBS, NFS, and FDC are direct or indirect subsidiaries of FMR LLC. Upon written request, we will mail an NFS financial statement, which is also available for your inspection.

Fidelity Investments and the pyramid logo is a trademark of FMR LLC. Options distributed by FMR Co., Inc. and Fidelity Investments Insurance Agency, Inc., and Mutual fund shares, other securities held in your account, and insurance products distributed through the following: Fidelity Brokerage Services LLC, Member NYSE, SIPC, and Strategic Advisors, Inc. a registered investment adviser and a Fidelity Investments company. Fidelity Personal Trust Company, FSB ("FPT"), a federal savings bank, or Fidelity Management Trust Company. These services provide discretionary money management for a fee. Fidelity Investments (with pyramid logo) is a trademark of FMR LLC. FBS, NFS, FDC, or other Fidelity Investments affiliates are not insured or guaranteed by the FDIC or any other government agency, are not deposits or obligations of, nor guaranteed by, any bank, and are not federally insured or obligations of any bank, and are not federally insured. These services provide discretionary money management for a fee. Fidelity does not provide legal or tax advice and the information provided herein is general in nature and should not be considered legal or tax advice. Consult an attorney or tax professional regarding your specific situation. Written inquiries may be mailed to: Fidelity Investments, Client Services, P.O. Box 770001, Cincinnati, OH 45277-0045. To confirm that an authorized, direct deposit may be made the same as the information originally provided. Written inquiries may be mailed to: Fidelity Mutual Fund Account, call Fidelity at 1-800-544-5555.

568130.5.0

Case 1:18-cv-07685-ALC   Document 51   Filed 12/06/19   Page 66 of 111

# THE WALL STREET JOURNAL.

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit
https://www.djreprints.com.

https://www.wsj.com/articles/appeals-court-overturns-two-insider-trading-convictions-1418224146

# Court Overturns Insider-Trading Convictions, a Blow to Justice Department

Judges Narrow Definition of Insider Trading, Say Prosecutors Took Too Broad a View in Wall Street Crackdown



The court's move to overturn convictions of Anthony Chiasson, left, and Todd Newman, right, comes as Michael Steinberg, center, plans to appeal his conviction on similar grounds. FROM LEFT: BLOOMBERG NEWS; ASSOCIATED PRESS; BLOOMBERG NEWS

By Christopher M. Matthews
Updated Dec. 10, 2014 7:18 pm ET

In a blow to the Justice Department's Wall Street crackdown, a federal appeals court overturned two insider-trading convictions and ruled it isn't always illegal to buy or sell stocks using inside information.

The ruling raised the bar for prosecutors on a crime that is already hard to prove, and it will likely limit the types of cases the government can pursue.

Specifically, the three-judge panel of the Second U.S. Circuit Court of Appeals said prosecutors must prove traders knew that the person who provided an inside tip gained some sort of tangible reward for doing so. The judges also said it may be legal to trade on inside information, even if it gives an investor an unfair advantage in the markets, as long as the tipper didn't commit an illegal breach of his or her duty.

Judge Barrington D. Parker said the Supreme Court had rejected the notion that insider-trading law prohibits all trading using confidential information, writing that, "although the government might like the law to be different," not every instance of financial unfairness constitutes fraud.

The ruling is a disappointing denouement for prosecutors winding down their recent run of insider-trading cases, a closely watched effort that has featured charges against high-level traders at some of the country's biggest hedge funds. The push sent a chill through Wall Street trading rooms and landed Manhattan U.S. Attorney Preet Bharara on the cover of Time magazine.

The unanimous decision overturned the December 2012 convictions of former hedge-fund traders Todd Newman and Anthony Chiasson in New York federal court. The judges said prosecutors have been too aggressive in their interpretation of the law.

Marc Powers, a partner at law firm Baker & Hostetler LLP, said the U.S. attorney and the Securities and Exchange Commission "have been pushing the boundaries of the law and the facts in insider-trading cases, beyond fairness and reason."

"The Second Circuit appears now to be setting the government straight," he said. Baker & Hostetler wasn't involved in the matter before the court.

MORE READING

- Did Preet Bharara Overreach?
- 5 Takeaways from the Ruling
- Read the Ruling
- Key Excerpts

In the case at hand, jurors deliberated for two days before finding Messrs. Newman and Chiasson guilty of using confidential information to make $72 million trading on stock in technology companies Dell Inc. and Nvidia Corp. The pair hadn't received the information directly. Instead, the tips they got were passed through a network of investor-relations representatives and analysts before reaching analysts who worked for the two men.

The appeals-court panel ruled that, in order to be found guilty of insider trading, a defendant must know a tip was illegally disclosed in exchange for a reward of "some consequence." The court also dismissed prosecutors' contention that career advice or friendship constituted a reward, saying that, under that logic, "practically anything would qualify."

The U.S. attorney's office had planned to retry the cases if they lost the appeal, according to people familiar with the matter. But the court dismissed the indictments altogether, which prevents a retrial. In a statement, Mr. Bharara said his office was considering options for further appeals.

"Today's decision by the Court of Appeals interprets the securities laws in a way that will limit the ability to prosecute people who trade on leaked inside information," Mr. Bharara said.

A common view of insider trading is of a plugged-in trader using a confidential tip to make lucrative trades. But the legal reality is more nuanced. Courts have long held that tippers must violate a duty of some sort in disclosing material nonpublic information, and the trader needs to know that that's the case.

At issue in the appeal was whether the trial judge made an error in telling the jurors in Messrs. Newman and Chiasson's trial that it was enough for the government to show that the men knew the information was disclosed in breach of a fiduciary duty and not necessarily in exchange for a reward.

The appeals court said that instruction was wrong, clarifying that the trader also needs to know that the tipper benefited tangibly from breaching the duty, something that might not apply to a person who trades on a tip from an old classmate, for instance.

On Wednesday, a lawyer for Mr. Chiasson praised the opinion. "Today's decision is a resounding victory for the rule of law and for Anthony Chiasson personally," Gregory Morvillo said in a statement. Stephen Fishbein and John Nathanson, lawyers for Mr. Newman, said the vindication comes after four years of unnecessary prosecution including a trial in which the Second Circuit held that the wrong legal standard was applied."

The office of Judge Richard J. Sullivan, who presided over the trial, declined to comment.

Legal observers said the decision could also provide grounds to overturn the marquee conviction of a former SAC Capital portfolio manager Michael Steinberg. The confidant of SAC founder Steven A. Cohen was found guilty of trading using confidential information that reached him via a chain of analysts and traders, and he plans to appeal his conviction on similar grounds. A spokesman for SAC Capital, now known as Point72 Asset Management, declined to comment.

The ruling won't affect the overwhelming majority of insider-trading convictions in the past five years. Prosecutors relied on a handful of cooperators to testify against Messrs. Newman and Chiasson. Legal experts said the cooperators, who all pleaded guilty, could seek to withdraw their pleas in the wake of the ruling but would face a steep climb in doing so.

Lawyers also don't expect the highest-profile convictions by Mr. Bharara's office—including the convictions of Raj Rajaratnam, former Galleon Group hedge-fund manager; or Rajat Gupta, the former Goldman Sachs Group Inc.



The appeals court's decision dents a near-perfect record of convictions for insider-trading cases under Preet Bharara, U.S. Attorney for the Southern District of New York. ASSOCIATED PRESS

FROM THE ARCHIVES

- Five Longest Insider-Trading Sentences (Sept. 7)
- Setback in Insider-Trade Case (July 2)
- Judges Consider What Defines Insider Trading (April 22)
- Court Case May Help Define 'Insider Trading' (April 20)
- Ex-Diamondback Employee Is Sentenced in Insider Case (May 2, 2013)
- Fund Co-Founder Sentenced in Insider Case (May 13, 2013)
- SAC's Steinberg Convicted in Insider-Trading Case (Dec. 18, 2013)
- FBI Sweep Targets Big Funds (Jan. 19, 2012)

director who provided Mr. Rajaratnam with information—to be jeopardized by the decision.

"We note that the government has not cited, nor have we found, a single case in which tippees as remote as Newman and Chiasson have been held criminally liable for insider trading," Judge Parker wrote.

David Ganek, who co-founded the hedge fund Level Global with Mr. Chiasson, said Wednesday's opinion called into question the government's entire probe into the fund, which shut down after 2010 raids by the Federal Bureau of Investigation. Mr. Newman's hedge fund, Diamondback Capital, was also raided and wound down operations in 2012.

This isn't the first time the courts have rebuked prosecutors for overreaching in insider-trading cases. Rudolph Giuliani was criticized by lawyers and some on Wall Street for pushing the boundaries of insider-trading cases in the late 1980s, after two Kidder Peabody employees were arrested only to see the charges dropped. Later, the Second Circuit court threw out the conviction by Mr. Giuliani's office of investment manager John Mulheren, who was accused of a stock-manipulation scheme.

David Miller, a former New York federal prosecutor who handled multiple

insider-trading cases, said the most significant consequence of the ruling is that it will make it particularly difficult to go after people who allegedly traded using inside information but were one or more layers removed from the source. Messrs. Newman, Chiasson and Steinberg fall under that category.

"The bottom line is this is going to have a major effect on downstream tippee investigations and prosecutions," said Mr. Miller, who is now a partner at Morgan, Lewis & Bockius LLP. "If the tippee doesn't even know of the tipper, how can you prove they knew there was a benefit?"

Mr. Bharara's team had enjoyed a nearly untarnished winning streak since he took office in 2009, securing 89 convictions.

The appeals court not-so-subtly suggested that the Justice Department has strayed too far from the real villains. "Recent insider trading prosecutions," the Second Circuit said, "are increasingly targeted at remote tippees many levels removed from corporate insiders."

*—Michael Rothfeld and Susan Pulliam contributed to this article*

Write to Christopher M. Matthews at christopher.matthews@wsj.com

Copyright © 2019 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com

# THE WALL STREET JOURNAL.

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com

https://www.wsj.com/articles/u-s-attorney-moves-to-dismiss-insider-trading-charges-in-sac-capital-advisors-case-1445545210

MARKETS

# U.S. Attorney Aims to Dismiss Insider Trading Charges in SAC Capital Advisors Case

Moves follows appeals court ruling that prosecutors stretched the limits of the law



Preet Bharara, U.S. Attorney for the Southern District of New York, speaks at a news conference on Oct. 6. PHOTO: SPENCER PLATT/GETTY IMAGES

*By Christopher M. Matthews and Aruna Viswanatha*
Updated Oct. 22, 2015 8:24 pm ET

Manhattan U.S. Attorney Preet Bharara will drop charges against seven people, dealing a blow to what had been one of the most successful insider-trading prosecutions and a marquee case in his tenure.

Not long ago, Mr. Bharara boasted a near-perfect conviction rate in the dozens of insider-trading cases pursued by his office. But on Thursday he moved to dismiss charges against former SAC Capital Advisors LP portfolio manager Michael Steinberg and six analysts.

Mr. Steinberg's conviction stood out, because it brought prosecutors as close as they ever got to SAC founder Steven A. Cohen, the billionaire founder of the hedge fund, which prosecutors had been investigating for a decade hoping to prove it had relied on illegal insider tips to boost its

crading results. Mr. Steinberg was a senior employee at the firm and a confidant of Mr. Cohen's. Prosecutors have never accused Mr. Cohen of any wrongdoing.

None of the defendants have been sentenced and all have remained free on bail since their convictions. A federal judge will need to approve Mr. Bharara's decision to dismiss the charges.

"Michael Steinberg did not commit any crime and is an innocent man," said Barry Berke, the lawyer for Mr. Steinberg. "We hope that his vindication will receive as much attention as his wrongful prosecution."

The

MORE COVERAGE

- Steven Cohen's Firm in Talks to Rehire Fund Manager
- Court Decision Foils Insider-Trading Cases (April 3)
- Critics See Overreach in Prosecutors' Insider-Trading Push (Dec 11, 2014)
- Ruling Puts Dent In Insider Probes (Dec 11, 2014)
- Insider Cases' Legal Basis Questioned (April 23, 2014)
- Turnabout by Juror Was Crucial in Steinberg's SAC Case (Dec. 19, 2013)
- Jury Votes to Convict SAC Manager (Dec. 19, 2013)

prosecutions were pursued in good faith, Mr. Bharara said in a short statement, but he had come to believe that "insisting on maintaining guilty pleas in these cases wouldn't be in the interests of justice." He cited an appeals- court ruling last year that found prosecutors had stretched the limits of insider- trading law and that effectively undermined the legal foundations of those cases.

Mr. Bharara built his reputation as Wall Street's toughest cop with the yearslong crackdown on insider trading that produced more than 80 convictions and only one acquittal. The move to drop the cases won't affect the insider-trading convictions of six other former SAC employees or the 2014 guilty plea by the firm itself.

But it is the latest blow to the long-running insider-trading push and undermines key allegations in its most-high profile investigation—the probe into SAC Capital, which has rebranded itself as Point72 Asset Management LP.

In late 2013, a jury convicted Mr. Steinberg. The trades at the heart of Mr. Steinberg's case were among those cited in a civil lawsuit brought by the Securities and Exchange Commission against Mr. Cohen. The SEC has accused him of failing to supervise traders at his firm, including Mr. Steinberg.

In 2014, SAC agreed to plead guilty to securities fraud and wire fraud and pay a $1.8 billion penalty, a rare instance of a hedge fund being criminally charged for insider trading. In its plea, it took responsibility for the actions of Mr. Steinberg and a handful of other employees. The firm was also barred from managing outside money and now manages Mr. Cohen's personal fortune.

Legal experts said Mr. Bharara's move Thursday could force the SEC to revise its case against Mr. Cohen but was unlikely to force the SEC to drop it since the case covered additional conduct.

Prosecutors on Thursday said they would also drop their case against another SAC employee, former analyst Jon Horvath, who pleaded guilty and testified against Mr. Steinberg at trial.

Mark Herr, a spokesman for Point72, said the group was "pleased that the ordeal for Mike Steinberg and his family is over."

The five other analysts who prosecutors will drop their cases against— Jesse Tortora, Spyridion Adondakis, Sandeep Goyal, Danny Kuo and Hyung G. Lim—all had pleaded guilty to insider trading and cooperated with the government. None worked at SAC. Lawyers for four of them said they were pleased with Mr. Bharara's decision, and the others didn't respond to requests for comment. A lawyer for Mr. Kuo said he believed the SEC would drop a related case against him.

In some respects, Mr. Bharara was left with little choice but to drop the cases following last year's ruling by the Second U.S. Circuit Court of Appeals in New York that overturned the insider-trading convictions of two hedge-fund portfolio managers.

In the ruling, the court said it wasn't enough for prosecutors to show that someone who received an inside tip traded on material nonpublic information about a corporation. Unless there is a "meaningfully close personal relationship" between the tipper and tippee, prosecutors had to prove that a person trading on the confidential information knew that it

came from somebody who stood to be substantially rewarded in exchange, according to the Second Circuit opinion.

Mr. Bharara has assailed the ruling and said it would hamper prosecutors' pursuit of insider trading. He said the stricter evidence standards set by the Second Circuit were a "potential bonanza for friends and family of rich people with access to material nonpublic information."

The Justice Department asked the U.S. Supreme Court to review the ruling, a request the high court denied earlier in October, effectively leaving the ruling as the law of the land.

Legal experts had expected that the developments would have an impact on the conviction of Mr. Steinberg and a handful of other cases.

Joon Kim, Mr. Bharara's top deputy, said Thursday's move would be "largely the extent of the fallout" on the office's prior insider trading cases.

Prosecutors accused Mr. Steinberg of using inside information about technology companies Dell Inc. and Nvidia Corp. to make lucrative trades. Jurors during the trial heard testimony from the government's star witness, Mr. Horvath, who pleaded guilty in 2012 to charges he obtained confidential Dell and Nvidia tips. But he was the only government witness to directly connect Mr. Steinberg to the alleged inside information, which came through a chain of analysts and traders.

By agreeing to dismiss the charges Thursday, prosecutors are conceding they cannot prove Messrs. Steinberg or Horvath knew that the original source of the tip had received some sort of improper benefit for disclosing the information.

The SEC case against Mr. Cohen has been delayed as the SEC and Justice Department awaited the Supreme Court to review the Second Circuit's decision. The civil case by the SEC faces a lower burden of proof than do criminal insider-trading cases.

*—Juliet Chung contributed to this article*

Write to Christopher M. Matthews at christopher.matthews@wsj.com and Aruna Viswanatha at Aruna.Viswanatha@wsj.com

Copyright © 2019 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

# THE WALL STREET JOURNAL.

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

https://www.wsj.com/articles/SB1008099091647768240

# Former Nvidia Engineer Is Fined For Insider Trading of Firm's Stock

By Rebecca Buckman Staff Reporter of The Wall Street Journal

Updated Dec. 11, 2001 4:46 pm ET

A former Nvidia Corp. engineer has been fined $250,000 by a federal judge for insider trading, the Securities and Exchange Commission said Tuesday.

The former employee, Manu B. Shrivastava, already has pled guilty to related criminal charges, the SEC said. Mr. Shrivastava's lawyer didn't immediately return a call seeking comment.

Mr. Shrivastava was the first employee of Nvidia, a graphics-processor maker based in Santa Clara, Calif., to be caught up in the SEC's insider-trading investigation of the company. The SEC filed its lawsuit against him in August 2000. U.S. District Court Judge Charles Breyer, of the Northern District of California, handed down the fine on Dec. 5.

"We're pleased that the court imposed such a substantial penalty," SEC District Administrator Helane Morrison said. "It should serve as a deterrent to others who would use confidential company information for their own benefit."

SEC Charges Nvidia Workers With Insider Trading in Shares (Nov. 20)

Nvidia to Start Making Chips in May for Xbox Game Console (April 2)

In November the SEC accused 15 more people with illegally trading Nvidia's shares after they received early news that Nvidia had won a contract to supply chips for Microsoft Corp.'s Xbox video-game system. The SEC alleges that the group earned more than $1.7 million in illicit profit.

The U.S. Attorney for the Northern District of California also last month indicted four of the 15 people on related criminal charges. The four were all Nvidia employees.

Two of the 15 have settled the SEC's civil complaints, said Robert Mitchell, an assistant district administrator in the agency's office in San Francisco. The other cases, he said, are "in litigation right now."

The SEC alleged that the defendants bought Nvidia shares last year after receiving a companywide e-mail message from the company's president and chief executive, Jen-Hsun Huang.

The message -- titled "X is Ours!" -- contained news of the contract win and indicated that Nvidia's sales tied to Microsoft's Xbox could reach nearly $2 billion over five years, according to the SEC. Mr. Huang had sent two previous e-mails updating employees about the status of the Microsoft negotiations -- information that wasn't available to the public, the SEC said.

Nvidia said in November that it was reviewing its programs to educate employees about insider trading. But a spokesman also defended the "open culture" at the company that prompted the CEO to share the good news about the Xbox contract with employees.

Write to Rebecca Buckman at rebecca.buckman@wsj.com

Copyright © 2019 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com

# On the Defensive, the S.E.C. Quietly Pursues High-Profile Cases

By Alexandra Stevenson and Matthew Goldstein

Aug. 8, 2015

Wall Street's chief regulator, the Securities and Exchange Commission, appears to some to be in need of a makeover.

Critics say it is too focused on minor cases, it is not aggressive enough in forcing wrongdoers to admit liability and yet it is too aggressive in seeking an unfair advantage for trying cases.

The agency contends that it has been ramping up enforcement. And it is quietly pursuing some high-profile cases that could enable it to redefine its regulatory role and reclaim some momentum.

In one case, the S.E.C., in tandem with other authorities, is poised to file charges soon in an unusual investigation that combines insider trading with cybersecurity, according to people briefed on the investigation but not authorized to speak publicly.

It is also pushing ahead with another insider trading case that involves trading activity in the shares of Dean Foods by the golfer Phil Mickelson and the professional sports gambler William T. Walters, according to several other people briefed on those investigations but not authorized to speak publicly.

And the agency is pursuing a major investigation into Wall Street's hiring of the children of China's elite.

---

**You have 3 free articles remaining.**
**Subscribe to The Times**

---

Progress in the insider trading cases comes as the criminal investigation of insider trading in New York has slowed, with federal prosecutors' efforts stymied by a recent appellate court ruling that has made it harder to mount cases.

Coming out ahead on any of these fronts would be a boon for the agency, but for the moment the S.E.C. finds itself on the defensive.

In a public dressing-down earlier this year, Senator Elizabeth Warren, Democrat of Massachusetts, called on the agency to be more aggressive in pursuing Wall Street banks. Ms. Warren has faulted Mary Jo White, the S.E.C. chairwoman, for not being quicker to enforce her own policy change of requiring parties that settle to admit liability and wrongdoing.

At the same time, the U.S. Chamber of Commerce and some law professors have criticized the agency's use of administrative courts, where S.E.C.-appointed judges hear cases. A number of defendants have filed lawsuits arguing that these courts give the S.E.C. an unfair home field advantage.

Many within the S.E.C. have expressed frustration at what they see as a one-sided look at the agency's track record.

Addressing the critics, Andrew J. Ceresney, the director of the S.E.C.'s enforcement division, pointed to the agency's record number of enforcement actions across the securities markets.

"Under Chair White's leadership, the enforcement division has demonstrated tremendous momentum over the last couple of years, with an unprecedented level of enforcement activity leading to innovative cases in every area of the securities markets," Mr. Ceresney said.

"We continue to bring significant cases against senior executives and financial institutions, utilize market experts, data and analytical tools to detect misconduct and advance investigations as never before, and litigate cases aggressively and successfully to protect investors and our markets," he added.

But settlements of cases have been slowed by a broader political fight at the agency between its Republican and Democratic commissioners. In an accounting fraud case against the Computer Sciences Corporation, back-and-forth negotiations between the commissioners and the enforcement division delayed a settlement by months.

Much of the scrutiny directed at the S.E.C. stems from the constraints of an environment in which a once-steady stream of blockbuster cases has disappeared. Five years after Congress handed the S.E.C. new tools to regulate the markets under the Dodd-Frank financial overhaul, the agency continues to adapt its role as a regulator in the markets. In the aftermath of the 2008 financial crisis, it was tasked with bringing cases against billion-dollar frauds like the one perpetrated by Bernard L. Madoff.

Recently, the S.E.C. has been active on less-splashy Wall Street cases. In June, the agency accused the private equity firm Kohlberg Kravis Roberts & Company of breaching its fiduciary duty by passing on "broken deal" expenses to investors, the first case of its kind and one that has laid the groundwork for other similar actions.

In addition, the S.E.C. is considering filing an enforcement action against Pimco, the giant asset manager, over potential trading infractions in one of its exchange-traded bond funds, Pimco recently disclosed. And the agency is examining what JPMorgan Chase disclosed to its wealth management clients when it sold the bank's products and how it guided clients to hedge fund investments.

But bigger cases are on the horizon. The agency is gaining traction in a corruption investigation that involves Wall Street banks and their recruitment of the children of China's political elite.

That case, which will involve more than one financial institution, could be brought within a few months.

And two major insider trading investigations are expected to show that the S.E.C., despite its challenges, is not afraid to pursue bigger cases.

In its cybersecurity case, the investigation centers on whether overseas hackers broke into the networks of American companies to secure inside information about corporate deals, later passing on that information to traders.

Elsewhere, the S.E.C.'s investigation into whether Mr. Mickelson and Mr. Walters possessed inside information about the plan by Dean Foods to announce a spinoff in August 2012 has escalated. The authorities suspect the tip about the spinoff came from a board member at the company who knows Mr. Walters, who then shared the information with Mr. Mickelson, the people briefed on the investigations said.

Mr. Walters's lawyer did not respond to a request for comment. A spokeswoman for Mr. Mickelson declined to comment. Representatives for Mr. Mickelson and Mr. Walters have previously said the men did nothing wrong.

Late Friday, Dean Foods announced the immediate resignation of Thomas C. Davis, the company's chairman, in a regulatory filing. Jamaison Schuler, a company spokesman, declined to comment on the resignation of Mr. Davis, 67, an investment banker who has been on the Dean Foods board since 2001.

Thomas M. Melsheimer, a Dallas lawyer representing Mr. Davis, said in an email statement on Friday evening that his client "voluntarily decided to step down from the board today."

In his statement, Mr. Melsheimer, a lawyer with Fish & Richardson who has worked on insider trading cases, according to his law firm biography, did not address the S.E.C. investigation.

As with any S.E.C. investigation, it is possible that regulators may conclude there was no wrongdoing and not bring an enforcement action. It is also possible that if any information was shared by a Dean Foods board member, it may have been inadvertent, the people briefed on the investigation cautioned.

Mr. Schuler, the company spokesman, said: "Dean Foods has cooperated with the government's requests for information and will continue to do so. Because there is an ongoing government investigation, it would be inappropriate to comment further at this time."

A parallel investigation by regulators and prosecutors into trading by Mr. Walters and the billionaire investor Carl C. Icahn in Clorox shares appears to have been largely abandoned, said two of the people close to the investigation.

Federal prosecutors have proceeded more cautiously in pursuing new insider trading cases because of an appellate court ruling in December that overturned the insider trading convictions of two hedge fund managers — Anthony Chiasson and Todd Newman — and that raised the burden of proof. The ruling created a new definition of what constitutes the exchange of a personal benefit to the person who passes an inside tip.

"In the criminal context, the prosecutor would now have to show that the defendant had actual knowledge of the underlying benefit and the breach by the insider," said Thomas A. Sporkin, a lawyer with BuckleySandler and former S.E.C. enforcement lawyer.

The ruling, which could undermine numerous convictions if it stands, poses such a threat to the government that on July 30 the Justice Department filed a petition with the Supreme Court to review it.

Whatever the Supreme Court decides, the S.E.C. may be in a better position to bring such cases before the courts.

The agency, which has its San Francisco and New York offices working on the investigation into Mr. Mickelson and Mr. Walters, could file lawsuits in federal court in California or Nevada, two states where the courts have been slower to adopt the ruling that overturned the two hedge fund managers' insider trading convictions.

A version of this article appears in print on Aug. 10, 2015, Section B, Page 1 of the New York edition with the headline: On the Defensive, the S.E.C. Is Quietly Moving Ahead With High-Profile Cases

**ECF**    Query    Reports ▾    Utilities ▾    Logout

| Date | Doc. | Description |
|---|---|---|
| 12/14/2017 | | |
| 12/22/2017 | 118 | STATUS REPORT of US v. Fishoff, Crim, No. 15-586, by UNITED STATES OF AMERICA. (EMEHELU, SHIRLEY) (Entered: 12/22/2017) |
| 01/22/2018 | 119 | STATUS REPORT of US v. Fishoff, Crim, No. 15-586, by UNITED STATES OF AMERICA. (EMEHELU, SHIRLEY) (Entered: 01/22/2018) |
| 02/22/2018 | 120 | STATUS REPORT of US v. Fishoff, Crim, No. 15-586, by UNITED STATES OF AMERICA. (EMEHELU, SHIRLEY) (Entered: 02/22/2018) |
| 03/22/2018 | 121 | STATUS REPORT of US v. Fishoff, Crim, No. 15-586, by UNITED STATES OF AMERICA. (EMEHELU, SHIRLEY) (Entered: 03/22/2018) |
| 04/24/2018 | 122 | STATUS REPORT of US v. Fishoff, Crim, No. 15-586, by UNITED STATES OF AMERICA. (EMEHELU, SHIRLEY) (Entered: 04/24/2018) |
| 05/22/2018 | 123 | Letter from the United States re 91 Order on Motion to Intervene. (Attachments: # 1 Text of Proposed Order)(EMEHELU, SHIRLEY) (Entered: 05/22/2018) |
| 05/23/2018 | 124 | ORDER amending 91 Order. The Government is to file only one final progress report regarding the status of the Fishoff Criminal Case within 30 days of the final sentencing hearing. Signed by Judge Michael A. Shipp on 5/23/2018. (mmh) (Entered: 05/23/2018) |
| 07/19/2018 | 125 | TEXT ORDER: This matter comes before the Court upon review of the docket. On May 23, 2018, the Court granted the Government's request to temporarily suspend the requirement that the Government file monthly progress reports regarding the status of the criminal case, United States v. Fishoff, Cr. No. 15-586. (ECF No. 124.) The May 23, 2018 Order provides, in relevant part, that: (1) the Government shall file its final progress report regarding the status of the Fishoff Criminal Case within thirty days after the final sentencing hearing; and (2) the stay of civil discovery shall remain in full effect until further order of the Court. Based on the foregoing, the Court finds good cause to stay and administratively terminate this matter until further order of the Court. The Court shall reopen the matter following receipt and review of the Government's final progress report or upon other good cause shown. So Ordered by Judge Michael A. Shipp on 7/19/2018. (gxb) (Entered: 07/19/2018) |
| 07/19/2018 | | ***Civil Case Administratively Terminated. (gxb) (Entered: 07/19/2018) |
| 08/23/2018 | 126 | MOTION for Leave to File Amended Complaint by SECURITIES AND EXCHANGE COMMISSION. (Attachments: # 1 Exhibit Proposed Amended Complaint, # 2 Exhibit Redline of Proposed Amended Complaint)(AUSTIN, DAVID) (Entered: 08/23/2018) |
| 08/23/2018 | | CLERK'S QUALITY CONTROL MESSAGE - The 126 Letter Application filed by David Austin on 8/23/2018 was submitted incorrectly as a Motion. PLEASE RESUBMIT THE Application USING Application/Petition found under Civil - Other Filings - Other Documents. The deadlines created by this filing have been terminated. If Counsel wishes to file a motion, please file a formal Notice of Motion with the necessary supporting documents. This submission will remain on the docket unless otherwise ordered by the court. (mmh) (Entered: 08/23/2018) |
| 08/23/2018 | 127 | APPLICATION/PETITION for Leave to File Amended Complaint for by SECURITIES AND EXCHANGE COMMISSION. (Attachments: # 1 Exhibit Proposed Amended Complaint, # 2 Exhibit Redline to Proposed Amended Complaint)(AUSTIN, DAVID) (Entered: 08/23/2018) |
| 08/24/2018 | 128 | Letter from David C. Austin on behalf of Securities and Exchange Commission re 127 Application/Petition. (Attachments: # 1 Exhibit)(AUSTIN, DAVID) (Entered: 08/24/2018) |
| 08/27/2018 | 129 | MOTION for Leave to Appear Pro Hac Vice of Lionel Andre by FEATHERWOOD CAPITAL, INC., STEVEN FISHOFF, JSF INVESTMENT CAPITAL INC.. (Attachments: # 1 Certification Certification of Michael Rella, # 2 Certification Certification of Lionel Andre, # 3 Text of Proposed Order)(RELLA, MICHAEL) (Entered: 08/27/2018) |

**Dhesh Govender**
**November 17-December 16, 2013**

Key:
Ron Chernin
Steve Costantin
Steve Fishoff

Privileged Confidential
Attorney Work Product

| Billing Account Number | Wireless Number | Date | Time | Dialed Number | Rate Period | Intl Description | In/Out | Feature Used | Minutes Used | Airtime Charges | Total LD Charges | Roaming Charges | Surcharges | Roaming Taxes | Total Charges |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 832945630 | (917) 715-4966 | 15-Dec-13 | 12:57 | (518) 229-0547 | NW | Home Call | In | M2AM | 1 | 0 | 0 | 0 | 0 | 0 | $0.00 |
| 832945630 | (917) 715-4966 | 15-Dec-13 | 12:58 | (518) 577-3909 | NW | Home Call | Out | M2AM | 1 | 0 | 0 | 0 | 0 | 0 | $0.00 |
| 832945630 | (917) 715-4966 | 15-Dec-13 | 13:33 | (212) 289-6257 | NW | Home Call | Out | M2AM | 1 | 0 | 0 | 0 | 0 | 0 | $0.00 |
| 832945630 | (917) 715-4966 | 15-Dec-13 | 21:16 | (917) 580-0237 | NW | Home Call | In | M2AM | 1 | 0 | 0 | 0 | 0 | 0 | $0.00 |
| 832945630 | (917) 715-4966 | 15-Dec-13 | 21:17 | (315) 396-7450 | NW | Home Call | Out | M2AM | 1 | 0 | 0 | 0 | 0 | 0 | $0.00 |
| 832945630 | (917) 715-4966 | 16-Dec-13 | 9:46 | (212) 600-2725 | DT | Home Call | Out | | 1 | 0 | 0 | 0 | 0 | 0 | $0.00 |
| 832945630 | (917) 715-4966 | 16-Dec-13 | 10:01 | (212) 600-2725 | DT | Home Call | In | | 2 | 0 | 0 | 0 | 0 | 0 | $0.00 |
| 832945630 | (917) 715-4966 | 16-Dec-13 | 10:02 | (732) 403-6978 | DT | Home Call | Out | M2AM | 3 | 0 | 0 | 0 | 0 | 0 | $0.00 |
| 832945630 | (917) 715-4966 | 16-Dec-13 | 10:24 | (818) 825-9873 | DT | Home Call | Out | M2AM | 8 | 0 | 0 | 0 | 0 | 0 | $0.00 |
| 832945630 | (917) 715-4966 | 16-Dec-13 | 11:52 | (305) 984-6066 | DT | Home Call | In | M2AM | 3 | 0 | 0 | 0 | 0 | 0 | $0.00 |
| 832945630 | (917) 715-4966 | 16-Dec-13 | 12:19 | (305) 984-6066 | DT | Home Call | In | M2AM | 3 | 0 | 0 | 0 | 0 | 0 | $0.00 |
| 832945630 | (917) 715-4966 | 16-Dec-13 | 12:30 | (518) 229-0547 | DT | Home Call | Out | M2AM | 2 | 0 | 0 | 0 | 0 | 0 | $0.00 |
| 832945630 | (917) 715-4966 | 16-Dec-13 | 12:43 | (818) 825-9873 | DT | Home Call | In | M2AM | 4 | 0 | 0 | 0 | 0 | 0 | $0.00 |
| 832945630 | (917) 715-4966 | 16-Dec-13 | 13:38 | (732) 403-6978 | DT | Home Call | Out | M2AM | 8 | 0 | 0 | 0 | 0 | 0 | $0.00 |
| 832945630 | (917) 715-4966 | 16-Dec-13 | 13:39 | (818) 825-9873 | DT | Home Call | In | M2AM | 7 | 0 | 0 | 0 | 0 | 0 | $0.00 |
| 832945630 | (917) 715-4966 | 16-Dec-13 | 16:08 | (818) 825-9873 | DT | Home Call | Out | M2AM | 5 | 0 | 0 | 0 | 0 | 0 | $0.00 |
| 832945630 | (917) 715-4966 | 16-Dec-13 | 16:14 | (717) 805-8607 | DT | Home Call | Out | M2AM | 2 | 0 | 0 | 0 | 0 | 0 | $0.00 |
| 832945630 | (917) 715-4966 | 16-Dec-13 | 16:16 | (917) 497-9287 | DT | Home Call | Out | M2AM | 2 | 0 | 0 | 0 | 0 | 0 | $0.00 |
| 832945630 | (917) 715-4966 | 16-Dec-13 | 16:18 | (732) 403-6978 | DT | Home Call | Out | M2AM | 2 | 0 | 0 | 0 | 0 | 0 | $0.00 |
| 832945630 | (917) 715-4966 | 16-Dec-13 | 16:39 | (305) 984-6066 | DT | Home Call | Out | M2AM | 1 | 0 | 0 | 0 | 0 | 0 | $0.00 |
| 832945630 | (917) 715-4966 | 16-Dec-13 | 17:14 | (212) 600-2725 | DT | Home Call | In | CW | 1 | 0 | 0 | 0 | 0 | 0 | $0.00 |
| 832945630 | (917) 715-4966 | 16-Dec-13 | 17:57 | (518) 229-0547 | DT | Home Call | In | M2AM | 1 | 0 | 0 | 0 | 0 | 0 | $0.00 |
| 832945630 | (917) 715-4966 | 16-Dec-13 | 17:57 | (646) 247-7369 | DT | Home Call | Out | M2AM | 1 | 0 | 0 | 0 | 0 | 0 | $0.00 |
| 832945630 | (917) 715-4966 | 16-Dec-13 | 17:58 | (646) 247-7369 | DT | Home Call | Out | M2AM | 2 | 0 | 0 | 0 | 0 | 0 | $0.00 |
| 832945630 | (917) 715-4966 | 16-Dec-13 | 18:01 | (518) 229-0547 | DT | Home Call | Out | M2AM | 1 | 0 | 0 | 0 | 0 | 0 | $0.00 |

*(handwritten annotation)* WINSON Tang 310-497-7038-cell #No Record of 12/6/13 call.

**Dhesh Govender**
November 17-December 16, 2013

**Privileged Confidential**
**Attorney Work Product**

Key:
Ron Chernin
Steve Costantin
Steve Fishoff

| Billing Account Number | Wireless Number | Date | Time | Dialed Number | Rate Period | Roam Home Intl Description | In/Out | Feature Used | Minutes Used | Airtime Charges | Total LD Charges | Roaming Charges | Surcharges | Roaming Taxes | Total Charges |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 832945630 | (917) 715-4966 | 16-Dec-13 | 18:05 | (818) 825-9873 | DT | Home Call | Out | M2AM | 3 | 0 | 0 | 0 | 0 | | $0.00 |
| 832945630 | (917) 715-4966 | 16-Dec-13 | 20:12 | (518) 229-0547 | DT | Home Call | Out | M2AM | 2 | 0 | 0 | 0 | 0 | | $0.00 |
| 832945630 | (917) 715-4966 | 16-Dec-13 | 20:20 | (862) 246-0263 | DT | Home Call | Out | M2AM | 1 | 0 | 0 | 0 | 0 | | $0.00 |
| 832945630 | (917) 715-4966 | 16-Dec-13 | 20:21 | (305) 984-6066 | DT | Home Call | Out | M2AM | 1 | 0 | 0 | 0 | 0 | | $0.00 |
| 832945630 | (917) 715-4966 | 16-Dec-13 | 20:22 | (862) 246-0263 | DT | Home Call | In | M2AM | 4 | 0 | 0 | 0 | 0 | | $0.00 |

# Gmail

**Q** wtang1014@yahoo.com

101–150 of many

Compose

| | | | | | | |
|---|---|---|---|---|---|---|
| **Inbox** 100,453 | | me .. Maria, me 21 | Inbox Mtg, JPM, AD newco - Maria, DR. Tang was in lobby at 7:20... | 1/16/14 |
| Snoozed | | me | intro call - Maria, Can you do a call on Thursday around 3pm EST? Al... | 1/7/14 |
| Important | | Anthony, me 2 | Inbox Bookrun Initial Public Offering Filing: uniQure B.V. (Nasdaq:Q... | 1/2/14 |
| Sent | | | uniQure_Extern... | |
| **Drafts** 675 | | Winson, me, me 4 | Inbox (no subject) - wtang1014@yahoo.com> wrote: where is the c... | 12/13/13 |
| Categories | | Michael .. Winson ... 7 | Inbox **2013 - 04 Posiphen MOA.pptx** - wtang1014@yahoo.com> Se... | **12/12/13** |
| **Social** 3,125 | | | 📄 2013 - 04 Posip... | |
| **Updates** | | me, postmaster 2 | Inbox ASH follow on your platform. - wtang1014@yahoo.com> Con... | 12/11/13 |
| **Forums** 149 | | Winson Tang | Inbox COH - can u/f/u with stephen forman at COH, his email is sfor... | 12/11/13 |
| **Promotions** 108,815 | | James, me 2 | Inbox Action List - he sent this after the call. lets see ------ Forwar... | 12/6/13 |
| [Gmail]Spam | | James .. me, Winson 8 | inbox FW: IP follow, next steps. - wtang1014@yahoo.com> wrote. S... | 11/27/13 |
| [Imap]/Drafts 62,676 | | | 📄 TA.pdf | |
| Notes | | | | |
| Personal | | James .. Winson, me 5 | Inbox IND - wtang1014@yahoo.com> wrote: 1)can we get a confere... | 11/22/13 |
| Sent Messages | | Winson, me, MD 10 | Inbox CARS - wtang1014@yahoo.com) Sent: Thursday, November 2... | 11/22/13 |
| Travel | | me, Winson 5 | Inbox (no subject) - wtang1014@yahoo.com> Sent: Monday, Nove... | 11/18/13 |
| More | | | | |

Calendar

**From Date: 9/1/2013**

**To Date: 9/30/2013**

**Trader: TRADER 10, DG**

Group:

# Profit Details Report
## Cedar Lane Enterprises
### Interest Included

| Cusip/Symbol | Security Description | Trade Pool | Profit Date | Gross Profit | | | Allocated Shares | Net Profit |
|---|---|---|---|---|---|---|---|---|
| BNFT | Benefit Focus | | 9/18/2013 | $8,625.00 | | | 500 | $8,568.00 |

| Type | Qty | Broker | Trade Date | Account | Price | Commission | Ticket Chg | | |
|---|---|---|---|---|---|---|---|---|---|
| Buy | 500 | GOLDMAN SACHS | 9/18/2013 | TRADER 10, DG - CEDAR LANE ENTERPRISES - 0027 | $26.5000 | $0.00 | $18.00 | | |
| BNFT | Benefit Focus | | Profit Total -> | $8,625.00 | $0.00 | $18.00 | 500 | $8,568.00 |

| Cusip/Symbol | Security Description | Trade Pool | Profit Date | Gross Profit | | | Allocated Shares | Net Profit |
|---|---|---|---|---|---|---|---|---|
| SGMO | SANGAMO BIOSCIENCES INC | | 9/18/2013 | ($913.00) | | | 11,000 | ($1,171.03) |

| Type | Qty | Broker | Trade Date | Account | Price | Commission | Ticket Chg | | |
|---|---|---|---|---|---|---|---|---|---|
| Buy | 11,000 | PRECISION | 9/18/2013 | TRADER 10, DG - CEDAR LANE ENTERPRISES - 0002 | $10.6481 | $110.00 | $18.00 | | |
| SGMO | SANGAMO BIOSCIENCES INC | | Profit Total -> | ($913.00) | $110.00 | $18.00 | 11,000 | ($1,171.03) |

| Cusip/Symbol | Security Description | Trade Pool | Profit Date | Gross Profit | | | Allocated Shares | Net Profit |
|---|---|---|---|---|---|---|---|---|
| NSPH | NANOSPHERE INC | | 9/19/2013 | $3,372.80 | | | 31,000 | $3,040.07 |

| Type | Qty | Broker | Trade Date | Account | Price | Commission | Ticket Chg | | |
|---|---|---|---|---|---|---|---|---|---|
| Buy | 150,000 | PIPER JAFFRAY | 9/13/2013 | TRADER 10, DG - CEDAR LANE ENTERPRISES - 0021 | $1.7500 | $0.00 | $3.72 | | |
| NSPH | NANOSPHERE INC | | Profit Total -> | $3,372.80 | $0.00 | $3.72 | 31,000 | $3,040.07 |

10/1/2013 11:48:58 AM

**From Date: 12/1/2013**

**To Date: 12/31/2013**

**Trader: TRADER 10, DG**

# Profit Details Report
## Cedar Lane Enterprises
Interest Included

**Group:**

| Cusip/Symbol | Security Description | Trade Pool | Profit Date | Gross Profit | Commission | Ticket Chg | Allocated Shares | Net Profit |
|---|---|---|---|---|---|---|---|---|
| **CYTR** | CYTRX CORP | | 12/4/2013 | $551.40 | | | 1,500 | |

| Type | Qty | Broker | Trade Date | Account | | Price | Commission | Ticket Chg | Allocated Shares | Net Profit |
|---|---|---|---|---|---|---|---|---|---|---|
| Buy | 25,000 | BANK OF AMERICA | 10/10/2013 | TRADER 10, DG - CEDAR LANE ENTERPRISES - 0025 | | $2.2624 | $0.00 | $1.08 | 1,500 | $512.2... |
| | | | | **Profit Total ->** | | $551.40 | $0.00 | $1.08 | 1,500 | $512.2... |

| **CYTR** | CYTRX CORP | | | | | | | | |

| **OREX** | OREXIGEN THERAPEUTICS INC | | 12/4/2013 | ($7,522.00) | | | 20,000 | |

| Type | Qty | Broker | Trade Date | Account | | Price | Commission | Ticket Chg | Allocated Shares | Net Profit |
|---|---|---|---|---|---|---|---|---|---|---|
| Buy | 20,000 | LEERINK SWANN | 12/2/2013 | TRADER 10, DG - CEDAR LANE ENTERPRISES - 0005 | | $6.2546 | $2,000.00 | $18.00 | 20,000 | ($9,760.0...) |
| | | | | **Profit Total ->** | | ($7,522.00) | $2,000.00 | $18.00 | 20,000 | ($9,760.0...) |

| **OREX** | OREXIGEN THERAPEUTICS INC | | | | | | | | |

| **CYTR** | CYTRX CORP | | 12/10/2013 | $219.00 | | | 2,500 | |

| Type | Qty | Broker | Trade Date | Account | | Price | Commission | Ticket Chg | Allocated Shares | Net Profit |
|---|---|---|---|---|---|---|---|---|---|---|
| Buy | 25,000 | BANK OF AMERICA | 10/10/2013 | TRADER 10, DG - CEDAR LANE ENTERPRISES - 0025 | | $2.2624 | $0.00 | $1.80 | 2,500 | $174.0... |
| | | | | **Profit Total ->** | | $219.00 | $0.00 | $1.80 | 2,500 | $174.0... |

| **CYTR** | CYTRX CORP | | | | | | | | |

**From Date: 12/1/2013**

# Profit Details Report
## Cedar Lane Enterprises
### Interest Included

**To Date: 12/31/2013**

**Trader: TRADER 10, DG**

**Group:**

| Cusip/Symbol | Security Description | Trade Pool | Profit Date | Gross Profit | | | Allocated Shares | Net Profit |
|---|---|---|---|---|---|---|---|---|
| **ATHM** | Autohome | | 12/11/2013 | $13,160.00 | | | 1,000 | $13,093.40 |
| **Type** | **Qty** | **Broker** | **Trade Date** | **Account** | **Price** | **Commission** | **Ticket Chg** | |
| Buy | 1,000 | GOLDMAN SACHS | 12/11/2013 | TRADER 10, DG - CEDAR LANE ENTERPRISES - 0027 | $17.0000 | $0.00 | $18.00 | 1,000 | $13,093.40 |
| **ATHM** | Autohome | | Profit Total -> | **$13,160.00** | | **$0.00** | **$18.00** | **1,000** | **$13,093.40** |
| **CYTR** | CYTRX CORP | | 12/11/2013 | $3,994.00 | | | 2,500 | $3,949.03 |
| **Type** | **Qty** | **Broker** | **Trade Date** | **Account** | **Price** | **Commission** | **Ticket Chg** | |
| Buy | 25,000 | BANK OF AMERICA | 10/10/2013 | TRADER 10, DG - CEDAR LANE ENTERPRISES - 0025 | $2.2624 | $0.00 | $1.80 | 2,500 | $3,949.03 |
| **CYTR** | CYTRX CORP | | Profit Total -> | **$3,994.00** | | **$0.00** | **$1.80** | **2,500** | **$3,949.03** |
| **SALE** | RetailMeNot | | 12/12/2013 | $677.00 | | | 1,000 | |
| **Type** | **Qty** | **Broker** | **Trade Date** | **Account** | **Price** | **Commission** | **Ticket Chg** | |
| Buy | 1,000 | GOLDMAN SACHS | 12/12/2013 | TRADER 10, DG - CEDAR LANE ENTERPRISES - 0027 | $26.0000 | $0.00 | $18.00 | 1,000 | $620.53 |
| **SALE** | RetailMeNot | | Profit Total -> | **$677.00** | | **$0.00** | **$18.00** | **1,000** | **$620.53** |

# Profit Details Report
## Cedar Lane Enterprises
### Interest Included

From Date: **12/1/2013**

To Date: **12/31/2013**

Trader: **TRADER 10, DG**

Group:

| Cusip/Symbol | Security Description | Trade Pool | Profit Date | Gross Profit | Allocated Shares | Net Profit |
|---|---|---|---|---|---|---|
| SYN | SYNTHETIC BIOLOGICS INC | | | $315.90 | 6,318 | $234.23 |

| Type | Qty | Broker | Trade Date | Account | Price | Commission | Ticket Chg | Allocated Shares | Net Profit |
|---|---|---|---|---|---|---|---|---|---|
| Buy | 300,000 | AEGIS CAPITAL | 12/12/2013 | TRADER 10, DG - CEDAR LANE ENTERPRISES - 0003 | $1.0000 | $0.00 | $0.38 | 6,318 | $234.23 |

| SYN | SYNTHETIC BIOLOGICS INC | | Profit Total -> | $315.90 | | $0.00 | $0.38 | 6,318 | $234.23 |
|---|---|---|---|---|---|---|---|---|---|

| TLOG | TETRALOGIC PHARMACEUTICALS | | 12/12/2013 | $45.00 | 1,000 | | | | ($11.13) |

| Type | Qty | Broker | Trade Date | Account | Price | Commission | Ticket Chg | | |
|---|---|---|---|---|---|---|---|---|---|
| Buy | 1,000 | GUGGENHEIM | 12/12/2013 | TRADER 10, DG - CEDAR LANE ENTERPRISES - 0034 | $7.0000 | $0.00 | $18.00 | 1,000 | ($11.13) |

| TLOG | TETRALOGIC PHARMACEUTICALS | | Profit Total -> | $45.00 | | $0.00 | $18.00 | 1,000 | ($11.13) |
|---|---|---|---|---|---|---|---|---|---|

| ADMP | ADAMIS PHARMACEUTICALS CORPORATION | | 12/13/2013 | $7,440.00 | 60,000 | | | | $6,801.21 |

| Type | Qty | Broker | Trade Date | Account | Price | Commission | Ticket Chg | | |
|---|---|---|---|---|---|---|---|---|---|
| Buy | 75,000 | NEWPORT COAST SECURITIES | 12/12/2013 | TRADER 10, DG - CEDAR LANE ENTERPRISES - 0030 | $5.9500 | $0.00 | $14.40 | 60,000 | $6,801.21 |

| ADMP | ADAMIS PHARMACEUTICALS CORPORATION | | Profit Total -> | $7,440.00 | | $0.00 | $14.40 | 60,000 | $6,801.21 |
|---|---|---|---|---|---|---|---|---|---|

3 of 7

1/6/2014 12:37:01 PM

# Profit Details Report
## Cedar Lane Enterprises
### Interest Included

From Date: **12/1/2013**

To Date: **12/31/2013**

Trader: **TRADER 10, DG**

Group:

| Cusip/Symbol | Security Description | | Trade Pool | Profit Date | Gross Profit | Allocated Shares | Net Profit |
|---|---|---|---|---|---|---|---|
| **ADMP** | ADAMIS PHARMACEUTICALS CORPORATION | | | 12/13/2013 | **$3,750.00** | **15,000** | **$3,576.73** |

| Type | Qty | Broker | Trade Date | Account | | Price | Commission | Ticket Chg | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Buy | 75,000 | NEWPORT COAST SECURITIES | 12/12/2013 | TRADER 10, DG - CEDAR LANE ENTERPRISES - 0030 | | $5.9500 | $0.00 | $3.60 | 15,000 | $3,576.73 |

| | ADAMIS PHARMACEUTICALS CORPORATION | | | Profit Total -> | **$3,750.00** | **$0.00** | **$3.60** | **15,000** | **$3,576.73** |
|---|---|---|---|---|---|---|---|---|---|

| **ORMP** | ORAMED PHARMACEUTICALS INC | | | 12/13/2013 | **$126.00** | **2,400** | **$41.68** |
|---|---|---|---|---|---|---|---|

| Type | Qty | Broker | Trade Date | Account | | Price | Commission | Ticket Chg | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Buy | 2,400 | PRECISION | 12/13/2013 | TRADER 10, DG - CEDAR LANE ENTERPRISES - 0002 | | $7.5813 | $24.00 | $18.00 | 2,400 | $41.68 |

| | ORAMED PHARMACEUTICALS INC | | | Profit Total -> | **$126.00** | **$24.00** | **$18.00** | **2,400** | **$41.68** |
|---|---|---|---|---|---|---|---|---|---|

| **SYN** | SYNTHETIC BIOLOGICS INC | | | 12/13/2013 | **$883.74** | **61,800** | **$242.93** |
|---|---|---|---|---|---|---|---|

| Type | Qty | Broker | Trade Date | Account | | Price | Commission | Ticket Chg | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Buy | 300,000 | AEGIS CAPITAL | 12/12/2013 | TRADER 10, DG - CEDAR LANE ENTERPRISES - 0003 | | $1.0000 | $0.00 | $3.71 | 61,800 | $242.93 |

| | SYNTHETIC BIOLOGICS INC | | | Profit Total -> | **$883.74** | **$0.00** | **$3.71** | **61,800** | **$242.93** |
|---|---|---|---|---|---|---|---|---|---|

1/6/2014 12:37:01 PM

**From Date: 12/1/2013**

# Profit Details Report
## Cedar Lane Enterprises
### Interest Included

**To Date: 12/31/2013**

**Trader: TRADER 10, DG**

Group:

| Cusip/Symbol | Security Description | Trade Pool | Profit Date | Gross Profit | Allocated Shares | Net Profit |
|---|---|---|---|---|---|---|
| NMBL | Nimble Storage | | | | | |
| | | | | | 1,000 | |

| Type | Qty Broker | | Trade Date | Account | Price | Commission | Ticket Chg | | |
|---|---|---|---|---|---|---|---|---|---|
| Buy | 1,000 GOLDMAN SACHS | | 12/13/2013 | TRADER 10, DG - CEDAR LANE ENTERPRISES - 0027 | $21.0000 | $0.00 | $18.00 | 1,000 | $10,043.85 |

| | | | Profit Date | Gross Profit | | Allocated Shares | Net Profit |
|---|---|---|---|---|---|---|---|
| NMBL | Nimble Storage | Profit Total -> | 12/16/2013 | $10,100.00 | | 1,000 | $10,043.85 |
| SPHS | Sophiris Bio | | 12/16/2013 | ($1,310.00) | | 1,000 | |

| Type | Qty Broker | | Trade Date | Account | Price | Commission | Ticket Chg | | |
|---|---|---|---|---|---|---|---|---|---|
| Buy | 40,000 LEERINK SWANN | | 8/16/2013 | TRADER 10, DG - CEDAR LANE ENTERPRISES - 0005 | $5.0000 | $0.00 | $0.45 | 1,000 | ($1,348.52) |

| | | | | Gross Profit | | Allocated Shares | Net Profit |
|---|---|---|---|---|---|---|---|
| SPHS | Sophiris Bio | Profit Total -> | | ($1,310.00) | | 1,000 | ($1,348.52) |
| NBS | NEOSTEM INC COM | NEW | 12/18/2013 | ($19,860.00) | | 20,000 | |

| Type | Qty Broker | | Trade Date | Account | Price | Commission | Ticket Chg | | |
|---|---|---|---|---|---|---|---|---|---|
| Buy | 20,000 ROTH CAPITAL | | 10/10/2013 | TRADER 10, DG - CEDAR LANE ENTERPRISES - 0006 | $7.0052 | $1,000.00 | $18.00 | 20,000 | ($21,098.10) |

| | | | | Gross Profit | | Allocated Shares | Net Profit |
|---|---|---|---|---|---|---|---|
| NBS | NEOSTEM INC COM | NEW | Profit Total -> | ($19,860.00) | | 20,000 | ($21,098.10) |

**From Date: 12/1/2013**

**To Date: 12/31/2013**

**Trader: TRADER 10, DG**

# Profit Details Report
## Cedar Lane Enterprises
### Interest Included

**Group:**

| Cusip/Symbol | Security Description | Trade Pool | Profit Date | Gross Profit | Allocated Shares | Net Profit |
|---|---|---|---|---|---|---|
| SPHS | Sophiris Bio | | 12/18/2013 | ($21,160.44) | 16,200 | |

| Type | Qty | Broker | | Trade Date | Account | | Price | Commission | Ticket Chg | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Buy | 40,000 | LEERINK SWANN | | 8/16/2013 | TRADER 10, DG - CEDAR LANE ENTERPRISES - 0005 | | $5.0000 | $0.00 | $7.29 | 16,200 | ($21,348.78) |

| | | | | | Profit Total -> | | ($21,160.44) | $0.00 | $7.29 | 16,200 | ($21,348.78) |

| SGMO | SANGAMO BIOSCIENCES INC | | 12/24/2013 | $8,389.50 | 35,000 | |

| Type | Qty | Broker | | Trade Date | Account | | Price | Commission | Ticket Chg | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Buy | 40,000 | DUPASQUIER | | 12/20/2013 | TRADER 10, DG - CEDAR LANE ENTERPRISES - 0001 | | $13.6735 | $350.00 | $15.75 | 35,000 | $7,647.27 |

| | | | | | Profit Total -> | | $8,389.50 | $350.00 | $15.75 | 35,000 | $7,647.27 |

| SYN | SYNTHETIC BIOLOGICS INC | | 12/24/2013 | $15,622.18 | 31,882 | |

| Type | Qty | Broker | | Trade Date | Account | | Price | Commission | Ticket Chg | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Buy | 300,000 | AEGIS CAPITAL | | 12/12/2013 | TRADER 10, DG - CEDAR LANE ENTERPRISES - 0003 | | $1.0000 | $0.00 | $1.91 | 31,882 | $15,282.63 |

| | | | | | Profit Total -> | | $15,622.18 | $0.00 | $1.91 | 31,882 | $15,282.63 |

# Profit Details Report
## Cedar Lane Enterprises
### Interest Included

From Date: 12/1/2013

To Date: 12/31/2013

Trader: TRADER 10, DG

Group:

| Cusip/Symbol | Security Description | Trade Pool | Allocated Shares | Net Profit |
|---|---|---|---|---|
| SGMO | SANGAMO BIOSCIENCES INC | | 6,000 | |

| Type | Qty | Broker | Trade Date | Account | Profit Date | Gross Profit | Price | Commission | Ticket Chg | Allocated Shares | Net Profit |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Buy | 10,000 | DUPASQUIER | 12/19/2013 | TRADER 10, DG - CEDAR LANE ENTERPRISES - 0001 | 12/26/2013 | | $12.7538 | $10.00 | $1.80 | 1,000 | $1,319.52 |
| Buy | 40,000 | DUPASQUIER | 12/20/2013 | TRADER 10, DG - CEDAR LANE ENTERPRISES - 0001 | | | $13.6735 | $50.00 | $2.25 | 5,000 | $2,006.02 |
| | | | | Profit Total -> | | $3,469.10 | | $60.00 | $4.05 | 6,000 | $3,325.57 |

SGMO    SANGAMO BIOSCIENCES INC    $3,469.10

Grand Total ->    $18,890.38    $3,434.00    $11,978.58

1/6/2014 12:37:02 PM

From Date: 1/1/2014     **Trader Profit Summary Report**     To Date: 1/31/201·

**Cedar Lane Enterprises**

Interest Included

Business:

Group:

| Type | Cusip/Symbol | Quantity | Date | Account | Price | Total Commission | Ticket Chg | Offset Price | Security Description | Gross Profit | Allocated Shares | Net Profit |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | **TRADER 10, DG** | | | | | | | | |
| Firm | DUPASQUIER | | | Account | CEDAR LANE ENTERPRISES - 0001 | | | | | | | |
| Buy | SGMO | 10,000 | 12/19/2013 | | $12.7538 | $182.11 | $20.96 | $13.4532 | Sangamo BioSciences $6,294.60 | | 9,000 | $6,091.53 |
| Firm | AEGIS CAPITAL | | | Account | CEDAR LANE ENTERPRISES - 0003 | | | | | | | |
| Buy | SRNE | 100,000 | 10/25/2013 | | $7.2500 | $202.83 | $21.60 | $8.1270 | Sorrento Therapeutics Inc. $17,540.00 | | 20,000 | $17,315.57 |
| Firm | DUPASQUIER | | | Account | CEDAR LANE ENTERPRISES - 0001 | | | | | | | |
| Buy | SGMO | 10,000 | 12/18/2013 | | $12.4960 | $202.34 | $23.29 | $13.4532 | Sangamo BioSciences $9,572.00 | | 10,000 | $9,346.34 |
| Firm | DUPASQUIER | | | Account | CEDAR LANE ENTERPRISES - 0001 | | | | | | | |
| Buy | SGMO | 10,000 | 12/17/2013 | | $12.5362 | $202.34 | $23.29 | $13.4532 | Sangamo BioSciences $9,170.00 | | 10,000 | $8,944.36 |
| Firm | DUPASQUIER | | | Account | CEDAR LANE ENTERPRISES - 0001 | | | | | | | |
| Buy | SGMO | 5,000 | 12/16/2013 | | $12.3891 | $101.17 | $20.65 | $13.4532 | Sangamo BioSciences $5,320.50 | | 5,000 | $5,198.6 |
| Firm | DUPASQUIER | | | Account | CEDAR LANE ENTERPRISES - 0001 | | | | | | | |
| Buy | SGMO | 34,000 | 1/8/2014 | | $13.4776. | $507.04 | $31.24 | $16.1741 | Sangamo BioSciences $67,412.50 | | 25,000 | $66,874.22 |
| Firm | JEFFERIES | | | Account | CEDAR LANE ENTERPRISES - 0023 | | | | | | | |
| Buy | GLYC | 1,000 | 1/10/2014 | | $8.0000 | $30.17 | $36.00 | $9.6932 | GlycoMimetics $1,693.20 | | 1,000 | $1,627.0 |
| Firm | PRECISION | | | Account | CEDAR LANE ENTERPRISES - 0002 | | | | | | | |
| Buy | GLYC | 1,000 | 1/10/2014 | | $9.3000 | $40.16 | $36.00 | $9.1455 | GlycoMimetics ($154.50) | | 1,000 | ($230.66) |
| Firm | DUPASQUIER | | | Account | CEDAR LANE ENTERPRISES - 0001 | | | | | | | |
| Buy | SGMO | 34,000 | 1/8/2014 | | $13.4776 | $182.86 | $22.76 | $18.2234 | Sangamo BioSciences $42,712.20 | | 9,000 — | $42,506.58 |

pvs

# 1 of 4

11/20/2014 10:14:24 AM

# Trader Profit Summary Report
## Cedar Lane Enterprises
### Interest Included

From Date: 1/1/2014                                      To Date: 1/31/2014

Group:

Business:

### TRADER 10, DG

| Type | Cusip/Symbol | Quantity | Date | Price | Total Commission | Ticket Chg | Offset Price | Gross Profit | Allocated Shares | Net Profit |
|---|---|---|---|---|---|---|---|---|---|---|
| **Firm** | Montecito | | **Account** | CEDAR LANE ENTERPRISES - 298-70601 | | | **Security Description** | SGMO 2/22/14 | | |
| **Buy** | **SGMOOPTB** (Roth Capital) | 25,000 | 1/7/2014 *Paid in Dec ?* | $3.8100 | $3.83 | $0.00 | $8.7950 | $124,625.00 | 25,000 | $124,621.17 |
| **Firm** | | | **Account** | CEDAR LANE ENTERPRISES - 0006 | | | **Security Description** | Rexahn Pharmaceuticals Inc | | |
| **Buy** | **RNN** | 250,000 | 1/15/2014 | $1.0500 | $1,254.86 | $35.31 | $1.1157 | $16,425.00 | 250,000 | $15,134.84 |
| **Firm** | PRECISION | | **Account** | CEDAR LANE ENTERPRISES - 0002 | | | **Security Description** | Rexahn Pharmaceuticals Inc | | |
| **Buy** | **RNN** | 40,000 | 1/16/2014 | $1.1150 | $400.70 | $36.00 | $1.0020 | ($4,520.00) | 40,000 | ($4,956.70) |
| **Firm** | PIPER JAFFRAY | | **Account** | CEDAR LANE ENTERPRISES - 0021 | | | **Security Description** | Derma Sciences | | |
| **Buy** | **DSCI** | 5,000 | 1/24/2014 | $11.5000 | $51.04 | $36.00 | $11.8550 | $1,775.00 | 5,000 | $1,687.96 |
| **Firm** | AEGIS CAPITAL | | **Account** | CEDAR LANE ENTERPRISES - 0003 | | | **Security Description** | KIPS BAY MEDICAL INC | | |
| **Buy** | **KIPS** | 150,000 | 1/24/2014 | $0.7000 | $151.89 | $36.00 | $0.7232 | $3,480.00 | 150,000 | $3,292.11 |
| **Firm** | AEGIS CAPITAL | | **Account** | CEDAR LANE ENTERPRISES - 0003 | | | **Security Description** | SYNTHETIC BIOLOGICS INC | | |
| **Buy** | **SYN** | 300,000 | 12/12/2013 | $1.0000 | $201.91 | $21.90 | $1.6803 | $44,219.50 | 65,000 | $43,995.69 |
| **Firm** | PRECISION | | **Account** | CEDAR LANE ENTERPRISES - 0002 | | | **Security Description** | Amarantus BioScience, Inc. | | |
| **Buy** | **AMBS** | 70,500 | 1/29/2014 | $0.1268 | $100.15 | $36.00 | $0.1176 | ($648.60) | 70,500 | ($784.75) |
| **Firm** | JEFFERIES | | **Account** | CEDAR LANE ENTERPRISES - 0023 | | | **Security Description** | CYTRX CORP | | |
| **Buy** | **CYTR** | 150,000 | 1/31/2014 | $6.5000 | $15.86 | $33.60 | $7.0061 | $65,793.00 | 130,000 | $65,743.54 |
| **Firm** | AEGIS CAPITAL | | **Account** | CEDAR LANE ENTERPRISES - 0003 | | | **Security Description** | SYNTHETIC BIOLOGICS INC | | |
| **Buy** | **SYN** | 300,000 | 12/12/2013 | $1.0000 | $351.24 | $20.10 | $2.0200 | $35,700.00 | 35,000 | $35,328.66 |

11/20/2014 10:14:24 AM

**Press Release**

# Theranos, CEO Holmes, and Former President Balwani Charged With Massive Fraud

## Holmes Stripped of Control of Company for Defrauding Investors

**FOR IMMEDIATE RELEASE**
**2018-41**

*Washington D.C., March 14, 2018* — The Securities and Exchange Commission today charged Silicon Valley-based private company Theranos Inc., its founder and CEO Elizabeth Holmes, and its former President Ramesh "Sunny" Balwani with raising more than $700 million from investors through an elaborate, years-long fraud in which they exaggerated or made false statements about the company's technology, business, and financial performance. Theranos and Holmes have agreed to resolve the charges against them. Importantly, in addition to a penalty, Holmes has agreed to give up majority voting control over the company, as well as to a reduction of her equity which, combined with shares she previously returned, materially reduces her equity stake.

The complaints allege that Theranos, Holmes, and Balwani made numerous false and misleading statements in investor presentations, product demonstrations, and media articles by which they deceived investors into believing that its key product – a portable blood analyzer – could conduct comprehensive blood tests from finger drops of blood, revolutionizing the blood testing industry. In truth, according to the SEC's complaint, Theranos' proprietary analyzer could complete only a small number of tests, and the company conducted the vast majority of patient tests on modified and industry-standard commercial analyzers manufactured by others.

The complaints further charge that Theranos, Holmes, and Balwani claimed that Theranos' products were deployed by the U.S. Department of Defense on the battlefield in Afghanistan and on medevac helicopters and that the company would generate more than $100 million in revenue in 2014. In truth, Theranos' technology was never deployed by the U.S. Department of Defense and generated a little more than $100,000 in revenue from operations in 2014.

"Investors are entitled to nothing less than complete truth and candor from companies and their executives," said Steven Peikin, Co-Director of the SEC's Enforcement Division. "The charges against Theranos, Holmes, and Balwani make clear that there is no exemption from the anti-fraud provisions of the federal securities laws simply because a company is non-public, development-stage, or the subject of exuberant media attention."

"As a result of Holmes' alleged fraudulent conduct, she is being stripped of control of the company she founded, is returning millions of shares to Theranos, and is barred from serving as an officer or director of a public company for 10 years," said Stephanie Avakian, Co-Director of the SEC's Enforcement Division. "This package of remedies exemplifies our efforts to impose tailored and meaningful sanctions that directly address the unlawful behavior charged and best remedies the harm done to shareholders."

"The Theranos story is an important lesson for Silicon Valley," said Jina Choi, Director of the SEC's San Francisco Regional Office. "Innovators who seek to revolutionize and disrupt an industry must tell investors the truth about what their technology can do today, not just what they hope it might do someday."

Theranos and Holmes have agreed to settle the fraud charges levied against them. Holmes agreed to pay a $500,000 penalty, be barred from serving as an officer or director of a public company for 10 years, return the remaining 18.9 million shares that she obtained during the fraud, and relinquish her voting control of Theranos by converting her super-majority Theranos Class B Common shares to Class A Common shares. Due to the company's liquidation preference, if Theranos is acquired or is otherwise liquidated, Holmes would not profit from her ownership until – assuming redemption of certain warrants – over $750 million is returned to defrauded investors and other preferred shareholders. The settlements with Theranos and Holmes are subject to court approval. Theranos and Holmes neither admitted nor denied the allegations in the SEC's complaint. The SEC will litigate its claims against Balwani in federal district court in the Northern District of California.

The SEC's investigation was conducted by Jessica Chan, Rahul Kolhatkar, and Michael Foley and supervised by Monique Winkler and Erin Schneider in the San Francisco Regional Office. The SEC's litigation will be led by Jason Habermeyer and Marc Katz of the San Francisco office.

###

# Related Materials

- SEC Complaint - Theranos and Holmes
- SEC Complaint - Balwani

**Press Release**

# SEC Charges Biotech Company and Executives With Accounting Fraud

**FOR IMMEDIATE RELEASE**
**2019-243**

*Washington D.C., Nov. 26, 2019* — The Securities and Exchange Commission today charged Georgia-based biotech company MiMedx Group Inc. and three former top executives with defrauding investors by misstating the company's revenue and attempting to cover up their misconduct. MiMedx has agreed to a settlement to resolve the claims.

The SEC alleges that from 2013 to 2017, MiMedx prematurely recognized revenue from sales to MiMedx's distributors and exaggerated MiMedx's revenue growth. According to the SEC's complaint, MiMedx improperly recognized revenue because its former CEO Parker H. "Pete" Petit and former COO William C. Taylor entered into undisclosed side arrangements with five distributors. These side arrangements allowed distributors to return product to MiMedx or conditioned distributors' payment obligations on sales to end users. Petit, Taylor, and former CFO Michael J. Senken allegedly covered up their scheme for years, even after MiMedx's former controller raised concerns about MiMedx's accounting for specific distributor transactions. The SEC also alleges that Petit, Taylor, and Senken all misled MiMedx's outside auditors, members of MiMedx's Audit Committee, and outside lawyers who inquired about these transactions.

"As alleged in our complaint, MiMedx's former executives misled investors about the growth of MiMedx's revenues and then repeatedly concealed their fraud," said Kurt Gottschall, Director of the SEC's Denver Regional Office. "This action reflects our commitment to holding issuers and their senior officers accountable for failing to provide accurate financial statements to the investing public, while the settlement with MiMedx gives appropriate credit for the company's later remediation and cooperation."

The SEC's complaint, filed today in the Southern District of New York, charges all defendants with violating the antifraud, reporting, books and records, and internal control provisions of the federal securities laws. The SEC also charged Petit, Taylor, and Senken with lying to MiMedx's outside auditors. Without admitting or denying the allegations, MiMedx has agreed to a settlement and to pay a $1.5 million penalty. The settlement is subject to court approval. The complaint seeks permanent injunctions, disgorgement plus interest, penalties, and officer-and-director bars against Petit, Taylor and Senken, and clawback of bonuses and other incentive-related compensation paid to Petit and Senken during the alleged fraud.

The SEC's investigation was conducted by Kevin Comeau, Ty Cottrill, and Anne Romero with assistance from Judy Bizu of the Denver office. The case was supervised by Laura Metcalfe. The litigation will be led by Steve McKenna and Mark Williams and supervised by Gregory Kasper. The SEC appreciates the cooperation of the U.S. Attorney's Office for the Southern District of New York.

###

# Related Materials

- SEC Complaint

# FierceBiotech

ech

## charges ex-MiMedx execs with defrauding investors

Paul Taylor | Nov 27, 2019 7:50am



*The Securities and Exchange Commission building (Scott S/Flickr)*

The U.S. Securities and Exchange Commission (SEC) has charged three former MiMedx executives with defrauding investors. Ex-CEO Pete Petit and his former colleagues stand accused of entering into undisclosed side arrangements with distributors that misled investors about revenue growth.

According (PDF) to the SEC, MiMedx exaggerated sales growth from 2013 to 2017 by "misstating millions of dollars of revenue in its financial statements." The SEC accusation rests on the belief that Petit and former Chief Operating Officer William Taylor, with the knowledge of ex-Chief Financial Officer Michael Senken, had a secret arrangement that allowed its largest distributor to only pay MiMedx when it resold the products.

MiMedx subsequently entered into arrangements with four more distributors. The SEC claims the concealment of these arrangements led MiMedx to improperly recognize revenue amounting to up to 14% of its reported sales each quarter.

In February 2018, MiMedx began "an internal investigation into current and prior-period matters relating to allegations regarding certain sales and distribution practices." The notice to disclose the investigation was the first of a series of statements in 2018 that the SEC calculates wiped out more than $1 billion in shareholder value and led to the departures of Petit, Taylor and Senken.



# FierceBiotech

"The primary issues appear to relate to business negotiations with some distributors in mid-2015. However, those communications have now been [ ] into alleged 'side deals,' which is not accurate. Under my leadership, the company collected virtually all the approximately $1 billion in booked [ ]es. Our accounts receivable aging remained within industry standards, and we also adequately reserved for sales returns and bad debts," Petit

it sees it, the investigation into him stemmed from "false allegations by short-sellers" and was overseen by an "inexperienced Board made self-[ ] decisions with poor business judgment."

EC disclosed the complaint against Petit and his former colleagues alongside news that MiMedx has agreed to pay a $1.5 million penalty to settle [ ] admitting or denying allegations against it. MiMedx chair Kathleen Behrens called the settlement "another step toward the Company's [ ]tment to resolve past issues and move forward without distraction" in a statement.

**More On**

## Suggested Articles



**MedTech**

### Sanofi trades Seprafilm unit to Baxter for $350M in cash

by Conor Hale
Dec 2, 2019 11:05am



**Biotech**

### Kodiak bags $225M in exchange for $1B-plus in future royalties

by Amirah Al Idrus
Dec 2, 2019 10:40am



**CRO**

### From short-lived LabCorp diagnostics lead, Ratliff lands at AMRI

by Ben Adams
Dec 2, 2019 9:40am

# FierceBiotech

GET THE NEWSLETTER

Subscribe to FierceBiotech to get industry news and updates delivered to your inbox.

Email

SIGN UP

I acknowledge that I may receive emails from FierceBiotech and on behalf of their trusted partners.



# FierceBiotech

**About the Author**



Nick Paul Taylor
*Contributing Writer*



# FierceBiotech

© 2019 Questex LLC. All rights reserved. 3 Speen Street, Suite 300, Framingham, MA 01701

Reproduction in whole or part is prohibited.

12/2/2019     SEC Charges Nissan, Former CEO, and Former Director with Fraudulently Concealing from Investors More than $140 Million …

Case 1:18-cv-07885-ALC   Document 51   Filed 12/06/19   Page 104 of 111

**Press Release**

# SEC Charges Nissan, Former CEO, and Former Director with Fraudulently Concealing from Investors More than $140 Million of Compensation and Retirement Benefits

**FOR IMMEDIATE RELEASE**
**2019-183**

*Washington D.C., Sept. 23, 2019* — The Securities and Exchange Commission today filed settled fraud charges against Nissan, its former CEO Carlos Ghosn, and its former director Greg Kelly related to false financial disclosures that omitted more than $140 million to be paid to Ghosn in retirement.

According to the SEC's orders and complaint, beginning in 2004 Nissan's board delegated to Ghosn the authority to set individual director and executive compensation levels, including his own. From 2009 until his arrest in Tokyo in November 2018, Ghosn, with substantial assistance from Kelly and subordinates at Nissan, engaged in a scheme to conceal more than $90 million of compensation from public disclosure, while also taking steps to increase Ghosn's retirement allowance by more than $50 million. Each year, Ghosn fixed a total amount of compensation for himself, with a certain amount paid and disclosed and an additional amount that was unpaid and undisclosed. Ghosn and his subordinates, including Kelly, crafted various ways to structure payment of the undisclosed compensation after Ghosn's retirement, such as entering into secret contracts, backdating letters to grant Ghosn interests in Nissan's Long Term Incentive Plan, and changing the calculation of Ghosn's pension allowance to provide more than $50 million in additional benefits. Kelly and Ghosn's Nissan subordinates misled Nissan's CFO and Nissan issued a misleading disclosure in connection with the increased pension allowance. The $140 million in undisclosed compensation and retirement benefits was never paid out to Ghosn.

"Investors are entitled to know how, and how much, a company compensates its top executives. Ghosn and Kelly went to great lengths to conceal this information from investors and the market," said Stephanie Avakian, Co-Director of the SEC's Division of Enforcement.

"Simply put, Nissan's disclosures about Ghosn's compensation were false," said Steven Peikin, Co-Director of the SEC's Division of Enforcement. "Through these disclosures, Nissan advanced Ghosn and Kelly's deceptions and misled investors, including U.S. investors."

In an administrative proceeding, the Commission charged Nissan with violating the anti-fraud provisions of the Securities Exchange Act of 1934. Nissan settled the charges, agreeing to pay a $15 million civil penalty and to cease and desist from committing or causing violations of the anti-fraud provisions. The SEC's complaint filed in district court charges Ghosn with violating anti-fraud provisions of the securities laws and Kelly with aiding and abetting Ghosn's and Nissan's violations. To settle the charges, Ghosn and Kelly agreed to be permanently enjoined from violating or aiding and abetting violations of the anti-fraud provisions. Ghosn also agreed to a $1 million civil penalty and a 10-year officer and director bar. Kelly agreed to a $100,000 penalty, a five-year officer and director bar and a five-year suspension from practicing or appearing before the Commission as an attorney. Nissan, Ghosn, and Kelly settled without admitting or denying the SEC's allegations and findings.

Case 1:18-cv-07885-ALC Document 51 Filed 12/06/19 Page 105 of 111

The SEC investigation was conducted by Brad Ney and Christian Schultz, with assistance from Jamie Wohlert, Richard Haynes and Sandhya Harris. The case was supervised by Tim England and Melissa Hodgman. The SEC would like to thank the Tokyo District Public Prosecutors Office for its assistance in connection with this investigation.

### 

# Related Materials

- SEC Order - Nissan
- SEC Complaint - Ghosn and Kelly

 Gmail

🔍 smikhail@askbio.com

Compose

**Inbox** 100,453

Snoozed

Important

Sent

**Drafts** 675

Categories

**Social** 3,125

**Updates** 62,676

**Forums** 149

**Promotions** 108,815

[Gmail]Spam

[!map]/Drafts

Notes

Personal

Sent Messages

Travel

More

Sheila Mikhail
Founder & CEO
Asklepios Biopharmaceutical, Inc.
870 Martin Luther King Jr. Blvd
Chapel Hill, NC 27514
Cell: 919.622-3600
www.askbio.com

**Dhesh Govender** <dhesh.healthcare@gmail.com>
to Sheila, Tim

I just forwarded the email my attorney sent to Tim on 8/2/18 re terms
Please let me know you have received it.

Thanks.

**Sheila Mikhail** <SMikhail@askbio.com>
to me, Tim

Got it. Thx

[ Great, thanks! ]   [ Thank you! ]   [ Great! ]

Dhesh_updates - dhesh.healthcare@gmail.com - Gmail

12/2/19, 6:54 PM

 Gmail

🔍 smikhail@askbio.com

Compose

| Inbox | 100,453 |
|---|---|
| Snoozed | |
| Important | |
| Sent | |
| **Drafts** | 675 |
| Categories | |
| **Social** | 3,125 |
| **Updates** | 62,676 |
| **Forums** | 149 |
| **Promotions** | 108,815 |
| [Gmail]Spam | |
| [Imap]/Drafts | |
| Notes | |
| Personal | |
| Sent Messages | |
| Travel | |
| More | |

# Dhesh_updates    Inbox ✕

**Dhesh Govender** <dhesh.healthcare@gmail.com>
to Jude, Sheila

Sheila and Jude.

I was trying to schedule a call this afternoon to discuss a personal m
and does not effect our relationship and agreement.
As a courtesy  and respect, I wanted to give you and Jude a heads ι

I think Lisa has us scheduled for this evening after 6pm ET.

Thank you.

**Jude Samulski** <rjslab@gmail.com>
to me, Sheila

Dhesh
Thanks for the email.
I hope everything is OK
With respect to a call, I think Sheila is off the grid with General Coun
Best
Jude

...

[Message clipped]  View entire message

Dhesh_consulting_propos... for di... - dhesh.healthcare@gmail.com - Gmail

  Gmail

Q  smikhail@askbio.com

Compose

Inbox                 100,453

Snoozed

Important

Sent

Drafts                    675

Categories

  Social                3,125

  Updates              62,676

  Forums                  149

  Promotions        108,815

[Gmail]Spam

[Imap]/Drafts

Notes

Personal

Sent Messages

Travel

More

## Dhesh_consulting_proposal_draft_for di

**Dhesh Govender** <dhesh.healthcare@gmail.com>
to Sheila, Jrslab

Sheila,

My employment attorney is working on the contract.
In meantime, I am proposing the following and we can incorporate in
For reference, I have also attached is the partial 2014 Bioworld Biopl
is currently a FT employee at $32,100/month ($385k/year), plus heal
performance bonus of $100k in cash and or equity.

Proposal:

- Consulting agreement that converts into full time employme
  any liquidity event, financing, M&A or strategic deal, IPO.

rate: $35,500/month
equity: 0.55% of SPE equity vesting each tranche quarterly with true
would be calculated on a pro forma basis on any share conversion o
bonus: 2.5% of either cash and or equity for any capital raised for an
guarantee: minimum 18.5% of base bonus payable in cash and or eq
title: Chief Business & Strategic Officer or Chief Financial & Strategic

As a consultant, Dhesh will pay for health insurance and all related f
All business related expenses to be paid by AskBio, including acces

**i.HUG**
Help Uganda Grow

Holiday 2019

Dear i.HUG Sponsors,
Seasons greetings! Thank you for all you do to help a child in need – we hope you enjoy the enclosed, with love, from Uganda.

We currently have 88 children in our sponsorship program, a considerable accomplishment given that sponsorship does so much to improve a child's life. Established in 2006, i.HUG initially focused on sending and ensuring children could complete primary school. However, the success of our program and students means that nearly half of sponsored children are now in secondary school—an unbelievable feat when only 1 in 4 children in Uganda who start primary school make it to secondary school and less than a quarter of all adolescents are enrolled in secondary school. This progress is even more impressive given the difficult circumstances in which they live.

Helping young people attend secondary school and connecting them to careers, through post-secondary and vocational education, is critical to breaking the cycle of poverty. In that regard, today, several of our students are serving as pathfinders.

Take Faridah -- the first child who entered i.HUG's program 13 years ago. This semester, she graduated from university with a degree in accounting. Faridah managed to achieve this feat while tackling incredible challenges, including extreme poverty, illness and the birth of her son which interrupted her studies. In 2020, two additional students, academically among the top 10% of all students in the country, are poised to enter university to study engineering. Eight students are currently pursuing post-secondary studies in areas such as nursing and tourism.

This success brings a new challenge of funding, given that vocational and post-secondary costs are more than primary school. We have subsidized costs with general funding to date; but with more students standing to benefit, we must appeal for help.

We want to run toward, and not away, from this incredible opportunity for our children. We will be reaching out to sponsors over this holiday season who support children who could especially benefit from additional support, based on their 2020 academic plans. And if you are able to give beyond your annual sponsorship, we would welcome this support, which you can see, goes so far to change lives of vulnerable children.

All the best,
Joanna Breitstein
President

THE INTERNATIONAL HUG FOUNDATION
PO BOX 868 YORKTOWN HEIGHTS, NY 10598
IHUG@IHUGFOUNDATION.ORG
WWW.IHUGFOUNDATION.ORG



To:  Pro Se Intake Office, US District Court, Room 105, 40 Foley Square, New York, NY 10007

From: Deshan S. Govender, 7 Turnberry Lane, Albany, NY 12211.  917-715-4966.

Date: December 2, 2019.


Dear Madam/Sir,


Please find one copy of my response to a motion brief for my existing case.

Since I am not allowed to use the ECF system, please file my response to a motion brief for my

case with Judge Andrew Carter.

For reference: Case No: 1:18-CV-07685.   **Time sensitive.**

Please file at your earliest convenience, or as soon as you receive.


Please call me when you have filed this via ECM and or have any questions whatsoever.

You can reach me at 917-715-4966 or via email at dgovender03@yahoo.com.


Thank you very much for your prompt assistance.

Respectfully,

Deshan Govender

RECEIVED
DEC - 6 2019
PRO SE OFFICE





Express

Reusable

TO REUSE: Cover or mark through any previous shipping in

E3 PCTA

TRK# 7785 4098 4332
0201

ORIGIN ID:DGVA   (917) 715-4966
DHESHA GOVENDER
7 TURNBERRY LN

LOUDONVILLE, NY 12211
UNITED STATES US

TO   PRO SE INTAKE OFFICE
     US DISTRICT COURT
     40 FOLEY SQUARE
     RM 105
(212) 805-0176   P02   REF:
     NEW YORK NY 10007

SHIP DATE: 03D
ACT WGT: 10.L
CAD: 66988332/S

BILL CREDIT CAI

WED – 04 DEC
PRIORITY OVE

NY-U